**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| TRANSMAR COMMODITY GROUP LTD. | Case No.: 16-13625 (JLG) |
| Debtor. | |

**DECLARATION OF ROBERT J. FREZZA**
**IN SUPPORT OF DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

I, Robert J. Frezza, declare, pursuant to section 1746 of title 28 of the United States Code, that:

1.      I am a Managing Director with Deloite CRG ("Deloitte"). I have more than 30 years of experience providing financial advisory services to clients across numerous industries in the United States and Europe.

2.      I have been engaged to serve as Chief Restructuring Officer by Transmar Commodity Group Ltd., the debtor and debtor-in-possession in the above-captioned chapter 11 case (the "Debtor"). The Debtor is a corporation organized under the laws of the State of New York with its principal place of business located at 200 South Street, Fourth Floor, Morristown, NJ 07960. I was engaged by the Debtor as Chief Restructuring Officer shortly before the Debtor's bankruptcy filing. In performing the duties of Chief Restructuring Officer, I have become familiar with the Debtor's business history, its corporate and capital structures, its business operations and financial affairs, and its books and records, as well as the Debtor's recent restructuring efforts.

3.      On the date hereof (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the Southern District of New York (the "<u>Court</u>").

4.      The Debtor intends to operate its business as a debtor-in-possession under Sections 1107 and 1108 of the Bankruptcy Code.

5.      To minimize the adverse effects of filing for chapter 11 protection, while at the same time maximizing value for the benefit of stakeholders, the Debtor has filed or will file a number of pleadings requesting various kinds of "first day" relief (collectively, the "<u>First Day Pleadings</u>") concurrent with or immediately after the filing of this Declaration (the "<u>Declaration</u>"). I am familiar with the content of each First Day Pleading (including the exhibits and other attachments to such motions) and, to the best of my knowledge, after reasonable inquiry, believe the relief sought in each First Day Pleading: (a) is necessary to enable the Debtor to operate in chapter 11 with minimal disruption; (b) is critical to the Debtor's efforts to preserve value and maximize recoveries for its creditors; and (c) best serves the Debtor's estate and creditors' interests. Further, it is my belief that the relief sought in the First Day Pleadings is narrowly tailored and necessary to achieve the goals of this chapter 11 case.

6.      I submit the Declaration in support of the Debtor's voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "<u>Chapter 11 Case</u>") and the First Day Pleadings. Except as otherwise indicated, all statements set forth in this Declaration are based upon: (a) my personal knowledge; (b) information supplied to me by members of the Debtor's management team or the Debtor's professionals; (c) my review of relevant documents, including the Debtor's books and records; or (d) my opinion based upon my experience and knowledge of the Debtor's

operations and financial condition.    If called upon to testify, I could and would testify competently to the facts set forth herein.    I am authorized to submit this Declaration on behalf of the Debtor.

7.        This Declaration consists of four parts.    Part I provides an overview of the Debtor and its affiliates' business history, current operations, organizational and capital structure and prepetition indebtedness.    Part II describes the circumstances leading up to and surrounding the commencement of the Chapter 11 Case.    Part III sets forth relevant facts in support of First Day Pleadings.    Part IV sets forth the information required by Local Rule 1007-2.

## PART I

## BUSINESS AND BACKGROUND

**A.        Overview and Nature of the Business.**

8.        As further set forth below, the Debtor is a wholly-owned subsidiary of a private limited liability company organized under the laws of England and Wales known as Transmar Group Ltd. (together with its subsidiaries and other affiliates, "Transmar Group").

9.        The Debtor operates as a full service cocoa trading and cocoa butter product supplier to the international confectionary industry.    Among other things, the Debtor imports cocoa beans and cocoa products (butter, liquor, cake, and powder) from South America, West Africa, and Southeast Asia (the most important providers being Ghana, Ecuador, Cote d'Ivoire and Brazil), for distribution throughout the United States and Europe.    Through Transmar Group, the Debtor and its various affiliates have storage and processing/melting capabilities in the United States on both the east and west coasts, as well as in South America, Central Europe, West Africa, Russia and Indonesia.

10.        The Debtor has successfully conducted operations in the cocoa industry for over 35 years, and holds a reputation for providing quality products and exceptional service. The

Debtor supplies all major United States and European chocolate producers, including Hershey, Mars, Nestlé, Guittard Chocolate, Ghiarardelli Chocolate, and Barry Callebaut.

**B.**     **Corporate Structure.**

11.     The Debtor, which is a corporation organized under the laws of the State of New York, is a wholly owned subsidiary of Transmar Group.

12.     Transmar Holdings LLC, a Delaware limited liability company, owns 85.135% of Transmar Group, the Debtor's parent, while ITC Cocoa House Ltd., a private limited liability company organized under the laws of England and Wales, owns the other 14.865% of Transmar Group.   ITC Cocoa House Ltd. is a wholly-owned subsidiary of ITOCHU Corporation, a Japanese corporation whose stock is traded on the Tokyo Stock Exchange ("ITOCHU"). Transmar Holdings LLC is a wholly-owned subsidiary of Morristown Group LLC, a Delaware limited liability company.  The Morristown Group is 100% owned by Peter G. Johnson, Mary Johnson, Peter B. Johnson, Timothy B. Johnson and Patricia Johnson Gasek (together, the "Johnson Family").   The Debtor, in turn, has three (3) direct subsidiaries: Morgan Drive Associates, L.L.C., Cocoa Services West, L.L.C. and Cocoa Services, L.L.C.

13.     An organizational chart illustrating the corporate structure of the Debtor and certain related entities and affiliates is annexed hereto as **Exhibit "A."**

**C.**     **Operations.**

14.      Background: Peter G. Johnson is an experienced cocoa trader, who formed the Debtor in April 1980.  Drawing on his experiences and driven by a vision of creating a single source of supply for all cocoa customers, Peter G. Johnson organized and developed the Debtor's and its affiliates' portfolio of services to include every facet of the cocoa supply chain so as to become a vertically-integrated platform for the procurement and delivery of cocoa products to a wide array of cocoa customers.

15.     Although the Debtor's role is primarily that of a traditional merchant engaging in commercial activity (i.e., sales and trading), the Johnson Family has established a vertically-integrated group of companies, ranging from cocoa purchasing and importation, as well as cocoa processing, to support an integrated supply chain for cocoa products.  Two of the Debtor's subsidiaries, Cocoa Services, L.L.C. and Cocoa Services West, L.L.C., provide cocoa product melting (i.e. cocoa butter and liquor) and logistical services for the delivery of these cocoa products in the United States.  Other related entities in the Transmar Group provide international cocoa origination capabilities, as well as cocoa processing capabilities, through affiliated entities that include importation and operating companies known as Transmar Ecuador S.A. ("Transmar Ecuador") and Euromar Commodities GmbH ("Euromar").[1]

16.     Customers.  The Debtor obtains cocoa beans and products and sells them to customers worldwide. Key sources for cocoa are located in Cote d'Ivoire – cocoa beans (approx. 28%); Indonesia – primarily cocoa butter (approx. 15%); Ghana – cocoa beans (approx. 11%); Ecuador – cocoa beans (approx. 12%); China – cocoa butter (approx. 6%); Germany – cocoa butter (approx. 7%); and other countries that are either producers and/or processors.  The Debtor's primary delivery destinations include Germany – cocoa beans and cocoa products (approx. 36%), and United States – cocoa beans and cocoa products (approx. 20%), followed by Malaysia – cocoa beans (approx. 8%).

17.     The Debtor markets its cocoa products throughout the United States, Europe and Asia.  Together with its affiliates, the Debtor has over 350 commercial customers.  Its sales are concentrated and targeted to high quality chocolate manufacturers, including Hershey, Mars, Nestlé, Guittard Chocolate, Ghiarardelli Chocolate, and Barry Callebaut.  Historically, and until

---

[1] Euromar is currently involved in its own insolvency proceeding in Germany.  These insolvency proceedings are discussed in detail infra.

very recently, the Debtor has also sold large quantities of cocoa beans and cocoa products to its affiliate, Euromar, for processing and sales throughout the European Union.

18.    Suppliers.  The Debtor has a diversified group of cocoa bean and cocoa product suppliers, located in Latin America, Africa and Asia.  Historically, the Debtor also has obtained approximately 4% of its raw cocoa product from Transmar Ecuador and, until very recently, approximately 23% of its cocoa products from Euromar.  Recently, the Debtor began increasing its supply of cocoa product from Cote d'Ivoire.

19.    Trading and Hedging:  The cocoa market is notoriously volatile and impacted by weather, geopolitics and economic fluctuations, which create an atmosphere of uncertainty within the cocoa industry.  As a result, in the normal course of its cocoa trading business, the Debtor enters into forward contracts with various counterparties, designed primarily to hedge exposure to commodity risks within certain risk management guidelines.

20.    The Debtor's cocoa inventories are primarily pre-sold or hedged through futures contracts.  Price risk hedging is done with exchange traded futures contracts in cocoa beans, either with the ICE (New York) or LIFEE (London).  To hedge cocoa and cocoa product positions (i.e., butter, liquor, powder, cake), each product is converted into an equivalent amount of cocoa beans.  The Debtor then values its position in these forward contracts on a daily mark-to-market basis ("MtM") with counterparty limits as approved by its lenders.  These activities are vital to the success of the Debtor and its affiliate businesses, and are designed to mitigate the risks that confront the Debtor's operations by allowing the Debtor to create a hedge against price fluctuations and thus protect the economic stability of its operations by preventing substantial declines in cash flow.

21.     The Debtor's cocoa supplies are usually delivered on an FOB/Cash Against Delivery basis, although occasionally a Cost & Freight letter of credit is used for the purchase of cocoa product in Asia.  In the normal course of business, the Debtor utilizes forward contracts with its suppliers to insure a guaranteed flow of cocoa product, which results in the Debtor having to commit to prices up to 12 months forward for its top tier suppliers. In certain countries, including Cote d'Ivoire, the Debtor purchases its cocoa products forward up to 18-24 months, according to a matching industry standard.

22.     The Naranjillo Appeal: In 2012, the Debtor began a negotiation with Cooperativa Agraria Industrial Naranjillo Ltda. ("Naranjillo") to buy Peruvian UTZ-certified cocoa butter, resulting in an agreement in or about August 2012, pursuant to which Naranjillo agreed to sell the Debtor a quantity of Peruvian UTZ-certified cocoa butter, as memorialized in ten one-page contracts.  In October 2015, the Debtor commenced an arbitration with the Cocoa Merchants Association of America ("CMAA") seeking to recover damages for Naranjillo's failure to perform under six of the ten cocoa butter contracts.  Naranjillo failed to appear at the February 4, 2016 arbitration before the CMAA panel in New York.  On February 4, 2016, the CMAA panel found that Naranjillo had defaulted on the cocoa butter contracts and awarded the Debtor damages in the amount of $2,606,626.60.

23.     Naranjillo thereafter filed a petition in the United States District Court for the Southern District of New York ("SDNY") to vacate the award issued by the CMAA (Case No. 16-3356).  In a September 21, 2016 opinion and order, SDNY granted Naranjillo's petition to vacate the arbitration award and denied the Debtor's counterclaim to confirm the award, determining, *inter alia*,  that the incorporation of the arbitration clause in the cocoa butter contracts between the Debtor and Naranjillo was not effectively accomplished.  On October 14,

2016, the Debtor filed a notice of appeal with the United States Court of Appeals for the Second Circuit (Case No. 16-3532) (the "Appeal").

24.     On December 23, 2016, the Appeal was voluntarily withdrawn pursuant to an agreement between the parties, subject to reinstatement by March 31, 2017, in order to allow the parties to pursue private mediation.

**D.     Prepetition Indebtedness.**

**a)     $400,000,000 Senior Secured Borrowing Base Facility**

25.     In September 2011, the Debtor entered into a Credit Agreement with various lenders, pursuant to which the lenders made available to the Debtor certain extensions of credit, including certain standby and documentary letters of credit.  That Credit Agreement has been amended and restated on various occasions.

26.     One of those amendments occurred on or about February 26, 2016, when the Debtor entered into that certain Amended and Restated Credit Agreement dated as of February 26, 2016 (the "Credit Facility"), by and among the Debtor and various lending institutions that were from time to time parties thereto (the "Lenders"), including ABN AMRO Capital USA, LLC ("ABN"), which served as syndication agent, administrative agent and collateral agent, Societe Generale ("SocGen"), which served as syndication agent, and BNP Paribas ("BNP") and Natixis, New York Branch ("Natixis"), which together served as co-documentation agents.  The Credit Facility is a committed senior secured borrowing base facility in the total aggregate amount of four hundred million dollars ($400 million).[2]

27.     In connection with the Credit Facility, the Debtor entered into that certain Amended and Restated Security Agreement (the "Security Agreement") dated as of February 26,

---

[2] Upon information and belief, the current Lenders are ABN, SocGen, BNP, Natixis, Macquarie, Bank Hapoalim, The Bank of Tokyo-Mitsubishi and Israel Discount Bank of New York.

2016, along with other collateral documentation, to secure the loans made under the Credit Facility. Pursuant to the Security Agreement and other collateral documentation, the Debtor granted the Lenders blanket first-priority liens on virtually all of the Debtor's assets (excluding any pledge of the equity interests in the Debtor's subsidiaries).

28.     As of the Petition Date, the Lenders assert that there is an outstanding principal balance of approximately $359,900,000 plus $4,703,054 in accrued but unpaid interest owed by the Debtor under the Credit Facility.

**b)     AMERRA Unsecured Subordinated Credit Facility**

29.     In or about September 2011, the Debtor and AMERRA Capital Management LLC ("AMERRA") entered into a credit facility whereby AMERRA loaned the sum of $10 million on an unsecured basis to the Debtor.

30.     In connection with the Debtor's borrowing of funds in September 2011, and subsequent entry into the Credit Facility in February 2016, AMERRA agreed to subordinate its claims to those of the Lenders.

31.     As of the Petition Date, AMERRA asserts that the Debtor owes AMERRA a principal sum of $8,684,597.02 under the AMERRA credit facility.

**c)     Other Unsecured Debt**

32.     As of the Petition Date, the total amount of unpaid unsecured debt owed by the Debtor to various creditors totals approximately $40 million.

## PART II

## RECENT EXPANSION AND EVENTS LEADING TO
## THE COMMENCEMENT OF THE CHAPTER 11 CASE

### A.    The Debtor and its Affiliates' Rapid Expansion

33.    Between 1980 and 1998, the Debtor and its affiliates focused their business on supplying cocoa beans and cocoa butter to the United States market.  Starting in or about 1998 and continuing through approximately 2002, the Debtor and its affiliates expanded their business beyond supplying, importing and sourcing cocoa to (i) investing in certain physical assets for processing and storing cocoa product and (ii) investing in direct importation of raw cocoa product from Ecuador.

34.    In or about 2002, Transmar Group's expansion continued with the formation of Euromar in Germany, enabling a vast expansion for the Debtor and its affiliates, causing the Transmar Group ultimately to become one of the largest purchasers and suppliers of cocoa products in the world.  In particular, between approximately 2002 and 2013, the Debtor and its affiliates continued their global expansion to establish cocoa butter and liquor melting operations, the construction of a cocoa processing plant in Ecuador, as well as investments in other cocoa processing operations in New Jersey, Africa and other locations beyond the United States.  Ultimately, to capitalize on industry trends and to serve large multinational customer demands, this rapid expansion continued during 2014–2015 with a goal toward creating a global supply chain for cocoa and cocoa products.

35.    As a result of this expansion, over the past two (2) years, the Debtor has begun the active acquisition of cocoa products at their place of origin, such as in South America, West Africa and Indonesia, in an effort to build a strong supply platform by providing a fully-

integrated supply chain, including origin sourcing, sustainability programs, bean processing, logistics, inventory management and product finishing for its cocoa products.

36.    In connection with these global expansion efforts, in early 2016, Transmar Group entered into a cross-border joint venture transaction with ITOCHU, which was created to assist with the sourcing, processing and global distribution of cocoa beans and cocoa products.

**B.    Events Leading to the Filing of the Debtor's Chapter 11 Case.**

*(i)    The Rapid Growth/Volatility in Cocoa Market.*

37.    Despite the successes associated with the Debtor's and its affiliates' rapid global expansion, problems also resulted because of this rapid growth.  For example, although its global network expanded, the Debtor and its affiliates faced obstacles and difficulties in expanding their infrastructure and corporate governance to integrate its activities into a single network.  One example of these difficulties arose in combining the Debtor's and its affiliates' computer systems, which apparently run on different and incompatible operating systems, causing the Debtor to experience significant problems in managing its multiple supply lines and delivery systems.

38.    Additionally, over the past two years, due to the volatility of pricing within the cocoa market and the inherent risks associated with hedging and trading, the Debtor and/or its affiliates, including Euromar in particular (discussed below), encountered difficulties in properly hedging their purchasing commitments for cocoa and/or cocoa products, which resulted in substantial losses.

*(ii)    Euromar.*

39.    Further, and most importantly, the financial situation at Euromar, an indirect subsidiary of the Debtor's parent company and one of the primary operating entities within the Transmar Group, caused substantial financial distress for the Debtor. At all relevant times,

Euromar was managed by Peter B. Johnson, the son of Peter G. Johnson, as its managing director (*Geshäftsführer*).  Although, prior to December 7, 2016, Peter B. Johnson was a director and officer of the Debtor, at all relevant times, his primary professional focus was on the success of Euromar.  Peter B. Johnson resigned as a director, officer and employee of the Debtor on December 7, 2016.

40.    Historically, the Debtor and Euromar have maintained a very close business relationship, with the Debtor at various times providing financial support to Euromar.  In fact, Euromar has served as one of the Debtor's primary customers, constituting, directly or indirectly, a large portion of the Debtor's sales of cocoa product.  As a result of this close business relationship, substantial intercompany claims between the two companies were created, which historically were reconciled at the end of each year, often by way of Euromar's assignment of forward contracts to the Debtor to fill any shortfalls owed.

41.    Between 2013 and 2015, sales volume related to Euromar's processing increased significantly, resulting in increasing financing requirements.  These financing requirements lead Euromar to set up a borrowing base credit facility with a European lending group in 2015.

42.    During this time of high growth at Euromar, Euromar entered into various unfavorable forward purchase contracts, including certain unhedged forward contracts, which resulted in enormous losses for Euromar when the price of cocoa in the market moved in ways that Euromar had not anticipated.

43.    Due to Euromar's increased financing requirements and increasing need for liquidity, during 2015, Euromar also began to finance its commodity flow by intermediate financing provided by repurchase lenders under repurchase agreements ("Repo Agreements"),

which came at unanticipated higher costs that negatively impacted Euromar's profitability margins.

44.     Additionally, the decision by the United Kingdom on June 23, 2016 to exit the European Union also caused fluctuations of the pound sterling (GBP).  Given the fact that cocoa and cocoa materials are traditionally traded in GBP, the United Kingdom's exit from the European Union had further significant negative impact on the liquidity of Euromar and the valuation of the commodity futures contracts with Euromar's suppliers.  Falling commodities markets, including the cocoa market, also caused a significant drain on Euromar's liquidity, which required Euromar to attempt to hedge its adverse future contracts also by way of currency swaps.

45.     Consequently, by the middle of 2016, Euromar was experiencing significant financial headwind caused by the deterioration of its profitability and liquidity.

46.     As a result of Euromar's liquidity crisis, beginning in August 2016, Euromar's European lenders, whose credit facility was by then in default, attempted an out-of-court restructuring of Euromar and demanded the appointment of a chief restructuring officer and co-managing director (*Geschäftsführer*), Josef Schultheis.  Mr. Schultheis leaned heavily upon the Debtor, as the most valuable member of the Transmar Group apart from Euromar, and ITOCHU, as an indirect shareholder of Euromar, in an effort to avoid placing Euromar in an insolvency proceeding in Germany. Among other things, to avoid a German insolvency proceeding for Euromar, Mr. Schultheis demanded that the Debtor and ITOCHU provide increased financial support to Euromar.

47.     More specifically, in or around August 2016, Mr. Schultheis and Euromar's lenders demanded that the Debtor execute restructuring support letters that obligated the Debtor

to continue providing certain financial support to Euromar by way of, among other things, deferring the Debtor's rights to enforce claims against Euromar with respect to certain intercompany transactions, and providing inventory to Euromar without requiring payment therefor until October 31, 2016, as contemplated by a separate standstill agreement between Euormar and its lenders (the "August Support Letters").  These support measures were expanded upon and extended until November 30, 2016, by way of a second support letter executed by the Debtor on October 25, 2016 (the "October Support Letter"), and further expanded upon and extended until January 31, 2017, by way of a final support letter executed by the Debtor on November 30, 2016 (the "November Support Letter," and together with the August Support Letters and October Support Letter, the "Support Letters").

48.    While ITOCHU executed an agreed-upon support letter with respect to Euromar dated September 22, 2016, ITOCHU and Mr. Schultheis failed to reach an agreement as to the terms of an extension of ITOCHU's original support letter in late November and early December of 2016.  As a result of this and other complications, an insolvency proceeding was filed for Euromar in Germany on December 2, 2016.  In connection with that German insolvency proceeding, in accordance with German insolvency law, an insolvency administrator was appointed for Euromar, who is working with Euromar's stakeholders in an effort to maximize the value of Euromar's assets.

49.    Given the importance of the business relationship between Euromar and the Debtor, where, *inter alia*, Euromar is one of the Debtor's largest customers, Euromar's insolvency has also substantially added to the Debtor's own financial distress.  Among other things, Euromar's financial difficulties have resulted in the inability to reconcile the intercompany claims between the two companies.  As a result, the Debtor currently is a very

large creditor of Euromar, having net claims against Euromar of at least $94 million. Moreover, as set forth above, the intercompany claims were typically reconciled annually by Euromar's assignment of forward contracts to the Debtor. A number of the forward contracts previously assigned to the Debtor by Euromar have resulted in losses to the Debtor similar to the losses sustained by Euromar as described above.

50.     In addition, in various instances, the Debtor sold product to various third parties, who in turn sold the product to Euromar. Certain of those third parties normally would not pay the Debtor until the third party received payment from Euromar. Euromar's financial woes and subsequent insolvency proceeding have resulted in Euromar's nonpayment to many of these third parties, which has resulted in the third parties' refusal to pay the Debtor.

51.     The Debtor's support of Euromar, which increased during the summer of 2016, and Euromar's failure to pay the Debtor substantial amounts for product sold, ultimately caused the Debtor to default under its own Credit Facility. Among other defaults, the Lenders advised the Debtor that the execution of the Support Letters by the Debtor caused various events of default under the Credit Facility.

52.     Further, as a result of its own deteriorating financial position, during 2016, the Debtor also increased its own reliance on Repo Agreements to finance its own commodity contracts, thereby placing further pressure on the Debtor's shrinking profit margins and liquidity.

53.     As a result of the foregoing, over the past few months, the value of the assets that served as the Lender's collateral precipitously declined, causing the Lenders to be undersecured.

## PART III

## FACTS IN SUPPORT OF FIRST DAY PLEADINGS[3]

54.     Concurrent with the filing of this Chapter 11 Case, the Debtor filed the First Day

Pleadings, wherein the Debtor requests various forms of relief.  Generally, the Debtor narrowly

tailored the First Day Pleadings to enable the Debtor to meet its goals of: (a) continuing its

operations in chapter 11 with as little disruption as possible; (b) maintaining the confidence and

support of its employees, vendors, contract counterparties and service providers during the

Chapter 11 Case; and (c) establishing procedures for the smooth and efficient administration of

the Chapter 11 Case.

55.     Given the importance of the relief sought in the First Day Pleadings to the

Debtor's ability to preserve value, the Debtor will move for entry of an order scheduling an

expedited hearing on the First Day Pleadings.  The Debtor seeks that the Court conduct a hearing

soon after the commencement of its chapter 11 case (the "First Day Hearing"), at which time the

Court can hear and consider certain of the First Day Pleadings.[4]

56.     I am aware of the relief requested in each of the First Day Pleadings.  To the best

of my knowledge, I believe the relief sought in the First Day Pleadings is necessary for the

Debtor to effectuate a smooth transition into chapter 11, is necessary to avoid irreparable harm to

its business and estate and will maximize value and recoveries for the benefit of the Debtor's

creditors.

57.     It is further my belief that, with respect to those First Day Pleadings requesting

authority to pay discrete prepetition claims or continue selected prepetition programs (e.g., those

---

[3] This section is intended as a summary of the key provisions of the First Day Pleadings and the relief sought
therein.  The terms of the First Day Pleadings themselves shall control.

[4] Capitalized terms used below in the description of the First Day Pleadings and not otherwise defined have the
meanings given to them in the applicable First Day Pleadings.

First Day Pleadings seeking relief related to the Debtor's obligations to their employees, warehouseman, and insurers), the relief requested is essential to the Debtor's operations and necessary to avoid immediate and irreparable harm to the Debtor, its estate, employees, creditors and other parties-in-interest.  Specifically, the success of this case depends in large part on the continuing operation of the Debtor's business in as normal a course as possible.  Impairment of the Debtor's operations at the early stages of this case would imperil the Debtor's efforts in the Chapter 11 Case and potentially damage the value of the Debtor's estate.

58.    For these reasons, I respectfully request that all the relief requested in the First Day Pleadings, and such other further relief as may be just and proper, be granted.

## I.    ADMINISTRATIVE MOTIONS

### i.    *Motion for an Order Extending the Debtor's Time to File Their Schedules of Assets and Liabilities and Statements of Financial Affairs (the "Schedules and SOFA Motion")*

59.    Through the Schedules and SOFA Motion, the Debtor requests entry of an order granting a 31-day extension of the time for the Debtor to file its schedules of assets and liabilities and statements of financial affairs (collectively, the "Schedules and SOFA") for a total of 45 days after the Petition Date.  The nature and scope of the Debtor's operations require it to maintain voluminous records and intricate accounting systems.  The complexity of the Debtor's business, the limited staff available to perform the required internal review of the Debtor's financial records and affairs, the numerous critical operational matters and the issues that the Debtor's accounting and legal personnel must address in the early days of the Chapter 11 Case, along with the pressure incident to the commencement of the Chapter 11 Case, necessitate additional time to file the Schedules and SOFA.

60.    In addition, focusing the attention of the Debtor's key accounting and legal personnel on critical operational and restructuring issues during the early days of the Chapter 11

Case will help the Debtor make a smoother transition into chapter 11 and, therefore, ultimately maximize the value of the estate for the benefit of creditors and all parties-in-interest.

61.     I believe that the relief requested in the Schedules and SOFA Motion is in the best interests of the Debtor's estate, creditors, and all parties-in-interest, and will enable the Debtor to continue to operate its business in Chapter 11 without disruption.  Accordingly, on behalf of the Debtor, I respectfully request that the Court grant the Schedules and SOFA Motion.

> ii.     *Motion for an Order (I) Authorizing the Debtor to (a) Prepare a List of Creditors in Lieu of Submitting a Formatted Mailing Matrix and (b) Mail Initial Notices and (II) Approving the Form and Manner of Notifying Creditors of the Commencement of the Debtor's Chapter 11 Case (the "Creditor List Motion")*

62.     Pursuant to the Creditor List Motion, the Debtor requests entry of an order: (i) allowing the Debtor to prepare an electronic list of creditors in lieu of submitting a creditor matrix and mail initial notices through its claims and noticing agent; and (ii) approving the form and manner of notifying creditors of commencement of the Chapter 11 Case.

63.     As previously stated, the Debtor has potentially hundreds of creditors, including vendors and suppliers, and many other parties-in-interest, and the breadth of the Debtor's business operations require the Debtor to maintain voluminous books and records, and a complex accounting system.

64.     In light of the size and complexity of the Debtor's business operations, and the extent of information necessary to prepare a creditor mailing matrix, I believe the relief requested in the Creditor List Motion is in the best interest of the Debtor's estate, creditors, and all parties-in-interest, and will enable the Debtor to continue to operate its business in chapter 11 without disruption.  Accordingly, on behalf of the Debtor, I respectfully submit that the Creditor Matrix Motion should be granted.

      ***iii.***     ***Debtor's Application for Entry of an Order Authorizing the Retention of Donlin, Recano & Company, Inc. as Claims and Noticing Agent Effective as of the Petition Date (the "<u>Claims Agent Application</u>")***

65.      Pursuant to the Claims Agent Application, the Debtor seeks to retain Donlin, Recano & Company, Inc. ("<u>Donlin</u>") as claims and noticing agent in the Chapter 11 Case.  I believe that by retaining Donlin, the Debtor's estate, and particularly its creditors, will benefit from Donlin's services. Donlin specializes in noticing, claims processing, and other administrative tasks necessary to operate chapter 11 cases effectively.  It is my understanding that Donlin is fully equipped to manage claims issues and provide notice to creditors and other interested parties in the Chapter 11 Case.  Therefore, on behalf of the Debtor, I respectfully request that the Court grant the Claims Agent Application.

## II.    OPERATIONAL MOTIONS

      ***iv.***     ***Motion for Interim and Final Orders Under Sections 105, 361 and 363 of the Bankruptcy Code Approving the Use of Cash Collateral, Providing Adequate Protection and Setting a Final Hearing Pursuant to Bankruptcy Rule 4001 (the "<u>Cash Collateral Motion</u>")***

66.      Through the Cash Collateral Motion, the Debtor seeks entry of interim and final orders under 11 U.S.C. §§ 105, 361 and 363 approving the consensual use of cash collateral, providing adequate protection to any party that alleges to have an interest in such cash (collectively, the "<u>Prepetition Lenders</u>") and setting a final hearing pursuant to Fed. R. Bankr. P. 4001.

67.      I submit that the Debtor's use of cash collateral will preserve the value of the Debtor's estate for all parties-in-interest, including the Secured Parties, preserve employment for the Debtor's employees, and preserve the Debtor's going-concern value while the Debtor implements its strategy in this case.

68.    The Debtor proposes to provide adequate protection of the interests of the Secured Parties in the form of valid, binding, enforceable, non-avoidable and automatically-perfected replacement security liens on the Debtor's post-petition assets to the same extent, validity and priority that existed as of the Petition Date.  Moreover, to the extent that the adequate protection liens provided for fails to protect the Prepetition Lenders against any diminution in value of their collateral, the Debtor proposes to grant the Prepetition Lenders superpriority administrative expense claims.  Finally, the Debtor proposes to pay the reasonable prepetition and post-petition fees, costs and expenses incurred by the Prepetition Agent (including legal and financial advisory fees) as and when due and payable under the Credit Facility.

69.    The Debtor's ability to pay for goods and services is crucial to the operational needs of the Debtor. Accordingly, I believe that the relief requested in the Cash Collateral Motion is in the best interests of the Debtor's estate and creditors. Therefore, on behalf of the Debtor, I respectfully request that the Court grant the Cash Collateral Motion.

   v.    *Motion for an Order Authorizing the Debtor to (I) Continue to Use Existing Cash Management System, (II) Maintain Existing Bank Accounts and Business Forms and (III) Waive Requirements 11 U.S.C. § 345(b) (the "*<u>*Cash Management Motion*</u>*")*

70.    As of the Petition Date, the Debtor maintained eleven (11) bank accounts (collectively, the "<u>Bank Accounts</u>") with various banks including, but not limited to, Brown Brothers Harriman ("<u>BBH</u>"), BNP Paribas, Bank of America, PNC Bank ("<u>PNC</u>"), Societe Generale and Bank Hapoalim (together, the "<u>Banks</u>").

71.    In the ordinary course of business, the Debtor maintains a cash management system to receive and disburse funds (the "<u>Cash Management System</u>"), which enables the Debtor to control and monitor its funds, reduce administrative expense and monitor performance.

72.     Through the Cash Management Motion, the Debtor requests entry of an order authorizing, but not requiring, the Debtor to (i) continue use of the Cash Management System, (ii) maintain the Bank Accounts and Business Forms and (iii) waive the requirements of section 345(b) of the Bankruptcy Code to the extent the Bank Accounts contain funds in excess of the amounts insured by the Federal Deposit Insurance Corporation or otherwise are not fully insured.

73.     Among other things, in the ordinary course of business, the Debtor receives funds from certain customers via wire transfer into the BBH account, which wire transfers are cleared through JP Morgan Chase.  The BBH account enables the Debtor to seamlessly deal with conversion issues related to the different currencies and is vitally important to the Debtor's operations.

74.     Certain other customers pay the Debtor via check, which amounts are deposited into one of the Debtor's PNC accounts and ultimately moved via wire transfer from PNC to the BBH account.

75.     In addition, the Debtor's payroll account is maintained at PNC.

76.     If the Debtor is required to open separate accounts as a debtor-in-possession and modify the Cash Management System in accordance with the U.S. Trustee Guidelines, such process would necessitate opening several new accounts. Thus, the Debtor's treasury, accounting, and bookkeeping employees would be forced to focus exclusively on immediately opening new bank accounts, instead of on their daily responsibilities during this critical juncture of the Chapter 11 Case.  The opening of new bank accounts would certainly increase operating costs, thereby negatively impacting the Debtor's cash flow. Most importantly, delays that would result from opening new accounts, revising cash management procedures, instructing customers to redirect payments, and implementing new information technology protocols would negatively

impact the Debtor's ability to operate its business while pursuing these arrangements, and potentially jeopardize customer relationships. Additionally, the Debtor would be subject to significant administrative burdens and expenses because it would need to execute new signatory cards and depository agreements, and create an entirely new manual system for issuing checks and paying post-petition obligations.

77.    Additionally, as part of a cash collateral arrangement that is being discussed with the Lenders, the Lenders require that the Debtor maintain its Cash Management System.

78.    Through the Cash Management Motion, the Debtor also requests authority to maintain Business Forms. In the ordinary course of business, the Debtor utilizes a variety of Business Forms.  A substantial amount of time and expense would be required in order to order, create or print new business forms. Therefore, the Debtor requests authorization to continue to use its pre-petition Business Forms, without reference to its status as a debtor-in-possession.

79.    Finally, through the Cash Management Motion, the Debtor seeks a waiver of the requirements of section 345(b) of the Bankruptcy Code.  The Debtor submits that cause exists to grant a waiver of the requirements of section 345 of the Bankruptcy Code because, among other considerations (i) the Debtor's Banks are highly rated, internationally established banking institutions subject to regulation, (ii) the Debtor retains the right to remove funds held at Banks and establish new bank accounts as needed, (iii) the costs associated with satisfying the requirements of section 345 are burdensome, and (iv) the process of satisfying those requirements would lead to needless inefficiencies in the management of the Debtor's business.  Moreover, strict compliance with the requirements of section 345 of the Bankruptcy Code would not be practical in the Chapter 11 Case.  A bond secured by the undertaking of a corporate surety would be prohibitively expensive, if such bond were available at all.

80.     I believe the Debtor's continued use of the Cash Management System and existing Business Forms will greatly facilitate its transition into the Chapter 11 Case by, among other things, avoiding administrative inefficiencies and expenses, minimizing delays in payment of post-petition debts, and providing important internal controls. Therefore, on behalf of the Debtor, I respectfully request that the Court grant the Cash Management Motion.

     ***vi.***     ***Motion for an Order (I) Authorizing the Debtor to (a) Satisfy and, to the Extent Applicable, Directing any Payroll Banks to Honor, Pay Pre-Petition Employee Compensation Obligations, and (b) Honor, in its Discretion, Pre-Petition Paid Time Off and Similar Themed Days; and (II) Authorizing the Debtor to Continue Paying and/or Otherwise Honoring all Other Employee Benefits (the "Wages Motion")***

81.     The Debtor has approximately 19 employees, consisting of 18 full-time salaried employees and 1 part time employee (collectively, the "Employees"). The Employees perform a variety of crucial functions for the Debtor including, but not limited to, business operations, human resources and accounting. The Employees' valuable skill sets, indispensable institutional knowledge and industry expertise and overall understanding of the Debtor's operations make the Employees critical to the success of this Bankruptcy Case.

82.     By the Wages Motion, the Debtor seeks entry of an order: (i) authorizing the Debtor to (A) satisfy and, to the extent applicable, directing any payroll banks to honor pre-petition gross salaries, payroll taxes, employee expense reimbursements, and related obligations to or for the benefit of the Debtor's employees (the "Pre-Petition Employee Compensation Obligations"), and (B) honor, in its discretion, pre-petition paid time off and similar themed days; and (ii) authorizing the Debtor to continue paying and/or otherwise honoring the other ordinary employee benefits provided to the Debtor's employees.

83.     As an initial matter, the Debtor seeks authority to pay accrued Pre-Petition Employee Compensation Obligations in the ordinary course of business and consistent with past

practices in effect on the Petition Date, if any remain as of the Petition Date, including: pre-petition payroll, pre-petition payroll taxes, and employee expense reimbursement obligations. None of the amounts to be paid to each employee for pre-petition payroll will exceed the $12,475.00 priority cap in section 507(a)(4) of the Bankruptcy Code.

84.    Further, the Debtor maintains an employee benefit policy pursuant to which Employees are provided with certain specific paid time off, bereavement, jury duty and holiday pay (collectively, the "Total Benefit Days"), as well as other benefits enumerated below (the "Other Employee Benefits"), and offer its Employees the opportunity to participate in various insurance and other company-sponsored programs (the "Company-Sponsored Programs" and, together with the Total Benefit Days and Other Employee Benefits, the "Employee Benefits"). The Employee Benefits provided by the Debtor are as follows: medical and dental insurance, a 401(k) retirement savings plan, a paid-time off policy, life insurance, accidental death & dismemberment insurance, long term disability insurance, a workers' compensation insurance, and an automobile insurance policy available to certain Employees.

85.    The continued, uninterrupted services of the Debtor's Employees is essential to the Debtor's efforts to ensure the smooth and successful operation of the Debtor.  Any delay in paying outstanding wages, salaries, and other compensation due to the Employees or the failure by the Debtor to continue its prepetition practices, programs, and policies with respect to Employee Benefits could severely disrupt the Debtor's relationship with its Employees, impair morale at this critical juncture, and disrupt the Debtor's operations, all of which would irreparably harm the Debtor's estate.  Accordingly, I believe that the relief requested in the Wages Motion is in the best interests of the Debtor, the Debtor's estate and creditors, and all other parties-in-interest in the Chapter 11 Case, and will enable the Debtor to continue to operate

its business during the Chapter 11 Case uninterrupted. Accordingly, on behalf of the Debtor, I respectfully request that the Court grant the Wages Motion.

> **vii.    Motion for an Order Authorizing the Debtors to (I) Pay Pre-Petition Insurance Premiums (II) Continue Pre-Petition Insurance Policies and Programs and (III) Perform All Pre-Petition Obligations in Respect Thereof (the "_Insurance Motion_")**

86.    Through the Insurance Motion, the Debtor seeks entry of an order authorizing the Debtor to continue to pay and perform under various prepetition insurance programs covering a variety of matters such as commercial liability, excess liability, commercial property, workers' compensation, directors' and officers' liability, fiduciary liability, and marine and warehouse (the "Insurance Programs"), and pay all pre-petition and post-petition obligations in respect thereof in the ordinary course of their business consistent with past practices.

87.    In connection with the day-to-day operations of its business, the Debtor maintains various Insurance Programs and related insurance policies (the "Insurance Policies") as set forth on a non-exhaustive list attached to the Insurance Motion through several different insurance providers (the "Insurance Providers").

88.    The Debtor is required to pay premiums under the Insurance Programs based on a fixed amount established and billed by each Insurance Provider.  Except for the Marine and Warehouse Policy (as defined in the Insurance Motion), the premiums for the Insurance Policies are pre-paid at a policy's inception or renewal.  The Marine and Warehouse Policy requires a $780,000 annual deposit premium payable in twelve monthly installments of $65,000, adjusted by applying transaction-based rates to the insured values of the goods.

89.    It is my understanding that the Debtor is current on all of its insurance obligations as of the Petition Date.  As a result, the Debtor files the Insurance Motion in an abundance of

caution in order to obtain authority to continue its pre-petition insurance policies and programs, and pay and perform, as may be necessary, all pre-petition obligations in respect thereof.

90.     I believe that the relief requested in the Insurance Motion is in the best interests of the Debtor's estate, its creditors, and all parties-in-interest and will enable the Debtor to continue to operate its business in Chapter 11 without disruption.  Accordingly, on behalf of the Debtor, I respectfully request that the Court grant the Insurance Motion.

### viii.    *Motion for Entry of an Order Authorizing, But Not Directing, the Debtor to Pay Certain Prepetition Claims of Logistics Service Providers, Warehousemen and Related Obligations (the "Service Provider Motion")*

91.     In connection with the day-to-day operation of its business, the Debtor relies on a network of (a) reputable common carriers, movers, shippers and freight forwarders (the "Logistics Service Providers") and (b) warehousemen, bailees, storage facilities, loading and unloading services, and other providers of storage services (the "Warehousemen") that transport and store the Debtor's inventory consisting of cocoa beans, liquor and butter (collectively, the "Goods") critical to the Debtor's business.

92.     The Debtor pays the Logistics Service Providers approximately $87,500 per month and the Warehousemen approximately $332,500 per month for the services provided, and estimates that approximately $800,000 is owed to the Logistics Service Providers and $800,000 to the Warehousemen as of the Petition Date.

93.     As part of its day-to-day operations, and in order to fulfill obligations under contracts with certain of its customers, the Debtor engages the services of third-party melting facilities in order to melt cocoa butter and cocoa liquor into a form usable by its customers (the "Melters," and together with the Logistics Service Providers and Warehousemen, the "Service Providers").

26

94.     As of the Petition Date, the Debtor estimates that approximately $200,000 is owed to the Melters.

95.     It is essential that, for the Debtor's business and its efforts to maximize value for the benefit of stakeholders, the Debtor maintains a reliable and efficient supply and distribution system, both domestically and internationally.

96.     If the Debtor fails to pay the claims of the Service Providers, as well as certain related obligations, including de minimis customs duties required to release the inventory for sale and production and harbor maintenance fees, which are based on dollar values of the Shipment (collectively, the "Service Providers Claims"), certain of the Service Providers may stop providing essential services to the Debtor.  Delays in receiving the Goods could cause major disruptions to the Debtor's operations, damaging the Debtor's business reputation and undermining the Debtor's ability to generate ongoing operating revenue.  Even if suitable alternatives for shipping and warehouse services were available, the time necessary to identify these replacements and integrate them into the Debtor's operations likely would cause a significant disruption to the Debtor's business.

97.     The Debtor seeks authority to continue to pay, in the ordinary course of business and to the extent necessary to preserve the value of its assets, in the Debtor's sole discretion, certain prepetition claims of Service Providers and related obligations.  The Debtor believe that certain of the Service Providers may assert possessory liens upon the Goods in their possession, and non-payment would result in the Service Providers retaining the Goods in their possession, which would cause a significant disruption in business operations and substantially harm the Debtor's estate.

98.     I believe the relief requested in the Service Provider Motion is in the best interest of

the Debtor's estate, its creditors and all parties-in-interest and will enable the Debtor to continue to

operate its business in Chapter 11 without disruption. Accordingly, on behalf of the Debtor, I

respectfully submit the Service Provider Motion should be granted.

**PART IV**

**INFORMATION REQUIRED BY LOCAL RULE 1007-2**

99.     In accordance with Local Rule 1007-2, the schedules attached hereto provide

certain information related to the Debtor.

100.    Pursuant to Local Rule 1007-2(a)(3), and to the best of my knowledge,

information and belief, no prepetition committee has been formed in anticipation of the Chapter

11 Case.

101.    Pursuant to Local Rule 1007-2(a)(4), **Schedule 1** hereto lists the holders of the

Debtor's twenty (20) largest unsecured claims, excluding claims of insiders.

102.    Pursuant to Local Rule 1007-2(a)(5), **Schedule 2** hereto lists the holders of the

five (5) largest secured claims against the Debtor.

103.    Pursuant to Local Rule 1007-2(a)(6), the Debtor will endeavor to file a summary

of the assets and liabilities as soon as practicable but is still in the process of collecting and

evaluating relevant information.

104.    Pursuant to Local Rule 1007-2(a)(8), **Schedule 3** hereto provides a list of the

Debtor's property not in the Debtor's possession, including property in the possession or custody

of any custodian, public officer, mortgagee, pledgee, assignee of rents or secured creditor, or

agent for any such entity, giving the name, address, and telephone number of each such entity

and the location of the court in which any proceeding relating thereto is pending.

105.    Pursuant to Local Rule 1007-2(a)(9), **Schedule 4** hereto provides a list of the premises owned, leased, or held under other arrangement from which the Debtor operates its business.

106.    Pursuant to Local Rule 1007-2(a)(10), **Schedule 5** hereto provides the location of the Debtor's substantial assets, the location of its books and records, and the value of any assets held by the Debtor outside the territorial limits of the United States.

107.    Pursuant to Local Bankruptcy Rule 1007-2(a)(11), **Schedule 6** hereto is a list of pending litigation commenced against the Debtor.

108.    Pursuant to Local Rule 1007-2(a)(12), **Schedule 7** hereto provides a list of the names of the individuals who comprise the Debtor's existing senior management, their tenure with the Debtor, and a brief summary of their relevant responsibilities and experience.

109.    Pursuant to Local Rule 1007-2(b)(1), **Schedule 8** hereto is the estimated amount of the payroll to employees of the Debtor (exclusive of officers, directors and stockholders) for the 30-day period following the commencement of the Debtor's Chapter 11 Case.

110.    Pursuant to Local Rule 1007-2(b)(2)(A), **Schedule 9** hereto contains the amounts to be paid to the Debtor's officers, directors and stockholders for services for the 30-day period following the commencement of the Debtor's Chapter 11 Case.

111.    Pursuant to Local Rule 1007-2(b)(3), **Schedule 10** hereto provides, for the thirty (30) day period following the filing of the Chapter 11 Case, a list of estimated cash receipts and disbursements, net cash gain or loss, obligations, and receivables expected to accrue that remain unpaid, other than professional fees.

## **<u>CONCLUSION</u>**

112.    The relief sought in each of the First Day Pleadings will minimize the adverse effects of the Chapter 11 Case on the Debtor, allow the Debtor to continue to operate its business, allow the Debtor time to implement its strategy in this case, and maximize value for all parties-in-interest. Accordingly, for the reasons stated herein and in each of the First Day Pleadings, I respectfully request that each First Day Pleading be granted in its entirety, together with such other and further relief as this Court deems just and proper.

I hereby certify, under penalty of perjury, that the foregoing factual statements made by me are true.

Executed on January 2, 2017

*/s/ Robert J. Frezza*
Robert J. Frezza, Chief Restructuring Officer
Transmar Commodity Group, Ltd.

4800745v6

Exhibit A – Corporate Structure



## SCHEDULE 1

### List of 20 Largest Unsecured Creditors

| Name of Creditor | Amount | Contingent, Unliquidated, Disputed, or Partially Secured |
|---|---|---|
| Amerra Capital Management<br>1185 6th Ave<br>New York, NY 10036 | $8,684,597.02 | |
| Theobroma B.V.<br>Postbus 12200<br>Z.O. Oceanenweg 1<br>Amsterdam 1100 AE<br>Netherlands | $7,953,946.87 | Disputed |
| Cocoa Marketing Company (Ghana) Ltd.<br>Post Office Box 1017, Room 302<br>Cocoa House<br>Accra<br>Ghana | $1,903,881.97 | |
| Swiss Trading Solutions GMBH<br>Pfeffingerstrasse 35<br>Reinach 4153<br>Switzerland | $1,542,806.27 | Disputed |
| Cooperative Café Cacao de Vavoua<br>05 BP 406<br>Abidjanj 05<br>Ivory Coast | $1,520,766.00 | Disputed |
| Amius<br>25 Berkeley Square<br>London W1J6HN<br>United Kingdom | $921,300.00 | |
| Trilini International Ltd.<br>41 Terrace Place,<br>Brooklyn, NY 11218 | $514,708.24 | Disputed |
| GCB Cocoa Singapore PT LTD<br>1 Commonwealth Lane #08-04<br>Singapore 149544<br>Singapore | $501,939.58 | Disputed |
| H.D. Cotterell<br>Ellerholzdamm 38<br>Hamburg 20457<br>Germany | $484,851.73 | |
| Adelcocoa SA<br>KM 10 1/2 Via Daule<br>Guayaquil<br>Ecuador | $467,812.54 | |

| | | |
|---|---|---|
| PT Maju Bersama Cocoa Industries<br>PO Box 33<br>91007 Tawau, No. 1022<br>Jalen Dunlop, Indonesia | $435,251.00 | |
| Ecuacoffee S.A.<br>KM 10.5 Vía Daule<br>Guayaquil<br>Ecuador | $378,716.48 | |
| Ivoire Cacao<br>16 BP 488<br>Abidjan<br>Ivory Coast | $364,127.92 | |
| La Universal<br>Eloy Alfaro 1103 y<br>Gómez Rendon<br>Ecuador | $279,000.00 | |
| ICESTAR B.V.<br>Coolsingel 93<br>Rotterdam 3012 AE<br>Netherlands | $253,783.89 | |
| VIGOLIN<br>82, Narva mnt. 10127<br>Tallinn<br>Estonia | $167,626.05 | |
| Ghirardelli Chocolate Company<br>1111 139th Ave, 6th Floor<br>San Leandro, CA 94578 | $155,681.29 | |
| Agrolaya<br>Km 2.5 Via a Valencia<br>Quevedo<br>Ecuador | $138,779.12 | |
| Nucita Venezolana C.A.<br>Avenida Güigüe, Maracay<br>Aragua<br>Venezuela | $123,000.00 | |
| Exportadora e Importadora<br>Agroatilio Cia. Ltda<br>Urb. Brasilia del Toachi<br>calle españa s/n y vinc<br>Santo Domingo<br>Ecuador | $119,719.82 | |

## SCHEDULE 2

## LIST OF CREDITORS
## HOLDING 5 LARGEST SECURED CLAIMS[1]

The following is a list of creditors holding the 5 largest secured claims against the Debtor.  The list has been prepared in accordance with Local Bankruptcy Rule 1007-2(a)(5).  The information herein shall not constitute an admission of liability by, nor is it binding on, the debtor.

| Name of Creditor | Mailing Address | Description of Collateral Securing Claim | Estimate of Value of Collateral | Amount of Claim |
|---|---|---|---|---|
| ABN AMRO Capital USA, as Agent | 100 Park Avenue New York, NY 10017 | Inventory, Accounts Receivable, Cash, and Forward Book Gains | To be determined | 21% of Approx. $360,000,000 principal plus $4,500,000 interest |
| Société Générale | c/o ABN AMRO Capital USA, as Agent 100 Park Avenue New York, NY 10017 | Inventory, Accounts Receivable, Cash, and Forward Book Gains | To be determined | 18% of Approx. $360,000,000 principal plus $4,500,000 interest |
| BNP PARIBAS | c/o ABN AMRO Capital USA, as Agent 100 Park Avenue New York, NY 10017 | Inventory, Accounts Receivable, Cash, and Forward Book Gains | To be determined | 15% of Approx. $360,000,000 principal plus $4,500,000 interest |
| Natixis | c/o ABN AMRO Capital USA, as Agent 100 Park Avenue New York, NY 10017 | Inventory, Accounts Receivable, Cash, and Forward Book Gains | To be determined | 15% of Approx. $360,000,000 principal plus $4,500,000 interest |
| Macquarie Bank | c/o ABN AMRO Capital USA, as Agent 100 Park Avenue New York, NY 10017 | Inventory, Accounts Receivable, Cash, and Forward Book Gains | To be determined | 11% of Approx. $360,000,000 principal plus $4,500,000 interest |

---

[1] This list reflects the latest information available to the Debtor as of the Petition Date.

**Schedule A2**

## Debtor's Property Not in Debtor's Possession (Inventory)

| Approximate Value | Warehouse Name | Address | Primary Contact | Phone Number |
|---|---|---|---|---|
| $ 78,950 | Camden International Terminal - CICT | 1200 Ferry Ave, Camden, Nj 08104 | Jennifer Weick Ryan Wheeler | 856 964 0100 |
| $ 315,815 | Carlyle Cocoa Co., LLC | 23 Harbor View Drive, New Castle, DE 19720 | Micahael Kostic | 302 428 3800 |
| $ 1,346,671 | Continental Terminals, INC | 112 Port Jersey Blvd Jersey City NJ 07305 | Roland Marrero | 973-578-2702 |
| $ 124,928 | Cocoa Processing Corp. | 650 Ramsey Ave, Hillside, NJ | Yelena Zeldin | |
| $ 487,067 | Cocoa Service West LLC | Cocoa Services West LLC 29975 Ahern Avenue Union City CA 94587 | Carrie McDermott | (510) 477-9747 |
| $ 4,357,282 | Cocoa Service LLC | 400 Eagle Court Swedesboro, NJ 08085 | Michael Tursi | |
| $ 498,753 | Dependable Distributions Services | 1301 Union Ave, Pennsauken, NJ 08110 | Donna Dove | 856 665 1700 |
| $ 812,209 | East Bay Logistics | 25503 Industrial Blvd. Hayward, Calif 94545 | Mitchell Lam/ Israel/ Stacy | 510 781 4858 |
| $ 93,409 | LaGrou Distributions | 1800 S. Wolf Road Des Plaines, IL 60018 | Debbie Yingling | |
| $ 3,021,441 | Hall's Warehouse | P.O. Box 378 501 Kentile Road South Plainfiled, NJ 07080 | Luis Bohorquez | 908 756 6242 x 337 |
| $ 142,151 | Lyons & Sons | 905 N. Lenola Road Moorestown, NJ 08057 | Joyce - Mike Dougherty | 856-234-1700 |
| $ 47,727 | Lanter Distributing | 17501 W. 98 th Street Lenexa, Kansas 66219 | Danny Lerow | 618-512-3030/ 618-540-9020 |
| $ 515,808 | Keymar | 257-259 Saint Mihiel Drive Riverside, NJ 08075 | Eric Hartman | 212482-8600 - 8564619356 |
| $ 646,299 | International Food Products | 150 Larking Williams Industrial Ct. Fenton, MO 63026 | Lisa Knapp | |
| $ 462,143 | United Cocoa Processors | 702 Pencader Drive, Newark, DE 19702 | Adriano da Silva | 302 731 0825 |
| $ 9,564 | Contimer LLC | Contimer L.L.C. Masina 11 10144 Tallinn | Slava Gerega | 372 60 50 549 - 372 60 50 550 |
| $ 10,920 | C.Steinweg Handelsveem | Sextantweg 8 • 1042 AH • Amsterdam • The Netherlands | Inge Romeijn | 31 (0)20 5878813 Fax:31 (0)20 6149198 |
| $ 6,932,857 | HD Cotterell Hamburg | H.D. Cotterell GmbH & Co.KG Ellerholzdamm 38  20457 Hamburg | Sylvia Dembowski, Soren Jurgens | 49 40 317875 30 |
| $ 106,908 | HD Cotterell Field Warehouse | | | |
| $ 147,876 | PT Makasar First Cocoa | TAN HAN KIONG Jl. Ir. Sutami, Pergudangan Parangloe Indah Blok J 5. No. 17 Makassar, Sulawesi Selatan, Indonesia | Yusni Hudji | |
| $ 113,385 | Quast & Cons | Am Windhukkai 5 20457 Hamburg Germany | Ralph Gassner | |
| $ 639,323 | Savita | Savita Naturals | Michael Trout | (856) 467-4949 |
| $ 239,724 | CWT Commodities, Amsterdam | Westpoort 7905 Accraweg 39  1047 HJ Amsterdam The Netherlands | Yvonne Hubner | 31 (0)20 585 3833 |
| $ 893,371 | Vigolin Tallin | Narva mnt 82 10127 Tallinn, Estonia | Elina Tuganova | 605 5651 |
| $ 17,574 | Vollers Belgium | Kaaien 218-220, B-2030 Antwerpen | Borghgraef, Kiane | 3235464066 |
| $ 9,080 | Vollers Hamburg | Vollers Hamburg GmbH Buket Ates - Abteilungsleiterin General Cargo / CFS  Head of Department General Cargo / CFS | Dammann, Denise | 49 40 788 74 612 |
| $ 1,722,988 | Vriescentrum Vink | Noorderkade 36b 1948 NR Beverwijk Nederland | Francine Bleesing | |
| $ 1,154,975 | Waspik | Zijderlaan Waspik B.V. Hooiweg 2  5165NL Waspik | Karin | 31 (0)4 16 31 36 36  31 (0)4 16 31 37 95 |

## SCHEDULE 4

### PREMISES OWNED, LEASED OR
### HELD UNDER OTHER ARRANGEMENT
### FROM WHICH THE DEBTOR OPERATES ITS BUSINESS

### Leased Real Property

| Lessor | Location | City | State | Zip Code |
|---|---|---|---|---|
| Town of Morristown | 200 South Street, 4th Floor | Morristown | NJ | 07920 |

## SCHEDULE 5

## LOCATION OF DEBTOR'S ASSETS, BOOKS AND RECORDS

Pursuant to Local Bankruptcy Rule 1007-2(a)(10), the following lists the locations of the

Debtor's substantial assets and the location of its books and records:

| Location of Debtor's Substantial Assets |
| --- |
| 200 South Street, 4th Floor<br>Morristown, New Jersey 07920 |
| See also Schedule 3 regarding location of inventory |

| Location of Debtor's Books and Records |
| --- |
| 200 South Street, 4th Floor<br>Morristown, New Jersey 07920 |

## **SCHEDULE 6**

### SIGNIFICANT LITIGATION COMMENCED
### AGAINST THE DEBTOR PRIOR TO THE PETITION DATE

| Title of Action | Court | Nature of Action | Status |
|---|---|---|---|
| Transmar Commodity Group Ltd. v. Cooperativa Agraria Industrial Naranjillo Ltd. Case No. 16-3532 | U.S. Court of Appeals for the Second Circuit | Appeal of order vacating Debtor's arbitration award against Naranjillo | Appeal withdrawn on December 23, 2016 and subject to reinstatement by March 31, 2017<br><br>Parties are pursuing private mediation |

## SCHEDULE 7

## DEBTOR'S EXISTING SENIOR MANAGEMENT

| Name/Position | Summary of Responsibilities |
| --- | --- |
| Peter G. Johnson, Chairman, President and Chief Executive Officer | Responsible for providing global strategic and executive leadership; establish the company vision, its values and long-range goals, strategic plans and policies. Responsible for ensuring a continuing focus on optimal growth and profitability, maximization of market share in key strategic markets. Ensures executive oversight on overall company KPIs to ensure optimal corporate performance. |
| Timothy B. Johnson, Vice-Chairman, Vice President and Chief Operating Officer | Responsible for providing global leadership and management necessary to ensure that the company has the proper operational controls, reporting procedures and human capital systems in place to ensure financial strength and operating efficiency. |
| Patricia Johnson Gasek, Secretary | Responsible for strengthening and continuous improvement of the administrative systems and procedures. These responsibilities include corporate communications strategy and programs, as well as tactical and limited strategic support for human resource policies and practices. Also serves as Secretary to Executive Board and is responsible for preparation of meeting agenda and follow-up on decisions and approved initiatives |
| Thomas Reich, Treasurer | Responsible for providing senior leadership and management in the financial administration and operations of the company's global capital, funding, liquidity requirements and regulatory relationships. Prepares or directs the preparation of financial position forecasts, annual capital and operating expense budgets and adherence to internal control policies, guidelines and procedures for (e.g.) cash and credit management, accounting and internal/external financial auditing. |
| Robert Frezza, Chief Restructuring Officer | Retained as Chief Restructuring Officer pursuant to December 18, 2016 Engagement Letter to assist the company with all phases of the Chapter 11 Case. Further detail will be provided in a subsequent motion regarding such retention. |

# SCHEDULE 8

## ESTIMATED AMOUNT OF WEEKLY PAYROLL TO EMPLOYEES EXCLUSIVE OF OFFICERS, DIRECTORS AND SHAREHOLDERS FOR THE 30-DAY PERIOD FOLLOWING THE PETITION DATE[2]

| Week Ending | Estimated Gross Payroll |
|-------------|-------------------------|
| 1/12 | $40,392.01 |
| 1/26 | $40,392.01 |

---

[2] Estimated amounts to be paid based upon pre-petition ordinary course of business; however, actual amounts to be paid are subject to any applicable requirements imposed on the Debtor under the Stipulation and Agreed Interim Order Pursuant to 11 U.S.C. §§ 361, 362 and 363 and Rules 4001(b), 4001(d) and 9014 of the Federal Rules of Bankruptcy Procedure (I) Authorizing Debtor's Use of Cash Collateral, (II) Providing Adequate Protection Thereof and (III) Scheduling a Final Hearing (the "Interim Cash Collateral Order") and any related final order (together, the "Cash Collateral Orders"), and any such payments shall be in accordance with the Approved Budget (as defined in the Cash Collateral Orders) in effect in connection with such orders (subject to Permitted Variances, as defined in the Cash Collateral Orders).

## SCHEDULE 9

## ESTIMATED AMOUNT OF WEEKLY AMOUNTS TO BE PAID
## TO OFFICERS, DIRECTORS AND SHAREHOLDERS
## FOR THE 30-DAY PERIOD FOLLOWING THE PETITION DATE[3]

| Week Ending | Estimated Gross Amounts to be Paid |
|:---:|:---:|
| 1/12 | $45,207.22 |
| 1/26 | $45,207.22 |

---

[3] Estimated amounts to be paid based upon pre-petition ordinary course of business; however, actual amounts to be paid are subject to any applicable requirements imposed on the Debtor under the Stipulation and Agreed Interim Order Pursuant to 11 U.S.C. §§ 361, 362 and 363 and Rules 4001(b), 4001(d) and 9014 of the Federal Rules of Bankruptcy Procedure (I) Authorizing Debtor's Use of Cash Collateral, (II) Providing Adequate Protection Thereof and (III) Scheduling a Final Hearing (the "Interim Cash Collateral Order") and any related final order (together, the "Cash Collateral Orders"), and any such payments shall be in accordance with the Approved Budget (as defined in the Cash Collateral Orders) in effect in connection with such orders (subject to Permitted Variances, as defined in the Cash Collateral Orders).

## SCHEDULE 10

### DEBTOR'S ESTIMATED CASH DISBURSEMENTS AND
### RECEIPTS FOR THE 30-DAY PERIOD FOLLOWING THE PETITION DATE

| | |
|---|---|
| **Cash Receipts** | $13,990,000 |
| **Cash Disbursements** | $1,892,000 |
| **Net Cash Gain (Loss)** | $12,098,000 |
| **Unpaid Obligations** | $740,000 |
| **Unpaid Receivables** | $17,860,000 |