STROOCK & STROOCK & LAVAN LLP
Andrew P. DeNatale
Kenneth Pasquale
180 Maiden Lane
New York, New York 10038
Telephone: (212) 806-5400
Facsimile: (212) 806-6006

*Attorneys for ABN AMRO Capital USA LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | : | |
|---|---|---|
| IN RE: | : | Chapter 11 |
| | : | |
| TRANSMAR COMMODITY GROUP LTD., | : | Case No. 16-13625 (JLG) |
| | : | |
| Debtor. | : | |
| | : | |
| | : | |

**MOTION OF THE AGENT PURSUANT TO**
**11 U.S.C. § 1112(b)(1) TO CONVERT THIS CHAPTER 11**
**BANKRUPTCY CASE TO A CASE UNDER CHAPTER 7**

ABN AMRO Capital USA LLC ("ABN AMRO" or the "Agent"), as administrative agent and collateral agent for itself and other secured lenders (the "Lenders") under the Amended and Restated Credit Agreement, dated as of February 26, 2016, as amended (the "Credit Facility"), by and through its undersigned counsel, respectfully submits this motion ("Motion") for entry of an Order, substantially in the form submitted herewith as Exhibit A, pursuant to sections 105(a) and 1112(b) of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), converting the chapter 11 case of Transmar Commodity Group LTD. (the "Debtor") to a case under chapter 7 of the Bankruptcy Code.

In support of this Motion, ABN AMRO respectfully represents as follows:

## **PRELIMINARY STATEMENT**

1.  The Agent and the Lenders have claims against the Debtor that exceed $360 million. This bankruptcy case was filed following the Debtor's disclosure to the Lenders of an unexplained and drastic (over $300 million) reduction in the value of the assets securing such claims. ABN AMRO, as Agent for the Lenders, therefore sought and was granted authorization from this Court to conduct an investigation pursuant to Rule 2004 into the facts and circumstances surrounding this apparent disappearance of hundreds of millions of dollars of the Lenders' collateral from the Debtor's estate. The reason for the decrease in collateral value (at least in part) is now clear -- the Debtor's management (including members of the Johnson family that indirectly own and continue to control the Debtor) perpetrated a massive fraud upon the Agent and the Lenders. The fraud was committed and allowed to continue by the same people who today remain in control of the Debtor-in-possession, and by employees of the Debtor who today remain employed by the Debtor. This *status quo* cannot continue.

2.  Through their review of documents produced by the Debtor, the Agent's professionals recently discovered emails exchanged between and among the Debtor's current management (mostly members of the Johnson family), in which management admits to committing a fraud upon the Lenders by manipulating the Debtor's books and records to support false borrowing base reports designed to maximize the amounts that the Debtor could draw under the Credit Facility. The Lenders extended credit based on these fraudulent reports. As particularly pertinent to this Motion, the Debtor remains in possession through its current officers and directors, and at least one remaining employee, all of whom participated to varying degrees in the fraud: Peter G. Johnson (the Debtor's Chairman, President and Chief Executive Officer), Timothy Johnson (the Debtor's Vice Chairman, Vice President and Chief Operating Officer), Mary Johnson (a director of the Debtor), and Gary O'Connor (the Debtor's Senior Staff

Accountant).[1] *See infra* at ¶¶ 11-19.  The Johnson family's management and control of the Debtor must end now that conclusive proof of fraudulent activity has surfaced.

3. As the Court is aware from many of the recent filings by the Debtor, the Debtor no longer has any continuing operations and instead is selling its diminishing assets as quickly as possible.  Under these circumstances, the most appropriate means for removing the Johnson family from control of the Debtor is a conversion of this chapter 11 case to a case under chapter 7 of the Bankruptcy Code.  The costs of administering the estate continue to mount, and the Debtor does not have any continuing business operations to support such costs.  Accordingly, it would be inappropriate to appoint a chapter 11 trustee because the exigent financial condition of the Debtor's estate cannot withstand the additional time and expense that would be incurred to permit a chapter 11 trustee to pursue functions beyond those available to a chapter 7 trustee, including pursuing a liquidating plan.  The Debtor's estate cannot afford the protracted plan process that would follow from the appointment of a chapter 11 trustee with the little cash that remains in the estate.  Moreover, given the facts that have come to light, the Lenders cannot consent to funding such a plan process with their cash collateral.

4. The Agent submits that a chapter 7 trustee is best suited to most efficiently and expeditiously liquidate the remaining assets of the Debtor and thereby maximize recoveries for the creditors in a streamlined fashion.  A chapter 7 liquidation is therefore the appropriate process to conclude this bankruptcy case.

## JURISDICTION AND VENUE

5. This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1] The Johnson family is the 100% owner of the Morristown Group, the indirect owner of the Debtor: Peter G. Johnson, his wife, Mary Johnson, and two sons, Peter B. Johnson and Timothy Johnson.

6.    The statutory predicates for the relief requested herein are sections 105(a) and 1112(b) of the Bankruptcy Code and Rule 1017 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## RELEVANT FACTS

**A.    Background**

7.    On December 31, 2016 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

8.    On January 18, 2017, an official committee of unsecured creditors was appointed in the Bankruptcy Case (the "Committee") [Docket No. 68]. No prior request for the appointment of a trustee or examiner has been made in this case.

**B.    The Credit Facility**

9.    On or about February 26, 2016, the Debtor, Lenders and ABN AMRO entered into the Credit Facility, which is a committed senior secured borrowing base facility in the total aggregate amount of $400 million. *See Declaration of Robert J. Frezza in Support of Debtor's Chapter 11 Petition and First Day Motions* (the "Frezza Decl.") [Docket No. 4], at ¶ 26. In connection with the Credit Facility, the Debtor, the Lenders and ABN AMRO also entered into an Amended and Restated Security Agreement, dated as of February 26, 2016 (the "Security Agreement"), to secure the loans made under the Credit Facility and which granted ABN AMRO, for the benefit of the Lenders, blanket first-priority liens on virtually all of the Debtor's assets. Frezza Decl., ¶ 27.

10.    As of the Petition Date, there was an outstanding principal balance of approximately $360 million, plus $4.7 million in accrued but unpaid interest owed to the Lenders under the Credit Facility. Frezza Decl., ¶ 28.

**C.      The Borrowing Base Fraud**

11.     Pursuant to section 7.2 of the Credit Facility, the Debtor was obligated to periodically furnish the Lenders with borrowing base reports (the "Borrowing Base Reports"), which calculated the collateral borrowing base available to support the Debtor's existing loans and requests for additional loans under the Credit Facility.  The Borrowing Base Reports calculated, among other things, the Debtor's eligible cash, eligible net liquidity in brokerage accounts, eligible accounts receivable, eligible inventory, eligible letters of credit, eligible net unrealized forward gains and losses, eligible prepayments to suppliers and eligible origin foreign inventory.

12.     In November 2016, the Lenders were first advised by the Debtor of significant discrepancies in the value of the Lenders' collateral as disclosed in the Borrowing Base Reports. For example, the Debtor reported a Gross Asset Value of $555,919,243 in its Borrowing Base Report dated as of October 28, 2016, but, as of November 30, 2016, the Debtor advised that the Gross Asset Value was now only $242,466,660 – a loss of over $313 million in asset value in one month's time that remains unaccounted for today.  As a result of this significant gap in collateral value, the Debtor no longer had sufficient assets reflected in the Borrowing Base Report to support the amount outstanding under the Credit Facility, and therefore created a default (in addition to the payment default that existed since August 2016) under the Credit Facility.   These defaults ultimately resulted in the Debtor filing for bankruptcy protection under chapter 11.

13.      Shortly after the filing, ABN AMRO, on behalf of the Lenders, sought and obtained authority from this Court to conduct an investigation into the Debtor's affairs and, in particular, the facts and circumstances underlying the apparent loss of the Lenders' collateral. *See, e.g.,* ECF Nos. 124, 125, 183.  ABN AMRO thereafter served subpoenas upon the Debtor

and many of the Debtor's current and former officers, directors and employees. Almost all of the persons subpoenaed by ABN AMRO asserted their Fifth Amendment right against self-incrimination and refused to produce documents and testify at oral examination, including Peter G. Johnson, Peter B. Johnson, Timothy Johnson, Thomas Reich (formerly the Debtor's Treasurer), William Yu (formerly the Debtor's Director of Mergers and Acquisitions), Gary O'Connor and Nancy Pizzi (formerly a Senior Staff Accountant).[2]

14. The Debtor itself has produced to date, on a rolling basis, well over one million documents in response to ABN AMRO's subpoena upon it. Although ABN AMRO and its professionals previously believed that circumstantial and forensic evidence of fraud existed, in reviewing the most recent document production provided by the Debtor, ABN AMRO's counsel discovered on or about May 12, 2017 that emails existed in which the Johnson family, and others, admit to committing a fraud upon the Lenders.[3] These emails reveal, among other things, that the Debtor's management willfully and knowingly manipulated the Debtor's books in order to support fictitious Borrowing Base Reports that the Debtor then used for its borrowing requests. The documentary evidence uncovered by the Lenders also confirms that the fraud was pervasive and ongoing since *at least* August of 2015.

15. The documents demonstrating the fraud are compelling and conclusive. For example, in an email dated March 2, 2016, with a subject "DO NOT FORWARD – DELETE" (a true and complete copy of which is attached to the *Declaration of Kenneth Pasquale in Support of Motion of the Agent Pursuant to 11 U.S.C. § 1112(b)(1) to Convert This Chapter 11*

---

[2] Two former employees have testified at oral examination, to date, in response to ABN AMRO's subpoenas: Nathanial Durant, who was President of the Debtor for a short time in the fall of 2016, and Daniel McNamara, formerly the Debtor's Vice President of Trading.

[3] Since that time, the Agent and Lenders have been carefully considering the information discovered by their professionals and their legal options, and preparing this Motion.

*Bankruptcy Case to a Case Under Chapter 7* (the "Pasquale Decl.") as Exhibit A), Peter B. Johnson wrote to his father, Peter G. Johnson, and Thomas Reich (emphasis added):

> Yesterday evening **I have received two versions of the borrowing base from Gary [O'Connor]. One "true" and one "adjusted". The manual adjustments made presumably to keep the BB in compliance amount to more than 140M USD.** This is essentially the hole that exists in the Transmar Borrowing Base. I have a sick feeling in my stomach, as such a massive gap will be extremely difficult to close . . . .

To this email, Peter G. replied:

> Geez. Worse than I thought[.] Tom [Reich] went white yesterday when Alex G started to probe about amount and verifying level of inventory--- . . . .

(Pasquale Decl., Ex. A at TCG001019624).

16. Another email chain, dated August 15 and 16, 2015 (*see* Pasquale Decl., Ex. B, at TCG001225817-TCG001225819), implicates all of the Johnson family members who currently manage the Debtor's business, as well as Peter B. Johnson, who resigned as an employee of the Debtor on December 7, 2016. *See* Frezza Dec. at ¶ 39. In that email exchange, Peter B. Johnson replied to an email from his father, Peter G. Johnson, that was also sent to Timothy Johnson and Mary Johnson. In his reply, sent with the subject line "VERY CAREFUL – DO NOT FAT FINGER FORWARD", Peter B. admitted that **"Transmar consistently submits inaccurate borrowing base reports to the banks, the discovery of which is an existential threat to our company"** and that "Euromar is widely underfinanced . . . requiring huge outlays of working capital from Transmar." He also wrote that "We can clean up the books to the point that Claire has nothing with which to pin us to the wall, but we cannot 'clean it up' to the extent you envision. Simply put - If Transmar were to cancel all the Condicaf and FTN and Neskao purchases in its books, the entire equity of the company would go to ZERO." *Id*. at TCG001225818.

17. Yet another email chain, dated May 4-5, 2016, between Peter G. Johnson and Peter B. Johnson, acknowledges the manner in which they cavalierly manipulated the borrowing base reports for both Transmar and its affiliate, Euromar. Peter B. wrote:

> Euromar agreed to essentially transfer to Transmar its entire inventory for the 29th cut-off date of Transmar's borrowing base, with the agreement that Transmar would invoice it all back by Euromar's BB date on the 30th. Transmar didn't/couldn't invoice everything back, which put Euromar in massive default of its BB.

Peter G. replied, in pertinent part: "F_ING A – What now???" (Pasquale Decl., Ex. I at TCG001014543).

18. In an email dated July 2, 2016, sent under the subject "Hole", Peter B. Johnson wrote to his father, Peter G., and brother, Timothy, noting that "[s]ince we are about 6-7 years into the usage of various tactics of drawing against the Borrowing Base to fill collateral gap. Dick [Krystie, a former Chief Financial Officer] was an expert in the game of 'reversing invoices', which was essentially another version of the shenanigans employed today." (Pasquale Decl., Ex. J at TCG00182088).

19. These emails, others annexed to the Pasquale Decl. and more beyond those conclusively demonstrate that the borrowing base fraud was pervasive throughout the Debtor's operation and was engineered and known by the members of the Johnson family who managed the Debtor's business, some of whom remain in management positions today. Specifically, Peter G. Johnson, Timothy Johnson and Mary Johnson are currently officers and/or directors of the Debtor, and Gary O'Connor is currently employed by the Debtor. These members of the Debtor's current management were either actively involved in, or complicit in, the fraud against the Lenders, continue to manage the Debtor's day-to-day affairs and have been involved in and sometimes spearheading the Debtor's efforts to sell inventory, collect receivables and realize

value from the sale of the Debtor's cocoa assets and contracts. The Debtor cannot be left in possession under such corrupt management.

## ARGUMENT

**A.   There is Cause to Convert this Case to Chapter 7 Under 11 U.S.C. § 1112(b)**

20.     Section 1112(b)(1) of the Bankruptcy Code provides, in pertinent part, that "on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause, unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate." 11 U.S.C. § 1112(b)(1); *see generally, In re Prisco Props., LLC*, 2010 WL 4402095, at *3 (Bankr. D.N.J. Nov. 1, 2010) (citation omitted) (noting 2005 amendments to Bankruptcy Code were "intended to make it more difficult to defeat a request for conversion or dismissal").

21.     Section 1112(b)(4) of the Bankruptcy Code provides a number of examples of "cause" for the purposes of determining whether a court should convert a case. 11 U.S.C. § 1112(b)(4). The list of factors constituting cause in section 1112(b)(4) is non-exclusive. *In re The 1031 Tax Group, LLC*, 374 B.R. 78, 93 (Bankr. S.D.N.Y. 2007); *see also In re State Street Assoc., L.P.*, 348 B.R. 627, 639 (Bankr. N.D.N.Y. 2006) (noting in pre-BAPCPA case that amended 1112(b) contains non-exclusive factors to be considered in determining whether cause exists to convert or dismiss a case). Thus, in considering a motion under section 1112(b), the court need not limit its review to the grounds set forth in the statute and may, using its equitable powers, look to other factors that justify granting the relief sought. *See In re C-TC 9th Avenue P'ship*, 113 F.3d 1304, 1311 (2d Cir. 1997)(noting that the list of factors constituting cause under section 1112(b) is "illustrative [and] not exhaustive"); *In re BH S & B Holdings, LLC*, 2010 WL

9

4644440, at *2 (citing *In re Ameribuild Construction Mgmt., Inc.*, 399 B.R. 129, 131 n.3 (Bankr. S.D.N.Y. 2009)) (holding that administrative insolvency constitutes cause under section 1112(b) notwithstanding the fact that administrative insolvency is not among factors listed in section 1112(b)); *see also* 11 U.S.C. § 102(3) (term "including" as used in Bankruptcy Code is not to be construed as limiting in nature). In addition, the court has "wide discretion" in determining whether cause exists under section 1112(b). *BH S & B*, 2010 WL 4644440, at *2 (citations omitted) ("Bankruptcy judges have wide discretion to determine whether cause exists to . . . convert a case under section 1112(b)."); *In re The 1031 Tax Group, LLC*, 374 B.R. at 93 ("[A] court is given wide latitude in determining whether the challenged conduct rises to the level of 'cause.'").

22.     For the reasons set forth below, cause exists to convert this bankruptcy case to a case under chapter 7,[4] and conversion is in the best interests of creditors and the estate.[5]

### 1. The Fraud Perpetrated by the Debtor's Management Warrants Conversion

23.     The fraud perpetrated by the Debtor's existing management and directors provides the cause necessary to convert this bankruptcy case to a case under chapter 7. Although not included in the enumerated items of section 1112(b)(4) of the Bankruptcy Code, courts have determined that "cause" may include fraud and dishonesty. *In re Jayo*, 2006 WL 2433451, at *8 (Bankr. D. Idaho July 28, 2006) (finding that "fraud and dishonesty falls within the express

---

[4] Once cause is shown, the burden of proof shifts to the party objecting to the requested relief "to either: (a) demonstrate that unusual circumstances exist that would make dismissal or conversion unfavorable to the creditors or estate; or (b) establish that a plan will be confirmed and that the act or omission that forms the basis for the aforementioned cause to dismiss or convert will be cured within a reasonable time." *StellarOne Bank v. Lakewatch LLC (In re Park)*, 436 B.R. 811, 815 (Bankr. W.D. Va. 2010); *see In re New Rochelle Tel. Corp.*, 397 B.R. 633, 640 (Bankr. E.D.N.Y. 2008) ("Absent a showing of 'unusual circumstances,' if the movant establishes that 'cause' exists to convert the case, it is the Court's obligation to dismiss or convert a Chapter 11 case."); *see also* 11 U.S.C. § 1112(b)(2).

[5] Conversion, as opposed to dismissal, of this chapter 11 case is in the best interests of creditors and the estate. The Debtor continues to have some assets (although not extensive), including potential causes of action against third parties, the recovery of which will inure to the benefit of creditors and the Debtor's estate. Recovery of such assets will be greatly aided, and likely maximized, by an organized and controlled process under the Bankruptcy Code rather than pursuant to non-bankruptcy avenues that would be pursued if the case were dismissed.

10

language of § 1104(a)(1) and, the Court above has found, it is not excluded from consideration under § 1112(b)(1) and (4)"); *In re Miell*, 419 B.R. 357, 366 (Bankr. N.D. Iowa 2009) ("The commission of a crime with components of fraud and dishonesty is not excluded from consideration under § 1112(b)."). Here, the Debtor's current management, with Peter G. Johnson at the helm, has for years engaged in a massive fraud that resulted in hundreds of millions of dollars in losses by the Lenders. Yet, the same corrupt management continues today to operate the Debtor as debtor-in-possession and, accordingly, the case should be converted and management replaced by a chapter 7 trustee.

24. Section 1107 and related provisions of the Bankruptcy Code that authorize chapter 11 debtors to remain in possession of estate assets are "premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee." *Wolf v. Weinstein*, 372 U.S. 633, 651 (1963); *see also Eurospark Indus.*, 424 B.R. 621, 627 (Bankr. E.D.N.Y. 2010). "The willingness of Congress to leave a debtor in possession of its assets is premised on the expectation that current management can be depended upon to carry out the fiduciary responsibilities of a trustee." *In re V. Savino Oil & Heating Co.*, 99 B.R. 518, 526 (Bankr. E.D.N.Y. 1989). The evidence conclusively demonstrates that the Debtor's current management has been engaged in an ongoing fraud against the Lenders and cannot be trusted to "carry out the fiduciary responsibilities of a trustee." *Id.* Thus, the Debtor's management must be removed and a chapter 7 trustee appointed in its place.

### 2. There Were and Are Substantial and Continuing Losses to and Diminution of the Estate and No Likelihood of Rehabilitation

25. In addition to the "cause" established by existing management's pervasive fraud, conversion of the case is also appropriate because the Debtor's assets have eroded since the Petition Date and will continue to erode. Section 1112(b)(4)(A) provides that cause exists to

11

convert a case to chapter 7 where there is a "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A). "A party seeking to demonstrate cause under § 1112(b)(4)(A) must establish both the 'substantial or continuing loss' prong as well as the absence of a reasonable likelihood of rehabilitation." *In re FRGR Managing Member LLC*, 419 B.R. 576, 581 (Bankr. S.D.N.Y. 2009). Furthermore, with respect to the first prong, "the loss or decline in value must be either *substantial* or *continuing,* but need not be both." *In re Paterno*, 511 B.R. 62, 66 (Bankr. M.D.N.C. 2014) (emphasis in original); *In re TMT Procurement Corp.*, 534 B.R. 912, 918 (Bankr. S.D. Tex. 2015) ("The loss may be substantial or continuing; it need not be both."). To establish substantial diminution in value, "courts often look at the debtor's track record, including the financial prospects of the debtor and the financial records filed with the court." *In re Paterno*, 511 B.R. at 66.

26.    Here, the Debtor's assets have substantially eroded since the Petition Date, and will continue to erode. Importantly, the Debtor is no longer operating and is simply running off its existing inventory and liquidating its assets. The Debtor's assets are not being replenished by operations and the costs continue to mount. This is apparent from the Debtor's budgets filed in connection with the Court's cash collateral orders, which reveal a serious erosion in the value of the Debtor's estate. For example, in the budget attached to the Final Cash Collateral Order (ECF No. 119; *see* Pasquale Decl., Ex. N), the Debtor anticipated a cash balance of over $24 million as of the end of the budget period (March 31, 2017). However, in the budget most recently filed with the Court, the Debtor projects the cash balance, as of the end of the budget period (June 2, 2017), including the excess amounts paid to ABN AMRO under the Cash Collateral Order, to be

approximately $14.3 million. *See* Pasquale Decl., Ex. O (ECF No. 265).[6] Although some of this discrepancy is the result of additional administrative costs, a comparison of these budgets also demonstrates lower asset values.

27. In addition to the substantial loss in asset value to date, if this case remains in chapter 11, the Debtor's estate will continue to diminish as a result of the significant professional fees and administrative expenses that would continue to be incurred. Currently, the Debtor's non-operating estate (through use of the Lenders' cash collateral) is supporting three sets of professionals. These professional fees are contributing to the continuing loss of value to the estate, which (when combined with the inability to rehabilitate set forth below), satisfies the standard for "cause" under section 1121(b)(4)(A) of the Bankruptcy Code. *See In re Lyons Transp. Lines, Inc.*, 123 B.R. 526, 531 (Bankr. W.D. Pa. 1991) (finding that an estate's continuing liability for administrative expenses constitutes a continuing diminution of the estate).

28. As set forth above, this case was originally filed as a chapter 11 liquidation, without any reasonable likelihood of a reorganization.[7] Accordingly, the second prong of section 1112(b)(4)(A) is satisfied as well -- there is no likelihood of rehabilitation and there never has been in this case. *See, e.g.*, *Loop Corp. v. U.S. Trustee*, 379 F.3d 511, 515-16 (8th Cir. 2004), *cert. denied*, 543 U.S. 1055 (2005)(confirming holding of bankruptcy court which converted cases to chapter 7 because liquidating debtor who had no intention of restoring its business had "no reasonable likelihood of rehabilitation"); *BH S & B Holdings, LLC*, 2010 WL 4644440, at *4 (Bankr. S.D.N.Y. Nov. 18, 2010) (citing cases and noting those following *Loop*). Cause therefore exists under section 1112(b)(4)(A) to convert this case to a case under chapter 7.

---

[6] As noted in this budget, the Debtor has paid approximately $8.345 million to ABN AMRO as "Excess Cash Collateral" pursuant to paragraph 24 of the Final Cash Collateral Order. Such amounts are no longer property of the estate but are included in the $14.3 million cash total to provide an accurate comparison to the original $24 million projection. *See* Pasquale Decl., Ex. O (ECF No. 265).

[7] One of the Debtor's affiliates, Euromar Commodities GmbH, which was provided pre-petition with significant financial support by the Debtor, is also in liquidation proceedings in Germany. *See* Frezza Decl. at ¶ 48.

13

**B.     Appointment of a Chapter 11 Trustee is Not in the Best Interest of Creditors and the Estate**

29.     As explained above, cause exists to convert this case to chapter 7. Where such cause exists, the Bankruptcy Code provides that the court shall convert or dismiss the case, "unless the court determines that . . . the appointment under section 1104(a) of a trustee . . . is in the best interest of creditors and the estate". 11 U.S.C. § 1112(b)(1). Here, the appointment of a chapter 11 trustee is not in the best interests of creditors or the estate.

30.     This case was filed as a chapter 11 liquidation. However, given the facts now before the Court, no reason exists for the liquidation process to continue in chapter 11. Management must be displaced, and the economic reality is that there simply are not enough funds left in the Debtor's non-operating estate to finance a chapter 11 process. The administrative expenses of the estate are continuing to mount, and the appointment of a chapter 11 trustee would only exacerbate these expenses given the trustee's likely need to retain counsel (and potentially a financial advisor), learn the history of the case, and then determine whether it is in the best interests of the estate to pursue a chapter 11 plan process. Additionally, unlike in a chapter 7, the costs of the committee professionals would continue in a chapter 11.

31.     Importantly, the chapter 11 process would need to be funded with the continuing use of the Lenders' cash collateral, but would lead to the same result (albeit at a higher cost) as would be achieved in a chapter 7 process -- liquidation of the Debtor's assets and a fair and orderly administration of the estate. The Lenders are no longer able to continue to extend the Debtor's ability to use cash collateral or to fund a plan process in light of (1) the amounts already expended and (2) the revelation of borrowing base fraud. Based on the foregoing, a chapter 11 plan is no longer an achievable goal in this case. Without the possibility of confirming a plan, the appointment of a chapter 11 trustee is not in the best interests of the creditors or the estate. A chapter 7 trustee is best suited to quickly and efficiently liquidate the remaining assets of the

Debtor, while at the same time pursuing any causes of action the trustee feels may add value to the estate and administering the estate in a fair and orderly manner.[8]

## NO PRIOR REQUEST

32.  No prior request for the relief sought in this Motion has been made to this or any other Court.

## NOTICE

33.  Notice of this Motion and the hearing thereon will be given to: (a) the Office of the U.S. Trustee (Attn: Serene Nakano, Esq.); (b) counsel to the Debtor; (c) counsel to the Committee (Attn.: Rocco A. Cavaliere); and (d) any such other party entitled to notice pursuant to Bankruptcy Rule 2002 and Local Rule 9013-1(b).

**WHEREFORE**, for the reasons stated herein, ABN AMRO, as administrative agent and collateral agent for the Lenders, respectfully requests that this Court enter an Order, in the form attached hereto as Exhibit A: (i) converting the chapter 11 case of the Debtor to a case under chapter 7 of the Bankruptcy Code and (ii) granting such other and further relief as this Court may deem just and proper.

Dated: May 23, 2017  
       New York, New York

STROOCK & STROOCK & LAVAN LLP

 /s/   Kenneth Pasquale  
Andrew P. DeNatale  
Kenneth Pasquale  
180 Maiden Lane  
New York, New York 10038-4982  
Telephone: (212) 806-5400

*Attorneys for ABN AMRO Capital USA LLC*

---

[8] The duties of a chapter 11 trustee are set forth in section 1106 of the Bankruptcy Code and include substantially all of the duties of a chapter 7 trustee plus (i) investigation of the acts, conduct, assets, liabilities, and financial condition of the debtor, the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the formulation of a plan, (ii) filing a report of such investigation, and (iii) filing a plan, filing a report of why the trustee will not file a plan, or recommending conversion or dismissal. These extra duties (and their attendant expenses) would provide no additional benefit to the estate or its creditors in this case.

**EXHIBIT A**

**EXHIBIT A**

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

---

|  |  |
|---|---|
| IN RE: : | Chapter 11 |
| TRANSMAR COMMODITY GROUP LTD., : | Case No. 16-13625 (JLG) |
| Debtor. : |  |

---

### ORDER CONVERTING CHAPTER 11 CASE TO CASE UNDER CHAPTER 7 OF THE BANKRUPTCY CODE

Upon consideration of the Motion (the "Motion")[1] of ABN AMRO Capital USA LLC, as administrative agent and collateral agent for itself and other secured lenders ("ABN AMRO"), for entry of an Order, pursuant to sections 105(a) and 1112(b) of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), converting the chapter 11 case of Transmar Commodity Group LTD. (the "Debtor") to a case under chapter 7 of the Bankruptcy Code; and the Court having jurisdiction over the matter in accordance with 28 U.S.C. §§ 157 and 1334; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; it is hereby

ORDERED, that the Motion is granted; and it is further

ORDERED, that the Debtor's chapter 11 case is hereby converted to a case under chapter 7 of the Bankruptcy Code; and it is further

ORDERED, that the Office of the United States Trustee shall immediately appoint a chapter 7 trustee to oversee the Debtor's chapter 7 case; and it is further

ORDERED, that the Debtor shall comply with the provisions of Bankruptcy Rule 1019(4) as soon as is practicable after the appointment of a chapter 7 trustee; and it is further

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

ORDERED, that within fourteen (14) days from the date of this order, the Debtor shall, pursuant to Bankruptcy Rule 1019(5)(A)(i), file a schedule of unpaid debts incurred after the Petition Date and before the date of this order, including the name and address of each holder of a claim; and it is further

ORDERED, that the Debtor shall, within thirty (30) days from the date of this order, file and transmit to the United States Trustee a final report and account as required by Bankruptcy Rule 1019(5)(A)(ii); and it is further

ORDERED, that upon entry of this order, the Committee shall be dissolved and the members thereof and the professionals retained by the Committee in accordance with section 1103 of the Bankruptcy Code shall be released and discharged from their respective fiduciary obligations, duties and responsibilities; and it is further

ORDERED, that this Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: May __, 2017  
       New York, New York

_____  
UNITED STATES BANKRUPTCY JUDGE