NOT FOR PUBLICATION

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x:

In re:                                              :
                                                    :          Chapter 7
Transmar Commodity Group Ltd.,                      :
                                                    :          Case No. 16-13625-JLG
                Debtor.                             :
---------------------------------------------------------------x


**MEMORANDUM DECISION AND ORDER ON MOTION FOR AN ORDER,
PURSUANT TO RULE 2004, AUTHORIZING THE TRUSTEE TO ISSUE SUBPOENAS
FOR THE EXAMINATION OF, AND THE PRODUCTION OF DOCUMENTS FROM,
AMERRA CAPITAL MANAGEMENT LLC AND NANCY OBLER**


<u>APPEARANCES</u>:

**Windels Marx Lane & Mittendorf, LLP**
156 West 56th Street
New York, NY 10019
By:    James Sullivan, Esq.

*Attorneys for Alan Nisselson, Chapter 7 Trustee*


**Sidley Austin LLP**
787 Seventh Avenue
New York, NY 10019
By:    John G. Hutchinson, Esq.
       Lee S. Attanasio, Esq.
       Benjamin F. Burry, Esq.

*Attorneys for AMERRA Capital Management LLC*

HON. JAMES L. GARRITY, JR.
UNITED STATES BANKRUPTCY JUDGE:


The matter before the Court is the Motion by Alan Nisselson, as the Chapter 7 Trustee

(the "**Trustee**") of Transmar Commodity Group Ltd. (the "**Debtor**" or "**Transmar**") for an

Order Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure Authorizing the

Trustee to Issue Subpoenas for the Examination of, and the Production of Documents from

AMERRA Capital Management LLC ("**AMERRA**") and Nancy Obler ("**Obler**" and together

with AMERRA, the "**Respondents**") [ECF No. 542] (the "**Motion**").[1]  AMERRA objects to the

Motion (the "**AMERRA Objection**").[2]

Although AMERRA has agreed to produce documents responsive to many of the

Trustee's document requests, it objects to the production of the AMERRA Internal

Communications and AMERRA External Communications (as those terms are defined herein).

It also objects to the oral examination of Ms. Obler.  To the extent set forth below, the Court

directs the production of the AMERRA Internal Documents and the oral examination of Ms.

Obler.  Thus, the Court overrules those aspects of the AMERRA Objection.  However, as

explained below, the Court sustains AMERRA's objection to the production of the AMERRA

External Communications.  Accordingly, for the reasons set forth herein, the Court GRANTS the

Motion in part, and DENIES the Motion in part.

---

[1]    The Trustee also filed a Reply to AMERRA's Objection to the Motion.  *See* ECF No. 548 (the "**Reply**").

[2]    *See* Objection of AMERRA Capital Management LLC to the Motion for an Order Pursuant to Rule 2004 of the
Federal Rules of Bankruptcy Procedure Authorizing the Trustee to Issue Subpoenas for the Examination of, and the
Production of Documents from, AMERRA Capital Management LLC and Nancy Obler [ECF No. 545].

JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Referral of Cases to Bankruptcy Judges of the United States District Court for the Southern District of New York, No. M10-468, 12 Misc. 00032, dated January 31, 2012 (Preska, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

FACTS[3]

*Background*

On December 31, 2016 (the "**Petition Date**"), Transmar filed a voluntary petition under chapter 11 of the Bankruptcy Code in this Court [ECF No. 1].  Several weeks earlier, Euromar Commodities GmbH ("**Euromar**"), an affiliate and trading partner of the Debtor, commenced insolvency proceedings in Germany.  *See* Declaration of Robert J. Frezza in Support of Debtor's Chapter 11 Petition and First Day Motions [ECF No. 4] (the "**Frezza Declaration**") ¶¶ 15, 48. As of the Petition Date, Transmar operated as a full service cocoa service trading and cocoa butter supplier to the international confectionary industry.  *See id.* ¶ 9.  It was party to a committed senior secured borrowing base facility in the aggregate amount of $400 million. ABN AMRO Capital LLC (the "**Agent**" or "**ABN**") was among the lenders under that facility (the "**Prepetition Lenders**"), but also served as the administrative agent and collateral agent thereunder.  *See id.* ¶ 26.  According to the Debtor, the lenders contend that as of the Petition Date, the outstanding principal amount under that facility totaled in excess of $359 million.  *See id.* ¶ 28.

AMERRA was a trading partner of the Debtor and is also among its largest creditors. Ms. Obler is a Managing Director at AMERRA.  On or about April 14, 2017, AMERRA filed a

---

[3]    Unless otherwise noted, the facts are not in dispute.

proof of claim (the "**Amerra Claim**") herein (Claim No. 40).  In it, AMERRA seeks payment of

(i) $8,918,213, representing unpaid principal and interest under a $10 million Subordinated Note

dated August 29, 2013; (ii) an undetermined amount for the profit participation payment and

other amounts due under a letter agreement dated August 29, 2013; and (iii) an undetermined

amount for amounts due under certain purchase and sale contracts for the sale and transfer of

cocoa products governed by an Amended Servicing Agency Agreement dated as of December 3,

2013.  *See* Motion ¶ 10.

Transmar remained in possession and control of its business and assets as a debtor in

possession until July 26, 2017, when, in response to the Agent's motion for such relief,[4] the

Court converted Transmar's chapter 11 case to one under chapter 7 of the Bankruptcy Code.  *See*

Order Granting Motion to Convert Chapter 11 Case to Chapter 7 [ECF No. 402].  By notice

dated July 26, 2017, the United States Trustee appointed the Trustee as interim trustee of the

Debtor's estate.  *See* Notice of Appointment of Trustee Alan Nisselson, Esq. [ECF No. 403].

The Trustee subsequently qualified and currently serves as the permanent trustee.

As of the Petition Date, Peter G. Johnson served as the Debtor's Chairman, President and

Chief Executive Officer; his son, Peter B. Johnson, served as the Debtor's Vice-Chairman, Vice-

President, and Chief Operating Officer, and was responsible for Euromar's operations; and

Thomas Reich served as the Debtor's Treasurer (such parties, collectively, the "**Debtor's**

**Principals**").  *See* Frezza Declaration, Sch. 7.   On or about August 8, 2017, the United States

Attorney for the Southern District of New York and the New York Office of the Federal Bureau

of Investigation announced the unsealing of an indictment (the "**Indictment**") in Manhattan

federal court charging each of the Debtor's Principals with defrauding a group of lenders with

---

[4]    *See* Motion Of The Agent Pursuant To 11 U.S.C. § 1112(b)(1) To Convert This Chapter 11 Bankruptcy Case
To A Case Under Chapter 7 [ECF No. 295].

false "borrowing base" reports from at least in or about 2014 through at least November 2016,

designed to secure and maintain a $400 million line of credit for the Debtor. *See* Motion ¶¶ 21-

22. On March 9, 2018, Peter G. Johnson and Peter B. Johnson each pled guilty to the

Indictment. *Id.* ¶ 23. Thomas Reich pled guilty to the Indictment on March 19, 2018. *Id*. ¶ 24.

## The Trustee's Informal Discovery

After his appointment, the Trustee received documents, including emails, from, among

others, the Debtor, its counsel, and the Agent. *See* AMERRA Objection ¶¶ 3, 35. That includes

materials that AMERRA voluntarily produced to the Agent in response to the Agent's Rule 2004

discovery in this case, consisting of: (i) documents evidencing 48 cocoa transactions between

AMERRA and one or both of the Debtor and Euromar; and (ii) documents evidencing claims

AMERRA has against the Debtor and certain of its affiliates, including Euromar.[5] By reason of

the informal discovery, the Trustee is in possession of approximately 1.1 million documents,

comprised of more than 2.7 million pages. *See id.* Those documents include more than 13,000

emails (including 8,000 attachments to those emails, totaling almost 57,000 pages) to or from

AMERRA.

## The Rule 2004 Motion

In this Motion, the Trustee seeks an order from this Court pursuant to Bankruptcy Rule

2004 authorizing him to issue one or more subpoenas to the Respondents, substantially in the

form of the subpoena attached as Exhibit B to the Motion (the "**Subpoena**"). The Subpoena

---

[5]    In January 2017, the Agent sought Rule 2004 discovery from AMERRA as to, *inter alia*, certain transactions among AMERRA, the Debtor, and Euromar. *See* ECF No. 71. Although AMERRA initially opposed that motion, the parties resolved for AMERRA to produce certain documents to the Agent. *See* Order Authorizing ABN AMRO Capital USA LLC to Issue Subpoenas to AMERRA Capital Management LLC for the Production of Documents [ECF No. 125] (the "**ABN 2004 Order**"). Thereafter, AMERRA voluntarily produced documents evidencing all 48 cocoa transactions between AMERRA and one or both of the Debtor and Euromar during the time period specified by the Agent, as well as documents evidencing claims AMERRA held against the Debtor, Euromar and other affiliates. *See* AMERRA Objection ¶ 12.

directs the Respondents to produce documents responsive to the Subpoena, and to appear for oral examination under oath.  It identifies the "Documents To Be Produced For Inspection and Copying," as:

a.    all documents AMERRA referred to or relied upon in preparing the Amerra Claim

b.    all communications (including electronic communications such as emails, text messages and Bloomberg terminal messages) between AMERRA or Obler and any other person or entity relating to the Amerra Claim;

c.    all communications (including electronic communications such as emails, text messages and Bloomberg terminal messages) between AMERRA or Obler and any other person or entity relating to the Debtor's sales invoice S55281 to AMERRA dated August 15, 2016 in the amount of $8,243,384.76 (the "**Receivable Claim**") (except to the extent such communications were sent by email to a recipient using an email with a "transmargroup.com" or "transmarusa.com" domain name);

d.    all electronic communications (including emails, text messages and Bloomberg terminal messages) between Obler and any other AMERRA officer, director, employee or representative concerning the Debtor, Euromar, any of their affiliates, or any related entities from January 1, 2015 through December 31, 2016 (except to the extent such communications were sent by email to a recipient using an email with a "transmargroup.com" or "transmarusa.com" domain name);

e.    all electronic communications (including emails, text messages and Bloomberg terminal messages) between Obler and Euromar from January 1, 2013 through December 31, 2016 (except to the extent such communications were sent by email to a recipient using an email with a "transmargroup.com" or "transmarusa.com" domain name);

f.    all electronic communications (including emails, text messages and Bloomberg terminal messages) between Obler and any of the following persons from January 1, 2013 through December 31, 2016: Peter B. Johnson, Peter G. Johnson, Mary Johnson, Timothy Johnson, William Yu, Thomas Reich, Nathaniel Durant, Nancy Pizzi, and Richard Gary O'Connor concerning the Debtor, Euromar, any of their affiliates, or any related entities from January 1, 2013 through December 31, 2016 (except to the extent such communications were sent by email to a recipient using an email with a "transmargroup.com" or "transmarusa.com" domain name); and

g.   all electronic communications (including emails, text messages and
Bloomberg terminal messages) between Obler and any non-Debtor third
party concerning Cocoa Origins Africa or any African affiliates of the
Debtor or Euromar from January 1, 2015 through December 31, 2016
(except to the extent such communications were sent by email to a recipient
using an email with a "transmargroup.com" or "transmarusa.com" domain
name).

*See* Subpoena Part III ¶¶ a – g; *see also* Motion ¶ 27.

The Trustee says that he needs those materials in order to:

(i)   evaluate the merits of proofs of claim filed against the Debtor, including the
Amerra Claim, and to determine whether there are any legal or equitable
bases to disallow or subordinate them, including any rights of setoff or
recoupment; and

(ii)   investigate and evaluate the merits of any claims held by the Debtor,
including receivable claims (such as the Receivable Claim) and the
avoidance claims under sections 544, 547, 548, 549, 550 and 553(b) of the
Bankruptcy Code, as well as any legal or equitable defenses thereto.

*See* Motion ¶ 32.

### *The AMERRA Objection*

AMERRA does not object to the production of documents/communications that are

responsive to the discovery requests in Subpoena Part III ¶¶ a.- c., e., and f (collectively, the

"**Undisputed Requests**").  *See* AMERRA Objection ¶ 2.  It has produced, or is in the process of

producing, all documents in its possession or control that are responsive to those requests.  It is

undisputed the once AMERRA completes that production, the Trustee will have every

communication in the relevant time period that AMERRA ever had with anyone at Transmar, or

its affiliate, Euromar, that are responsive to those requests.  However, AMERRA opposes the

Trustee's request to depose Ms. Obler, and for the production of (i) documents responsive to the

demand in Subpoena Part III ¶ d., for all electronic communications (within the relevant time

period) among Ms. Obler and other AMERRA parties "concerning the Debtor, Euromar and any

of their affiliates or any related entities" (the "**AMERRA Internal Communications"**) and (ii)

in Subpoena Part III ¶ g., for all electronic communications (within the relevant time period)

between Ms. Obler "and any non-Debtor third party concerning Cocoa Origins Africa or any

African affiliates of the Debtor or Euromar" (the "**AMERRA External Communications**")

(collectively, the "**Disputed Requests**").

DISCUSSION

*Legal Standards*

Under Rule 2004 of the Federal Rules of Bankruptcy Procedure, "the court may order the

examination of any entity." Fed. R. Bankr. P. 2004(a). "The purpose of a Rule 2004

examination is to assist a party in interest in determining the nature and extent of the bankruptcy

estate, revealing assets, examining transactions and assessing whether wrongdoing has

occurred." *In re Recoton Corp.*, 307 B.R. 751, 755 (Bankr. S.D.N.Y. 2004) (citing *In re Bennett

Funding Grp., Inc.*, 203 B.R. 24, 28 (Bankr. N.D.N.Y. 1996)). As relevant here, the Trustee's

Rule 2004 examination "may relate only to the acts, conduct, or property or to the liabilities and

financial condition of the debtor, or to any matter which may affect the administration of the

debtor's estate[.]" Fed. R. Bankr. P. 2004(b); *see also In re Coffee Cupboard, Inc.*, 128 B.R.

509, 516 (Bankr. E.D.N.Y. 1991) ("The examination of a witness about matters having no

relationship or no effect on the administration of an estate is improper." (citing *Keene Corp. v.

Johns-Manville Corp. (In re Johns-Manville, Corp.)*, 42 B.R. 362, 364 (S.D.N.Y 1984))). Third

parties are subject to examination under this rule "if they possess knowledge of the debtor's acts,

conduct, or financial affairs which relate to the bankruptcy proceedings." *In re Bennett Funding

Grp., Inc.*, 203 B.R. at 28 (citations omitted); *see also In re Ecam Publications, Inc.*, 131 B.R

7

556, 559 (Bankr. S.D.N.Y. 1991) ("Third parties are subject to examination pursuant to Rule

2004 if they have knowledge of the debtor's affairs.") (citation omitted).

      The decision to grant or deny a request for discovery under Rule 2004 is within the sound

discretion of the court.  *See In re SunEdison, Inc.*, 562 B.R. 243, 249 (Bankr. S.D.N.Y. 2017)

("[R]elief [under Rule 2004] lies within the sound discretion of the Bankruptcy Court.")

(citations omitted); *see also In re Bd. of Dirs. of Hopewell Int'l Ins., Ltd.*, 258 B.R. 580, 587

(Bankr. S.D.N.Y. 2001) ("Rule 2004 provides that the Court 'may' order disclosure thereunder,

giving the Court significant discretion.").  However, "in granting a Rule 2004 request, the

bankruptcy court is required to make a finding of good cause for the examination." *In re

Madison Williams and Co., LLC*, No. 11-15896, 2014 WL 56070, at *4 (Bankr. S.D.N.Y. Jan. 7,

2014) (citation omitted).  The party seeking discovery under Rule 2004 bears the burden of

showing good cause for the examination it seeks.  *See SIPC v. BLMIS LLC (In re Madoff)*, Adv.

Pro. No. 08-01789, 2014 WL 5486279, at *2 (Bankr. S.D.N.Y. Oct. 30, 2014).  That burden will

not be satisfied "merely by a showing that justice would not be impeded by production of the

documents." *In re Drexel Burnham Lambert Grp., Inc.*, 123 B.R. 702, 712 (Bankr. S.D.N.Y.

1991) (citation omitted).  Rather, the party seeking Rule 2004 discovery must demonstrate either

that the proposed examination is necessary to establish the claim of the party, or that the denial

of discovery would cause the party undue hardship or injustice.  *See ePlus, Inc. v. Katz (In re

Metiom, Inc.*), 318 B.R. 263, 268 (S.D.N.Y. 2004) (noting that good cause for Rule 2004

discovery exists if the proposed examination "is necessary to establish the claim of the party, or

if denial of such request would cause the examiner undue hardship or injustice." (quoting *In re

Dinubilo*, 177 B.R. 932, 943 (E.D. Cal. 1993))); *accord In re Gawker Media LLC*, No. 16-11700,

2017 WL 2804870, at *5 (Bankr. S.D.N.Y. June 28, 2017) (same); *In re AOG Entm't, Inc.*, 558

B.R. 98, 109 (Bankr. S.D.N.Y. 2016) (same).  If the movant meets that burden, the bankruptcy

court must then "balance the competing interests of the parties, weighing the relevance of and

necessity of the information sought by examination."  *In re Drexel Burnham Lambert Grp., Inc.*,

123 B.R. at 712.  Courts will not order Rule 2004 discovery when the burden on the producing

party outweighs the benefits to the requesting party.  *See In re Texaco, Inc.*, 79 B.R. 551, 553

(Bankr. S.D.N.Y. 1987) ("[T]he examination should not be so broad as to be more disruptive and

costly to the [producing party] than beneficial to the [requesting party]."); *Bank One, Columbus,*

*N.A. v. Hammond (In re Hammond)*, 140 B.R. 197, 201 (S.D. Ohio 1992) (stating that in

evaluating a Rule 2004 examination, "the bankruptcy court must balance the examiner's interests

against the debtor's interest in avoiding the cost and burden of disclosure.").  *See also In re*

*SunEdison, Inc.,* 562 B.R. at 250 (analyzing the balance of burdens under Rule 2004 in light of

the "spirit of the proportionality" underlying amended Fed. R. Civ. P. 26, which takes into

account, among other things, the amount in controversy, the parties' relative access to relevant

information, the parties' resources, the importance of discovery in resolving the issues, and

whether the burden or expense of the proposed discovery outweighs its likely benefit).

*Analysis*

The Trustee is a fiduciary of the estate "whose principal duty is to administer estate

property so as to maximize distribution to unsecured creditors, whether priority or general

unsecured."  *In re All Island Truck Leasing*, 546 B.R. 522, 532 (Bankr. E.D.N.Y. 2016)

(citations omitted); *see also In re Balco Equities, Ltd., Inc.*, 323 B.R. 85, 97 (Bankr. S.D.N.Y.

2005) ("As an officer of the Court and as a representative of the Debtor's creditors, the Trustee

has a duty to realize the maximum return for the estate for further distribution to the Debtor's

creditors.") (citation omitted).  To that end, without limitation, he is duty bound to investigate the

affairs of the Debtor.  *See* 11 U.S.C. § 704(a)(4) ("The trustee shall . . . investigate the financial

affairs of the debtor."); *see also In re Vantage Petroleum Corp.,* 34 B.R. 650, 651 (Bankr.

E.D.N.Y. 1983) ("A trustee in bankruptcy is under an affirmative duty to investigate the debtor's

affairs in order to discover and recover assets for the benefit of creditors of the debtor.").

Moreover, he is the proper party in interest to prosecute prepetition causes of action that become

estate assets.  *See, e.g.*, *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 375 B.R.

719, 725 (S.D.N.Y. 2007) ("[C]ourts have consistently held that only the trustee and not a debtor

has standing to pursue causes of action that belong to the bankruptcy estate." (quoting *Hopkins v.*

*Foothill Mt. Inc. (In re Hopkins)*, 346 B.R. 294, 304 (Bankr. E.D.N.Y. 2006))); *see also In re*

*Arana*, 456 B.R. 161, 170 (Bankr. E.D.N.Y. 2011) ("Only the Chapter 7 trustee may administer

property of the estate, including bringing actions on behalf of the estate.") (citations omitted).

In opposing the Motion, and as a preliminary matter, AMERRA contends that the Court

should deny the Trustee access to the communications responsive to the Disputed Requests

because the Trustee has identified AMERRA as a litigation target and seeks to use the Rule 2004

discovery for the improper purpose of identifying causes of action to assert against it.  *See*

AMERRA Objection ¶¶ 42-45.  It maintains that if the Trustee wants discovery beyond what

AMERRA has agreed to produce, he should commence an adversary proceeding or contested

matter against AMERRA, and seek discovery under the Federal Rules of Civil Procedure.

Courts routinely deny requests for Rule 2004 discovery when the matters at issue among the

parties are the subject of an adversary proceeding or contested matter.  *See In re Recoton Corp.*,

307 B.R. 751, 755 (Bankr. S.D.N.Y. 2004) ("Rule 2004 examinations are also not generally

permitted once an adversary proceeding has been filed, as the greater protections of the

Bankruptcy Rules 7026 through 7037, which are modeled on Fed. R. Civ. P. 26–37, then

apply.") (citation omitted); *In re Bennett Funding Grp., Inc.*, 203 B.R. at 28 (noting that "once an adversary proceeding or contested matter has been commenced, discovery is made pursuant to the Fed. R. Bankr. P. 7026 *et. seq*., rather than by a Fed. R. Bankr. P. 2004 examination.") (citations omitted). *Cf. In re Washington Mut., Inc.*, 408 B.R. 45, 51 (Bankr. D. Del. 2009) (noting that where the Rule 2004 discovery sought is unrelated to the pending proceeding or entities in the pending proceeding, it should be allowed) (citations omitted). To be sure, resort to Rule 2004 discovery of a third party like AMERRA may be improper if the Trustee has identified it as a litigation target and is using Rule 2004 to skirt the more stringent discovery rules applicable to state and federal court litigation. *See In re Valley Forge Plaza Assocs.*, 109 B.R. 669, 675 (Bankr. E.D. Pa. 1990) ("Many courts have expressed distaste for efforts of parties to utilize [Rule] 2004 to circumvent the restrictions of the [Federal Rules of Civil Procedure] in the context of adversary proceedings or contested matters."); *see also SIPC v. BLMIS LLC (In re Madoff)*, Adv. Pro. No. 08-01789, 2014 WL 5486279, at *2 (Bankr. S.D.N.Y. Oct. 30, 2014) (observing that the scope of discovery under Rule 2004 "is 'very broad' and can encompass broader discovery than is available under the Federal Rules of Civil Procedure.").

However, the record is clear that the Trustee has not determined to bring claims against AMERRA. *See* Reply at 9. Rather, he is the preliminary stages of his review and analysis of the estate's claims, if any, against AMERRA. *See* Motion ¶ 25. As such, his use of Rule 2004 discovery at this time to identify or evaluate possible claims against AMERRA fits squarely within the scope of Rule 2004. *See, e.g.*, *In re Gawker Media LLC*, No. 16-11700, 2017 WL 2804870, at *6 (Bankr. S.D.N.Y. June 28, 2017) (granting trustee's Rule 2004 discovery where stated purpose of request was to determine whether trustee should commence litigation against the examinees); *In re Hughes*, 281 B.R. 224, 226 (Bankr. S.D.N.Y. 2002) ("[T]he investigation

of potential claims on behalf of a debtor is not an improper use of Rule 2004 discovery." (citing

*In re Brierley*, 145 B.R. 151, 170 (Bankr. S.D.N.Y. 1992))); *see also In re Drexel Burnham*

*Lambert Grp., Inc.*, 123 B.R. 702, 708 (Bankr. S.D.N.Y. 1991) ("A trustee in bankruptcy, under

the Act and the Code, is under a duty to maximize the realization of estate liquidation. To that

end a trustee must marshal the estate's assets and, if necessary to achieve that end, institute all

necessary litigation.").  Indeed, "[l]egitimate goals of Rule 2004 examinations include

'discovering assets, examining transactions, and determining whether wrongdoing has

occurred.'"  *In re Millennium Lab Holdings II, LLC*, 562 B.R. 614, 626 (Bankr. D. Del. 2016)

(citation omitted); *see also In re Ecam Publications, Inc.*, 131 B.R. 556, 560 (Bankr. S.D.N.Y.

1991) (rejecting argument by witnesses that trustee is improperly using Rule 2004 to take

discovery in preparation for asserting claims against them and noting that Rule 2004's intended

use is to "determine whether there are grounds to bring an action to recover property of the

estate.").  Accordingly, the Court finds no merit to this aspect of AMERRA's objection.[6]

---

[6]    Several months after the entry of the ABN 2004 Order and AMERRA's voluntary production of documents to the Agent, ABN moved this Court under Rule 2004 for an order authorizing the Agent to issue subpoenas for the production of additional documents from, and the oral examination of AMERRA, by Obler ("**ABN's Second 2004 Request**").  *See* ECF No. 255.  In that request, the Agent was seeking discovery of AMERRA's internal electronic communications concerning the Debtor and its affiliates and its electronic communications with non-Debtor parties concerning other non-Debtor third parties.  Specifically, the Agent sought discovery of:

> [A]ll electronic communications (including emails, text messages and Bloomberg terminal messages) between Obler and any other AMERRA officer, director, employee or representative concerning the Debtor, Euromar, any of their affiliates, or any related entities from January 1, 2015 through December 31, 2016 (except to the extent such communications were sent by email to a recipient using an email with a "transmargroup.com" or "transmarusa.com" domain name).

> [A]ll electronic communications (including emails, text messages and Bloomberg terminal messages) between Obler and any non-Debtor third party concerning Cocoa Origins Africa or any African affiliates of the Debtor or Euromar from January 1, 2015 through December 31, 2016 (except to the extent such communications were sent by email to a recipient using an email with a "transmargroup.com" or "transmarusa.com" domain name).

*See* ABN's Second 2004 Request at 18-19 of 22.

The Court now considers whether the Trustee has met his burden of demonstrating good cause for obtaining production of the communications he is seeking in the Disputed Requests. A contention of the Trustee in support of both requests is that where, as here, the Debtor has engaged in misconduct, when weighing the relevance and necessity of the requested discovery for purposes of Rule 2004, the bankruptcy court should grant him greater latitude to investigate the Debtor's financial affairs. *See* Reply at 4-5.[7] As support for that position, the Trustee cites *In re Vantage Petroleum Corp.*, 34 B.R. 650 (Bankr. E.D.N.Y. 1983) and *Marx v. Chase Nat'l Bank*, 117 F.2d 800 (2d Cir. 1941). However, he overstates the import of those decisions. To be sure, in both decisions, the courts state that a party should be accorded some latitude in conducting discovery where the debtor is alleged to have engaged in misconduct. However, while both courts considered that factor, neither relied on it in granting, or affirming the grant of, discovery. Rather, both courts approved the requested discovery after determining that the information sought was relevant to the matters at issue in each case and that the requested discovery was not unduly burdensome.[8]

---

AMERRA again objected to ABN's requested discovery. *See* ECF Nos. 273, 293. This time, the parties could not resolve the objection. Following a hearing on ABN's Second 2004 Request, and pursuant to a ruling from the bench, the Court denied the motion. *See* Order Denying ABN AMRO Capital USA LLC's Request Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure Authorizing it to Issue a Subpoena for the Further Production of Documents and the Oral Examination of AMERRA Capital Management, LLC, by Nancy Obler [ECF No. 362]; *see also* transcript of June 13, 2017 hearing [ECF No. 367] ("**Transcript**"). In doing so, this Court determined, among other things, in as much as the Agent had identified AMERRA as a litigation target, it was inappropriate to afford it Rule 2004 discovery. *See* Transcript at 22:7-23:4. Here, the Trustee's request for discovery of AMERRA is distinguishable from ABN's Second 2004 Request because, as previously discussed, the Trustee has not identified AMERRA as a litigation target and is seeking the discovery in furtherance of his fiduciary duties to the Debtor's estate and creditors.

[7]    Here, the misconduct is evidenced by the Indictment of the Debtor's Principals, and their subsequent entry of guilty pleas on the Indictment. *See* Motion ¶¶ 21-24.

[8]    In *Marx v. Chase Nat'l Bank*, 117 F.2d 800 (2d Cir. 1941), the Second Circuit affirmed the order of the District Court upholding the bankruptcy referee's order authorizing the bankruptcy trustee to conduct wide-ranging discovery of a bank, with regard to the bank's relationship with the debtor and certain of its non-debtor affiliates, pursuant to §21a of the Bankruptcy Act, 11 U.S.C. § 44(a) (1958). The debtor was wholly owned by an individual ("**Clarke**"). In turn, the debtor directly or indirectly controlled a number of public utility companies. *Id*. The

In support of his request to obtain the AMERRA Internal Communications, the Trustee

contends, in part, that to date, his investigation of the Debtor's business and affairs has revealed

that AMERRA, and Obler in particular, provided advice to the Debtor and its principals

concerning, among other things, the Debtor's operations and management, its relationship and

communications with the Prepetition Lenders, and the transactions between the Debtor and its

affiliate, Euromar.  *See* Motion ¶¶ 36a. & 42.  He says that Obler often strategized with the

Debtor, Euromar, and their affiliates regarding their efforts to restructure their assets and

---

trustee was examining the relationship among Clarke, the debtor and the debtor's affiliates.  The bank, through a
securities company, had become an important factor for the affiliates.  The bank objected to the trustee's
examination on the grounds that the trustee had no claim against the bank, and that many of the documents were
irrelevant, even if the trustee could assert such a claim.  *Id.* at 801.  In upholding the District Court, the Second
Circuit rejected those contentions.  First, it held that to obtain the discovery under § 21a, the trustee, as the
examining party, did not have to show that the discovery he was seeking was related to a claim or defense that he
was asserting.  Rather, the trustee's burden was to demonstrate that the documents were relevant to his investigation
of the debtor and its affiliates, which the Court noted could be "at large and without limit except in cases of plain
abuse, to be determined in the court's discretion."  *Id.* (citations omitted).  Second, the Court found that the District
Court did not err in finding that the requested discovery was relevant to the trustee's examination.  *Id.* ("In the case
at bar all the documents demanded may have some relevance to the trustee's action, if to nothing else.").  As
additional support for the District Court's decision, the Second Circuit noted that, in any event, "the trustee was
entitled to examine anyone who had had dealings with Clarke or any of this companies, because it was impossible
otherwise to unravel such a tangled corporate skein."  *Id.* at 802.  It is not clear whether the trustee made that
argument below.  In any event, in contrast, here the Trustee does not contend that the Debtor's misconduct has made
it impossible for him to obtain the information he needs.  To the contrary, as noted above, the Trustee has volumes
of documents from the Debtor itself, the Agent, AMERRA, and others to assist him in investigating the Debtor's
transactions and financial condition.

In *In re Vantage Petroleum Corp.*, 34 B.R. 650 (Bankr. E.D.N.Y. 1983), the chapter 7 trustee in bankruptcy was
examining the debtor's dealings with a non-debtor third party ("**Future Positions**").  Pursuant to Rule 2004, he
subpoenaed documents from Future Positions.  *Id.* at 650.  Future Positions objected to the requested production and
moved to quash the subpoena.  It contended that the trustee should be denied the discovery because the trustee failed
to demonstrate that the documents requested had any relevance to the debtor's financial affairs.  *Id.*  The trustee
contended that his requests were within the parameters of Rule 2004, because he had reason to believe that assets of
the debtor had been diverted to Future Positons, and the requested discovery was calculated to reveal as much.  In
denying the motion to quash, the bankruptcy court found that the documents requested "sufficiently related to 'the
acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect
the administration of the debtor's estate.'" *Id.* (quoting Rule 2004).  In reaching that conclusion, the court observed
that some courts have indicated that a trustee should be given more latitude to conduct Rule 2004 discovery "where
there has been a showing that the debtor engaged in questionable conduct."  *Id.* at 651 (citing *In re Foerst*, 93 F.
190, 191 (S.D.N.Y. 1899); *Marx v. Chase Nat. Bank*, 117 F.2d 800, 802 (2d Cir. 1941)).  In the final analysis, the
*Vantage* court denied the motion to quash because the documents that the trustee requested were relevant to his
analysis of the debtor's financial affairs, and Future Positions had not shown that it would be unduly burdensome for
Future Positions to produce the requested documents.  *Id.* at 651-52.  It is not at all clear that the trustee was
accorded "greater latitude" in his investigation by reason of the debtor's "questionable conduct," or otherwise.

businesses, including transactions among the Debtor, Euromar, and their affiliates. *See id.* He

maintains that based upon AMERRA's close access to the Debtor and Euromar during the

relevant time period, an examination of AMERRA, generally, and Obler, in particular, is crucial

to the discovery of assets and claims. *Id.* ¶ 43. To the end, the Trustee says that AMERRA's

internal communications may: (i) provide additional evidence relating to the substance and

nature of the guidance and strategic advice that Ms. Obler provided to the Debtor or Euromar;

(ii) shed light on the legitimacy of AMERRA's claim and whether the claims is subject to

equitable defenses, avoidance actions, or equitable subordination; and (iii) assist him in

determining which transactions involving the Debtor, Euromar and their numerous affiliates may

have been legitimate and which transactions may be avoidable by the Trustee.

AMERRA acknowledges that "in the final months before bankruptcy, [it] communicated

with the Debtor and its creditors frequently in the hope of securing a strategy that would turn

Transmar and Euromar around[.]" AMERRA Objection ¶ 31. It contends that the Court should

deny the Trustee access to Ms. Obler's internal communications related to that guidance and

strategic advice because the Trustee already has documents which reveal the guidance that Ms.

Obler provided to the Debtor, and has not identified particular gaps in the Debtor's records that

he believes he can fill by AMERRA's internal communications. *See id.* ¶ 36. Further,

AMERRA maintains that there is nothing remarkable about its prepetition interactions with the

Debtor; and that it is common for creditors and trading partners of a potential debtor to engage in

those communications. *Id.* ¶ 31. That may be true. Still, the role that Ms. Obler (and any other

AMERRA representative) played in advising the Debtor on restructuring strategies is plainly

relevant to Trustee's examination into the Debtor's operations and affairs, and whether the estate

holds claims against AMERRA. At a minimum, those communications may assist the Trustee in

ascertaining the depth of AMERRA's relationship with the Debtor and its principals, and in

putting AMERRA's guidance and strategic advice in context, especially with regard to how

AMERRA was managing its relationship with the Debtor and how the Debtor was managing its

relationship with the Prepetition Lenders.  The Trustee cannot get that information from the

documents that AMERRA has produced to date, and will be unduly harmed and prejudiced if he

is denied access to those communications because AMERRA is the sole source of those

communications.  Thus, the Court finds that the Trustee has established good cause for obtaining

the AMERRA Internal Communications, as they relate to the guidance and strategic advice that

Ms. Obler and/or any other AMERRA personnel provided to the Debtor and its principals

concerning the Debtor's operations and management, the restructuring of Debtor's assets and

businesses, the Debtor's relationship and communications with the Prepetition Lenders, and

AMERRA's transactions with the Debtor and Euromar.  *See, e.g.*, *In re Gawker Media LLC*, No.

16-11700, 2017 WL 2804870, at \*6 (Bankr. S.D.N.Y. June 28, 2017) (finding that plan

administrator established good cause for Rule 2004 request against third-party Thiel, where

discovery was needed to determine whether potential causes of action exist, and if they do,

whether to prosecute them); *see also In re Millennium Lab Holdings II, LLC*, 562 B.R. 614, 627-

28 (Bankr. D. Del. 2016) (holding that "the Trustee has demonstrated good cause warranting

granting of the Trustee's Rule 2004 Motion on behalf of the Corporate Trust" where he "has

testified that the examinations are necessary to 'enable the Plan Trusts to determine the scope of

viable claims that may exist on behalf of the Plan trusts against potential third parties[.]'").  But

that is the full extent to which the Court will grant the Trustee access to the AMERRA Internal

Communications, as he has not established cause for granting him further access to those

communications.  Although AMERRA complains that it will be required "to spend hundreds of

thousands of dollars and devote its internal resources and the time of its personnel" in responding to the document request, it has not demonstrated that the burden it will bear in responding to the document requests outweighs the benefits to the Trustee in getting those documents. *See In re Musicland Holding Corp.*, 424 B.R. 95, 100 (Bankr. S.D.N.Y. 2010) ("The party resisting discovery bears the burden of demonstrating that discovery of otherwise relevant evidence should be limited." (*citing* 8 Charles Alan Wright *et al.*, FEDERAL PRACTICE AND PROCEDURE § 2008.1 (2d ed. 1994 & Supp. 2009))). Moreover, the Court directs the parties to "meet and confer" in an effort to minimize the burden and expense to AMERRA in responding to this document request.

Cocoa Origins Africa ("**COA**"), is a Delaware limited liability company in which AMERRA held a "profits participation," and occupied two seats on its board of directors. AMERRA was also among COA's largest creditors.[9]  The Trustee says that according to the

---

[9]    The Trustee did not describe COA in any detail in the Motion.  At the close of the hearing on the Motion, the Court requested AMERRA to supplement the record with a description of COA, including a discussion of AMERRA's relationship with COA.  Both parties agreed that AMERRA would do so.  By letter dated July 23, 2018, AMERRA supplemented the record as requested by the Court.  *See* ECF No. 555 (the "**AMERRA Letter**").

COA is governed by an Amended and Restated Operating Agreement dated as of December 2, 2013, and amended by Amendment No. 1 to the Amended and Restated Operating Agreement dated as of March 4, 2014 (as so amended, the "**COA Operating Agreement**").  It was formed with Transmar Group, L.L.C. - TA Series (the "**Transmar Member**"), as its single member.  AMERRA does not have information regarding the specifics of Transmar Member's relationship to the Debtor.  *See* AMERRA Letter at 1.

COA was formed to engage in the cocoa trading business.  However, during the years 2015 and 2016 (the "**Operative Period**"), it principally made loans to other entities in connection with this business, none of which entities was a debtor.  *See id.*  During that time period, COA's board of directors was comprised of Peter B. Johnson, Timothy Johnson, Nancy Obler, Peter Rihs and Nathaniel Durant.  *See id.*  The COA Operating Agreement grants to AMERRA an irrevocable power of attorney from the Transmar Member to protect its rights to name two of the directors to the board of directors.  *See id.*

Among other things, the COA Operating Agreement reflects that (i) the Transmar Member made an initial capital contribution of $890,329; and (ii) that amount was treated as a "Preferred Liquidation Payment."  *Id.* at 2. That preferential treatment entitles the Transmar Member to receive distributions under the COA Operating Agreement after amounts required to pay financing arrangements, including financing provided by AMERRA (discussed below).  The Preferred Liquidation Payment amount was increased to $1,660,329 in Amendment No. 1 to the Operating Agreement.  *See id.*

Indictment, the Debtor used a number of means to falsify the "borrowing base" reports. Motion ¶ 22. One such method was to enter into transactions (each a "**circular transaction**") with an amenable third party intermediary pursuant to which the intermediary would (i) execute contracts with, and receive invoices from, the Debtor, (ii) not take physical possession of the invoiced goods, and (iii) "pay for" the goods with cash that it received from the Debtor, through Euromar. *Id.* The Trustee believes that the Debtor engaged in circular transactions to strip away valuable assets from the Debtor and its creditors for the benefit of Euromar, COA, and the Debtor's African affiliates. *See* Reply at 5-6. He maintains that in conducting his investigation, he has uncovered "unusual transactions" (which he does not describe) that the Debtor had with COA and other (unidentified) African affiliates. *See id.* at 7. He contends that in many such transactions, it appears that funds may have been transferred from the Debtor to such entities for no or inadequate consideration, and that AMERRA was "involved" (in unspecified ways) with respect to "many" of those transactions. *Id.* Further, he says that it "appears" that Ms. Obler and/or certain unidentified "colleagues" at AMERRA had "communications regarding some of these transfers." *Id.* Accordingly, the Trustee contends that AMERRA's "internal communications may help shed light on the nature of such transactions and disclose potential targets for further investigation." *Id.* He also asserts that for those same reasons, and on the

---

During the Operative Period, COA also was partially funded with debt from AMERRA. Pursuant to a Senior Secured Credit Agreement, dated December 12, 2013, as amended, AMERRA, as agent for itself and certain lenders, loaned $11,640,000 to COA. AMERRA also provided $1,660,329 in unsecured debt to COA pursuant to a Subordinated Note, dated December 12, 2013, as amended. AMERRA was also granted a "profit participation," pursuant to which Available Cash is divided between AMERRA and the Transmar Member. *See id.* The Available Cash is net of (i) required payments of debt, (ii) the Transmar Member's Preferred Liquidation Payment, and (iii) payments to employees whose compensation includes a sharing of Available Cash. AMERRA never received any payments on account of its profit participation. The COA Operating Agreement restricts the Transmar Member's (or any of its affiliates') ability to enter into joint ventures (but not other business relationships or investments) that operate in the same or similar industries as COA, without first providing AMERRA with a right of first refusal. *See id.*

strength of AMERRA's relationship with COA, that it is "fair" for the Court to direct AMERRA to produce the AMERRA External Communications regarding COA. *Id.*

To be sure, the documents and communications relating to the circular transactions that the Trustee is seeking from AMERRA are relevant to the Trustee's examination of the Debtor's affairs, including the merits of claims that the Trustee may assert against third parties. However, as previously noted, "[r]elevance alone is not sufficient to justify a Rule 2004 request." *In re Gawker Media LLC*, No. 16-11700, 2017 WL 2804870, at *5 (Bankr. S.D.N.Y. June 28, 2017) (citing *In re Drexel Burnham Lambert Grp. Inc.*, 123 B.R. 702, 712 (Bankr. S.D.N.Y. 1991). Neither is the fact that the Debtor engaged in misconduct pre-petition and that its certain of its principals have pleaded guilty to crimes charged in the Indictment. The Trustee still must establish "good cause" for granting him the requested discovery. In assessing whether the Trustee has done so, the Court notes that the Trustee is in possession of at least 5,942 documents containing the phrase "Cocoa Origins Africa" that he obtained from parties other than AMERRA. AMERRA Objection ¶ 35, n.7. He has not demonstrated, or even attempted to demonstrate, that his examination of the circular transactions and events surrounding those transactions will be prejudiced if he is denied discovery of the AMERRA Internal Communications, if any, relating to COA and it African affiliates, or the AMERRA External Communications. In short, he has failed to establish "good cause" for the Court to grant him that portion of his Rule 2004 discovery request. *See, e.g.*, *ePlus, Inc. v. Katz* (*In re Metiom, Inc.*), 318 B.R. 263, 268 (S.D.N.Y. 2004) (noting that good cause for Rule 2004 discovery can be shown by demonstrating that the examination 'is necessary to establish the claim of the party, or if denial of such request would cause the examiner undue hardship or injustice." (quoting *In re*

*Dinubilo*, 177 B.R. 932, 943 (E.D. Cal. 1993))).[10]  Accordingly, the Court denies the Trustee's

request for production of the AMERRA Internal Communications related to COA, and its

African affiliates, and for production of the AMERRA External Communications.

    The Court now considers AMERRA's objection to the oral examination of Ms. Obler.  It

is well settled that the scope of a Rule 2004 examination can be very broad.  *See, e.g.*, *In re*

*Vantage Petroleum Corp.*, 34 B.R. 650, 651 (Bankr. E.D.N.Y. 1983) ("Under Rule 2004 and its

precursors, it has been well-established that the scope of such an investigation is broad.  The

exploration can be in the nature of a fishing expedition.") (citations omitted).  Nonetheless,

courts may "limit, condition or even forbid the use of Rule 2004" where it is used to "abuse or

harass[ ]. . . ."  *Martin v. Schaap Moving Sys., Inc.*, No. 97-5042, 1998 WL 405966, at *3 (2d

Cir. April 20, 1998) (quoting *In re Mittco, Inc.*, 44 B.R. 35, 36 (Bankr. E.D. Wisc. 1984)).  To

that end, the "[e]xamination of a witness as to matters having no relationship to the bankrupt's

affairs or the administration of his estate . . . is improper."  *Keene Corp. v. Johns-Manville Corp.*

---

[10]    On July 25, 2018, the Trustee filed an unsolicited letter "in response" to the AMERRA Letter.  *See* ECF No.
556.  In it, he does not challenge any of the information conveyed to the Court in the AMERRA Letter.  Rather, the
Trustee says that he submitted his letter in order to "bring a few additional pertinent facts to the Court's attention
that were not set forth in the AMERRA Letter."  *Id.* at 1.  The Trustee then provides a number of "facts" (as
supported by three exhibits) that he says demonstrates "AMERRA's significant involvement in the Debtor's
financial affairs, and the financial affairs of COA and the Debtor's African affiliates[.]"  *Id.* at 3.  In light of this
information,

> the Trust strongly urges the Court to require [AMERRA] to produce external electronic
> communications between Obler and any non-Debtor third party concerning COA or any African
> affiliates of the Debtor or Euromar that are identified this letter as requested in request (g) of the
> Trustee's 2004 Motion.  Similarly, the Trustee urges the Court to require [AMERRA] to produce
> internal electronic communications between Obler and other [AMERRA] representatives
> concerning the Debtor, Euromar, or any of the affiliates identified in this letter as requested in
> request (d) of the Trustee's Rule 2004 motion.

*Id.*  The Court declines that invitation.  When he filed the Motion and his Reply to the AMERRA Objection, the
Trustee was in possession of all of the documents and information that he now seeks leave to submit in support of
the Motion.  He failed to do so.  Moreover, at the outset of the hearing on the Motion, the Court asked the Trustee
and AMERRA whether either wished to submit evidence in support of their respective positions on the Motion.
Both parties advised the Court that they did not wish to do so.  Finally, at the close of the hearing, the Trustee did
not seek leave of the Court to supplement the record of the Motion.  To the extent that the letter can be construed to
include a request for leave to supplement the record, the request is denied.

*(In re Johns-Manville, Corp.)*, 42 B.R. 362, 364 (Bankr. S.D.N.Y. 1984). In contrast, courts

routinely permit the examination of "witnesses having knowledge of the debtor's acts, conduct,

liabilities, assets, etc.[.]" *Id.* There is no dispute that Ms. Obler is the AMERRA representative

who is most familiar with AMERRA's relationship with the Debtor, Euromar and COA.

Moreover, AMERRA does not contend that the subject matter of the discovery that the Trustee is

seeking from Ms. Obler is beyond the bounds of permitted discovery under Rule 2004. That is

plainly not the case, as the Trustee is focusing on matters relating to documents that AMERRA

has or will produce to the Trustee, the strategic advice that Ms. Obler provided to the Debtor and

Euromar, and AMERRA's alleged involvement with the Debtor and COA in the circular

transactions. Rather, AMERRA focuses on the burdens it will bear if the Court grants the

Trustee leave to examine Ms. Obler. AMERRA asserts that the Court should deny the Trustee

that opportunity because neither Ms. Obler nor AMERRA's counsel is up to speed on many of

the thousands of documents the Trustee has access to and on which he might question her. *See*

AMERRA Objection ¶ 48. It maintains that its relationship with the Debtor and Euromar is

"long and extensive" and that because it does not know what documents the Trustee has or may

rely on in examining Ms. Obler, it will be extremely expensive and time consuming to get "Ms.

Obler and [AMERRA's] counsel fully up to speed[.]" *Id.* It says that if the Court is inclined to

authorize the oral examination of Ms. Obler (which it opposes), the Court should either: (i) limit

the scope of the examination to the subject matter of the of the documents that are to be, or have

been, produced by AMERRA; or (ii) if the scope of the examination is not so limited, bar any

further oral examination or deposition of her in this case, including in any adversary proceeding

he may commence. *Id.* As to the latter, AMERRA explains that it is concerned that the

Trustee's purpose in conducting wide ranging Rule 2004 discovery is to ambush Ms. Obler by

questioning her on matters that she cannot possibly be prepared for and then use that deposition transcript against her in a subsequent deposition.

There is nothing in the record that validates AMERRA's concerns about the Trustee's intent to "ambush" Ms. Obler, and the Court finds that the Trustee has established good cause for conducting an examination of Ms. Obler. However, the Court, in its discretion, will limit that examination to the following: (i) the matters relating to/underlying the documents that AMERRA will or has produced (directly or indirectly) to the Trustee as requested in the Undisputed Requests, including the contents of those documents; (ii) the matters relating to/underlying the AMERRA Internal Communications that the Court has directed AMERRA to produce to the Trustee, and the contents of those communications; (iii) AMERRA's relationship with COA, including the documents referenced by AMERRA in the AMERRA Letter; and (iv) the transactions involving payments to or from AMERRA that the Trustee maintains are "circular transactions." As to the latter, the Trustee shall identify and produce copies of any documents he intends to use in his examination of Ms. Obler in advance of that examination. The Trustee and AMERRA shall agree upon a reasonable schedule for the production of those documents and the conduct of Ms. Obler's examination.

## CONCLUSION

Based on the foregoing, the Court GRANTS the Motion in part and DENIES the Motion in part.

IT IS SO ORDERED.

Dated: New York, New York
       August 17, 2018                                    /s/ *James L. Garrity, Jr.*
                                                          Honorable James L. Garrity, Jr.
                                                          United States Bankruptcy Judge