WINDELS MARX LANE & MITTENDORF, LLP
*Attorneys for Alan Nisselson Chapter 7 Trustee*
156 West 56th Street
New York, New York 10019
Tel. (212) 237-1000 / Fax (212) 262-1215
Howard L. Simon (hsimon@windelsmarx.com)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------

In re

TRANSMAR COMMODITY GROUP LTD.,

                     Debtor.

-----------------------------------------------------------------

ALAN NISSELSON, as Chapter 7 Trustee
of the estate of TRANSMAR COMMODITY
GROUP LTD.,

                     Plaintiff,

         -against-

AMERRA CAPITAL MANAGEMENT, LLC;
AMERRA AGRI ADVANTAGE FUND, L.P.;
AMERRA AGRI OFFSHORE MASTER FUND II,
L.P.; AMERRA AGRI OPPORTUNITY FUND,
L.P.; AMERRA LATIN AMERICA FINANCE,
LLC; AMERRA AGRI MULTI STRATEGY FUND,
L.P.; AMERRA AGRI FUND II, L.P.; AMERRA
AGRI FUND III, L.P.; AMERRA-KRS AGRI
FUND, L.P.; AMERRA AGRI OFFSHORE
MASTER FUND III, L.P.; AMERRA HEARTLAND
AGRI FUND E, L.P., AMERRA HEARTLAND
AGRI FUND B, L.P.; and EUROMAR
COMMODITIES, L.L.C.;

                     Defendants.

-----------------------------------------------------------------

Chapter 7

Case No. 16-13625 (JLG)

Adv. Pro. No. 18-_____ (JLG)

## <u>COMPLAINT</u>

      Alan Nisselson, as Chapter 7 trustee (the "Trustee" or "Plaintiff") of Transmar

Commodity Group Ltd. (the "Debtor" or "Transmar"), by and through his attorneys,

Windels Marx Lane and Mittendorf LLP, as and for his Complaint against defendants (i) AMERRA Capital Management, LLC ("AMERRA"); (ii) AMERRA Agri Advantage Fund, L.P. ("AMERRA Advantage"), AMERRA Agri Offshore Master Fund II, L.P. ("AMERRA Offshore II"), AMERRA Agri Opportunity Fund, L.P. ("AMERRA Opportunity"), AMERRA Latin America Finance, LLC ("AMERRA Latin"), AMERRA Agri Multi Strategy Fund, L.P. ("AMERRA MS"), AMERRA Agri Fund II, L.P. ("AMERRA Fund II"), AMERRA Agri Fund III, L.P. ("AMERRA Fund III"), AMERRA-KRS Agri Fund, L.P. ("AMERRA KRS"), AMERRA Agri Offshore Master Fund III, L.P. ("AMERRA Offshore III"), AMERRA Heartland Agri Fund E, L.P. ("AMERRA Heartland E"), AMERRA Heartland Agri Fund B, L.P. ("AMERRA Heartland B") (collectively, the "AMERRA Funds"); and Euromar Commodities, L.L.C. ("Euromar LLC", and collectively, with AMERRA and the AMERRA Funds, the "Defendants") respectfully sets forth and alleges as follows:

### NATURE OF THE ACTION

1.      This is an action by the Trustee seeking (i) avoidance and recovery of fraudulent conveyances of approximately $38.7 million in transfers by the Debtor directly, or indirectly through Euromar LLC, to AMERRA and/or the AMERRA Funds; (ii) avoidance and recovery as insider preferences of approximately $24 million in transfers by the Debtor to AMERRA and/or the AMERRA Funds and (iii) the disallowance of a bankruptcy claim filed by AMERRA until such transfers are returned to the Debtor's estate (the "Estate").

2.      The avoidable transfers were all made during 2015 and 2016 when Transmar was insolvent and engaged in a several-year massive bank fraud.

3.      AMERRA is a Transmar insider.  Particularly during 2016, when Transmar was faced with a severe liquidity crisis, AMERRA played a dominant role in Transmar's financial

2

affairs.  Among other things, AMERRA's Managing Director was acting as a member of the

liquidity committee of Transmar and its European affiliates and a de facto Transmar board

member who was referred to by Transmar executives as "running the show" and the "ONLY

person who really matters."

## JURISDICTION AND VENUE

4.      The United States District Court for the Southern District of New York (the

"District Court") has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334.  By

virtue of 28 U.S.C. § 157(a) and the Amended Standing Order of Reference dated January 31,

2012 of Chief Judge Loretta A. Preska of the District Court, this proceeding is automatically

referred to the United States Bankruptcy Court for the Southern District of New York (the

"Court").

5.      This adversary proceeding is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A),

(B), (F) and (H) to be heard and determined by the Court and the Court may enter final orders for

matters therein.

6.      The statutory basis for this adversary proceeding is Sections 502, 544, 547, 548,

550 and 551 of title 11 of the United States Code (the "Bankruptcy Code"), New York Debtor &

Creditor Law ("DCL") Sections 273, 274, 275, 276, 276-a, 278 and 279, Rules 3007, 6009 and

7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the general

equity powers of this Court.

7.      The Trustee consents to the entry of final orders or judgments by this Court if it is

determined that this Court, absent consent of the parties herein, cannot enter final orders or

judgments consistent with Article III of the United States Constitution.

8.      Venue of this case and this adversary proceeding is proper in this District under 28 U.S.C. §§ 1408 and 1409.

## PROCEDURAL BACKGROUND

9.      On December 31, 2016 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

10.     On May 23, 2017, ABN AMRO Capital USA LLC (the "Agent"), as syndication agent, administrative agent and collateral agent for itself and a group of prepetition lenders (the "Lenders") that hold a first priority blanket lien against essentially all of the Debtor's assets, filed a motion to convert the Debtor's chapter 11 case to a case under chapter 7 of the Bankruptcy Code (the "Motion to Convert").

11.     On July 11, 2017, the Court entered an Order that approved conversion of the Debtor's bankruptcy case (the "Bankruptcy Case") to a case under chapter 7 of the Bankruptcy Code, and granted related relief.

12.     On July 26, 2017 (the "Conversion Date"), the Court entered an order converting the Debtor's Chapter 11 case to a case under Chapter 7 of the Bankruptcy Code.

13.     On July 26, 2017, the Office of the United States Trustee appointed Alan Nisselson as the interim trustee of the Estate, and he has since become the permanent trustee of the Estate pursuant to Section 702(d) of the Bankruptcy Code, and by operation of law has continued to serve in that capacity.

## THE PARTIES

14.     The Trustee is a resident of the State of New York maintaining an office at Windels Marx Lane & Mittendorf, LLP, 156 West 56th Street, New York, New York 10019.

15.     AMERRA is an investment adviser, registered with the U.S. Securities and Exchange Commission, which in its words, offers "customized commodity finance solutions for producers, processors, traders, and distributors operating in agribusiness in the Americas."

16.     In addition to its services as a private investment adviser, AMERRA also provides debt financing in the agricultural sector.

17.     AMERRA's principal place of business is located at 1185 Avenue of the Americas, New York, New York 10036.

18.     Upon information and belief, Defendants AMERRA Advantage, AMERRA Opportunity, AMERRA Latin, AMERRA MS, AMERRA Fund II, AMERRA Fund III, AMERRA KRS, AMERRA Heartland E and AMERRA Heartland B are each Delaware limited partnerships or limited liability companies managed, operated and controlled by AMERRA in New York.

19.     Upon information and belief, Defendants AMERRA Offshore II and AMERRA Offshore III are Cayman Islands limited partnership funds managed, operated and controlled by AMERRA in New York.

20.     In certain of the documents relating to the avoidable transfers set forth below, AMERRA is referred to as the "administrative agent" for certain of the AMERRA Funds.

21.     On April 14, 2017, AMERRA filed Proof of Claim No. 40 in the Bankruptcy Case seeking $8,918,213.19 from the Debtor (the "Claim").

22.     AMERRA identifies itself as the creditor in the Claim.  AMERRA also notes in the Claim its capacity as administrative agent for certain of the AMERRA Funds.

23.     Upon information and belief, Euromar LLC is a corporation originally formed under the laws of the State of New Jersey which then changed its state of formation to Delaware.

Euromar LLC's principal place of business is listed as 200 South Street, Morristown, New Jersey 07960.

## Factual Background

### A.    Transmar and its Euromar Affiliates

24.    Transmar, a wholly owned subsidiary of Transmar Group Ltd. ("Transmar Group"), was a corporation organized under the laws of the State of New York with its principal place of business in New Jersey.

25.    Prior to the Conversion Date, Transmar was engaged in the business of trading cocoa and cocoa products for sale within the international confectionary industry.

26.    Among other things, Transmar purchased cocoa beans and cocoa products (butter, liquor, cake and powder) from South America, West Africa, and Southeast Asia and effected sales throughout the United States and Europe.

27.    Euromar Commodities GmbH ("Euromar GmbH") and Euromar LLC (collectively, "Euromar") were also wholly owned subsidiaries of Transmar Group.

28.    Like Transmar, Euromar GmbH was engaged in the business of buying and selling cocoa and cocoa-related products.

29.    Transmar and Euromar were indirectly owned and operated by members of the Johnson family, including those members mentioned below.

30.    At relevant times, Transmar and Euromar shared similar management, most notably Peter B. Johnson ("Peter Jr."), a Transmar executive who was also the Managing Director of Euromar GmbH and responsible for its operations.

### B.    The Bankruptcy Filings of Transmar and Euromar GmbH in December 2016

31.    Throughout 2016 (and for several years before), Transmar and Euromar were experiencing severe financial distress.

32.    Upon information and belief, by 2016, Euromar GmbH was operating with a $250 million dollar shortfall in its borrowing base with its respective lenders.

33.    In August 2016, a chief restructuring officer was appointed to manage and restructure Euromar GmbH.

34.    In December 2016, its financial difficulties landed Euromar GmbH in a formal insolvency proceeding in Germany.

35.    At the end of the same month, Transmar filed its bankruptcy on the Petition Date.

36.    Transmar's Bankruptcy Case was filed following its disclosure to the Lenders, through the Agent, of an unexplained and drastic (over $300 million) reduction in value of the Debtor's assets (the "Transmar Borrowing Base") that secured the Lenders' advances of credit.

## C.    Transmar's Massive Banking Fraud is Uncovered

37.    Following the Petition Date, the Debtor continued to operate its business as a debtor in possession.

38.    However, during Rule 2004 discovery, the Lenders discovered that the shortfall in Transmar's Borrowing Base was a result of a massive fraud perpetrated by the Debtor's management from at least 2014 through the end of 2016.

39.    Accordingly, on May 23, 2017, the Agent filed the Motion to Convert and the case was shortly thereafter converted on the Conversion Date.

40.    The Agent has filed a claim on the Lenders' behalf in the Debtor's Bankruptcy Case in the aggregate principal amount of not less than $359,900,000, which claim has been allowed by the Court by Order dated February 10, 2017.

## D.    The Indictment and Guilty Pleas of Former Transmar Executives

41.    On or about August 8, 2017, the United States Attorney for the Southern District of New York and the New York Office of the Federal Bureau of Investigation announced the

7

unsealing of an indictment (the "Indictment") against Peter G. Johnson ("Peter Sr."), Peter Jr.

and Thomas Reich ("Reich", and collectively with Peter Sr. and Peter Jr., the "Indicted Transmar

Executives").    The Indictment charged the Indicted Transmar Executives with defrauding

Transmar's credit facility lenders (as such lenders and credit facility have changed from time to

time) with false "borrowing base" reports from at least in or about 2014 through at least in or

about November 2016 designed to secure and maintain a $400 million line of credit for the

Debtor.

42.    According to the Indictment, the Debtor utilized a number of means to falsify the

"borrowing base" reports, including arrangements or "circle" transactions with amenable third

party intermediaries that agreed to execute contracts with, and receive invoices from, the Debtor,

but which never took physical possession of the invoiced goods and "paid for" the goods with

cash received from the Debtor itself through the Debtor's affiliate Euromar GmbH.

43.    Each of the Indicted Transmar Executives has since pled guilty to one count of

conspiracy to commit bank fraud and wire fraud affecting a financial institution and has been

sentenced to prison for his role in these transactions.

44.    In their plea allocutions, Peter Sr., the former Chairman, President and CEO of

Transmar, and Peter Jr., a former Transmar executive and Euromar GmbH's Managing Director,

admitted that between 2014 and 2016 they falsified reports, or were aware of such false reports,

that overstated the Debtor's collateral/inventory to its lenders in order to support the Debtor's

credit facilities.    The false information included Transmar Borrowing Base reports listing

fictitious inventory.

45.    In his plea allocution, Reich, a former Transmar financial executive, succinctly summarized the fraud perpetrated by the Indicted Transmar Executives on the Debtor and Euromar.  He stated:

> We, at Transmar and Euromar, worked to document fictitious transactions in order to borrow against in order to try to save the company.  We booked assets we did not own.  We ignored liabilities we owed.

**E.    Debtor's Insolvency During the Relevant Period**

46.    Among other things, the Trustee's analysis of the Debtor's December 31, 2015 audited financial statement (the "December 2015 Statement") shows that Transmar overstated the value of its forward contracts and accounts receivable by approximately $96.5 million and $27.2 million, respectively.

47.    Transmar overstated the accounts receivable on its December 2015 Statement by including "circle contracts" of the type referred to in the Indictment.

48.    For example, the Trustee's investigation has determined that receivables of approximately $27.2 million were based on "circle contracts" involving Transmar, Euromar GmbH and third party intermediaries Trilini International Ltd., EWC East Way Commodities B.V., Touton SA and H.C.C.O. Hamburg Cocoa & Commodity Office that were never paid.

49.    In addition, the value of the Debtor's forward contracts on the December 2015 Statement was substantially overstated by the inclusion of certain purported "contracts" that were cancelled.

50.    For instance, there were at least 12 purported forward contracts, which were not bona fide or actual contracts, on the Debtor's books and records between the Debtor and African cocoa supplier Neskao Cocoa Products, valued by the Debtor at more than $16.8 million, which were cancelled.

51.     Adjusted solely for the overstatement of accounts receivable and purported forward contracts, the December 2015 Statement shows the Debtor to have approximately $48.9 million more in liabilities than assets and negative shareholder equity of that amount.

52.     Similarly, an analysis of the Debtor's December 31, 2014 audited financial statement shows that the values of its forward contracts and accounts receivable were overstated by approximately $92.2 million and $23.7 million, respectively, resulting in negative shareholder equity of approximately $43.8 million (liabilities greater than assets).

53.     In addition, upon information and belief, over a period of years, and possibly since a 2011 credit agreement with its then-lenders, the Debtor (i) submitted false borrowing base reports, which, among other things, certified to its lenders false descriptions of the types and amounts of assets serving as collateral for the lenders' loans, (ii) moved inventory and receivables back and forth between and among its affiliated companies and (iii) falsified the balances owed between Transmar and its affiliates in order to mislead the lenders regarding the nature and value of the assets serving as collateral for the lenders' loans.

54.     The purpose of these borrowing base reports and activities was to falsely inflate the amount and value of Transmar's assets to obtain additional borrowings and avoid defaults under the credit agreements and other existing loans.

55.     Thus, since at least 2014, the asset values shown in the Debtor's financial statements and borrowing base reports were grossly inflated and the Debtor's liabilities were greater than the fair value of the Debtor's property, exclusive of any property transferred, concealed, or removed with an intent to hinder, delay, or defraud the Debtor's creditors.

56.     Upon information and belief, the Debtor also had not generated a positive operating cash flow since 2012.  Given that the Debtor was (i) in violation of its existing loan

agreements, (ii) relying on false borrowing base reports to avoid defaults under such loans and to obtain additional loans and (iii) not generating a positive cash flow, the Debtor was insolvent since at least 2014, and upon information and belief, for years before that, as it would not have been able to pay its existing debts as they became due absent the submission of the false borrowing base reports.

57.     Moreover, upon information and belief, since at least 2014, the Debtor was undercapitalized and was unable to finance its day-to-day business operations without defrauding its lenders and other creditors.

**F.     AMERRA's Historical Non-Arm's Length Relationship With Transmar**

58.     Since at least 2013, AMERRA was a lender to Transmar by virtue of an outstanding $10 million subordinated note, dated August 29, 2013 (discussed further below), executed by Transmar in favor of AMERRA

59.     AMERRA also provided short-term transaction financing to Transmar.

60.     More significantly, AMERRA and Transmar became business partners in 2013 as a result of what AMERRA referred to as "AMERRA's cocoa joint venture in Africa with the Transmar Group."

61.     The joint venture was formed in order for Transmar and AMERRA to fund Cocoa Origins Africa, L.L.C. ("COA"), an entity that in turn provided financing to Transmar's major African cocoa suppliers.

62.     Pursuant to this joint venture, a Transmar entity and AMERRA provided significant funds to COA and received substantial equity type interests in the entity.

63.     COA was critical to the plans of Transmar's management to expand its worldwide operations.

64.    COA's board members included Peter Jr., Nathaniel Durant ("Durant"), AMERRA's Managing Director, Nancy Obler ("Obler"), and another AMERRA executive.

65.    Durant was involved in the management and operation of COA in Africa. Notably, he would later become President of Transmar Group.

66.    Thus, well before 2016 when their affairs would become even more interwoven, the relationship between AMERRA and Transmar went well beyond that of an arm's length lender and borrower.

**G.    AMERRA's Dominant Role During Transmar's 2016 Liquidity Crisis**

67.    The Transmar and AMERRA ties only deepened as a result of Transmar's severe liquidity crisis in 2016.

68.    During 2016, AMERRA played the dominant role in the Debtor's attempt to deal with its severe liquidity crisis, which included the unexplained shortfall or hole in the borrowing base that supported Transmar's critical credit facility with its Lenders.

69.    As Transmar began to deal with its liquidity crisis, AMERRA's Obler was treated like a Transmar board member, working closely with Peter Jr. and later with Durant, as Transmar fought for survival in 2016.

70.    Along with Peter Jr., Obler was one of the two key members of Transmar's three person liquidity committee who actively directed Transmar's internal corporate financial activities as if she was a Transmar board member. The third member was another Transmar, non-Johnson family executive.

71.    Peter Jr., Obler and that same third executive, at relevant times, were also the three members of a Transmar "mini board" formed in order to solve Transmar's liquidity crisis.

72.     Following a meeting in July 2016, Obler, who Peter Jr. referred to as the "wildly overqualified Secretary of the mini-Board," noted that the three members agreed that Peter Jr. would copy Obler and the third member "on all relevant emails with respect to liquidity and implementation of steps to raise cash."

73.     At the beginning of 2016, Peter Jr. directed that Transmar provide Obler with a detailed plan dealing with significant aspects of Transmar's financial situation, including the sources and uses of funds with regard to, among other things, Transmar's borrowing base, shareholder loans and forward sales contracts with AMERRA.

74.     Acting as a de facto Transmar board member, Obler also:

- Received the Agent's December 2015 confidential syndication strategy presentation to Transmar;

- Participated in frequent meetings and telephone calls with Peter Jr. and Reich to address Transmar's liquidity issues;

- Communicated daily with Peter Jr. about all major issues and strategy concerning Transmar and Euromar GmbH, including the period when these sister affiliates' interests were no longer aligned;

- Communicated directly with then-Transmar Group President Durant on liquidity and exposure issues;

- Participated in Transmar-related personnel decisions and performance reviews;

- Participated in meetings and telephone calls with Transmar's Lenders. Obler was the main contact person for Transmar's Lenders who asked her for updates on Transmar's financial situation. One of the Lenders even called Obler at home on a weekend to express its concerns regarding Transmar. She also acted as Transmar's ambassador and voiced the concerns of Transmar/AMERRA to Transmar's lenders;

- Had access to a database where the agent for Transmar's syndicated credit facility shared information with facility's lenders even though AMERRA did not participate as a lender in this facility;

- Demanded and was provided with highly confidential information and daily updates on Transmar's financial condition. This information included the

13

findings of financial advisory and restructuring firm RPA Advisors, Inc. ("RPA"), who was tasked by the Lenders to analyze Transmar's books in late 2016. According to Peter Jr., Obler was directly or indirectly being informed about RPA's findings and was inquiring about RPA's review;

- Was forwarded by Peter Jr. a message that he sent to Peter Sr. about plans to "eliminate any fraudulant [sic] entries" on Transmar's financial records in order to comply with Transmar's credit agreement;

- Was designated to analyze the "first cut" of the "story-line" that Transmar planned on providing to the Lenders; and

- Led discussions with the representative of a potential buyer of the Transmar Group—who understood her to be Transmar's financial advisor.

75.     AMERRA's dominance was such that Johnson family members referred to Obler "running the show" and the "ONLY person who really matters".

76.     The result of this dominance was that, as it became apparent in 2016 that strategic decisions needed to be made as to the future operations of Transmar Group entities, Obler was heavily involved in such decision-making and her wishes were given paramount consideration by Transmar.

77.     For example, according to Peter Jr., what was most important when detailing out Transmar's sources and uses of funds was that capital be allocated in a way that would not increase AMERRA's exposure.

78.     Also, in addressing the issue of whether Euromar GmbH and Transmar should start being operated separately and autonomously, Transmar executives struggled to accommodate Obler's desire for autonomy, despite that the significant intercompany debt owed by Euromar to Transmar meant this was not feasible or beneficial to Transmar.

79.     Nevertheless, in the course of the same deliberations, Peter Sr. credited Obler as being the one with the "steady hand to shepherd [Transmar Group] entities back into health and wealth."

80.     This ignored the fact that Obler also actively sought to use her company's power over Transmar to the benefit of AMERRA.

81.     For example, when Transmar's Lenders reacted negatively to the repayment of part of the subordinated debt due to AMERRA in August 2016, Obler threatened to "trigger a huge problem for the entire [Transmar] group."

82.     Of course, ultimately, any attempt to restructure the Transmar Group entities failed and Transmar was forced to file for bankruptcy and thereafter into liquidation.

83.     Unlike AMERRA, no other lender or creditor -- including the Lenders, who had a $400 million credit facility -- held this position of authority, was included in internal Transmar meetings, communications and decision-making, was given access to Transmar's most highly confidential and sensitive financial information.

## H.     AMERRA's Connections and Loyalty to Euromar

84.     As between Transmar and Euromar, AMERRA's interests were more clearly aligned with Euromar.

85.     Specifically, although AMERRA's "investment" in Transmar was relatively small, AMERRA was substantially invested in the Transmar Group, mainly through Euromar, with a total investment said to be at approximately $150 million.

86.     As a result of the Euromar debt to AMERRA, though Obler may have favored an approach that would save both entities, if that was not to be the case, AMERRA would focus on saving Euromar, which, as set forth below, it attempted to do.

## THE FRAUDULENT TRANSFERS

87.     When it came to dealing with survival issues, Transmar and Euromar were often joined at the hip.

88.     In 2015-16, Euromar GmbH was facing its own severe liquidity crisis and began to miss payments to critical suppliers, providers and partners.

89.     This crisis led to Transmar's financial support of Euromar, or, in Peter Sr.'s words, Transmar putting "a lot of lipstick on the Euromar pig at [Transmar's] expense."

90.     As set forth below, during 2016, Transmar made several transfers to AMERRA in order to benefit Euromar that constitute intentional and constructive fraudulent conveyances.

**A.     The $8.4 Million Goods Transfer to AMERRA on behalf of Euromar GmbH**

91.     In August 2016, Euromar GmbH did not have sufficient collateral to list in its upcoming August 15, 2016 borrowing base report to its lenders.

92.     In order to assist Euromar GmbH in rectifying its borrowing base shortfall, Transmar and AMERRA implemented a plan to use Transmar's assets to increase Euromar GmbH's collateral.

93.     Specifically, Euromar GmbH was waiting on a transfer of title from AMERRA for $8,394,913.98 worth of goods (the "Euromar Goods"). These goods were previously sold by AMERRA to Euromar GmbH, but title had not been transferred because Euromar GmbH had been unable to pay the related invoices (the "Unpaid AMERRA Invoices").

94.     In return for Transmar transferring to AMERRA certain unrelated goods with the same value (the "Transmar Goods"), AMERRA agreed to release to Euromar GmbH the Euromar Goods.

95.     Transmar transferred the Transmar Goods, valued at $8,394,913.98 (the "$8.4 Million Transfer"), to AMERRA. The warehouse holding the Transmar Goods was directed to and did issue confirmations memorializing the change in title of the goods from Transmar to AMERRA effective as of August 15, 2016.

16

96.     As of this same date, AMERRA thereafter transferred title of the Euromar Goods to Euromar GmbH, thus increasing Euromar GmbH's borrowing base collateral accordingly.

97.     The parties papered the transaction as if it was a true purchase and sale of commodities.  As directed by AMERRA, Transmar declared in its sale invoices that the goods sent to AMERRA were "for payment on behalf of Euromar Commodities GmbH to be applied against the [Unpaid AMERRA Invoices]."

98.     Contrasting this situation with the circles referred to in the Indictment, Peter Jr. in an internal communication referred to this transaction as an "intermediary TRUE SALE, no circles or other shit."

99.     In reality though, this transaction between Transmar and AMERRA was nothing more than an actual giveaway of goods by Transmar for the benefit of Euromar GmbH.

100.    At the time of the $8.4 Million Transfer to AMERRA, Transmar intended, or knew with substantial certainty, that it would not be reimbursed by Euromar GmbH and that Transmar's creditors would be deprived of these assets.

101.    Among the badges of fraud related to the $8.4 Million Transfer were: (i) Transmar did not receive consideration for the $8.4 Million Transfer; (ii) Transmar was insolvent at the time it made the $8.4 Million Transfer, (iii) Transmar made the $8.4 Million Transfer on behalf of its insolvent commonly owned affiliate Euromar GmbH and (iv) members of the Johnson family, the indirect owners of both Transmar and Euromar GmbH, and Obler, who managed AMERRA but was a de facto Transmar board member, or her subordinates, orchestrated the transaction.

102.    In addition, the $8.4 Million Transfer was made during the period of time when Transmar was admittedly engaged in transactions intended to defraud its primary creditors - - its lenders.

103.    Each of the following AMERRA Funds executed the above-referenced purchase and sales contracts: AMERRA Heartland E, AMERRA Heartland B, AMERRA Advantage, AMERRA KRS, AMERRA MS, AMERRA Fund III, AMERRA Offshore III and AMERRA Opportunity (collectively, the "Funds Relevant to the $8.4 Million Transfer").

104.    The $8.4 million Transfer is avoidable as an intentional and/or constructive transfer and the Trustee is entitled to recovery from AMERRA or, to the extent AMERRA asserts and proves that it received the $8.4 Million Transfer as a conduit for any and all of the Funds Relevant to the $8.4 Million Transfer, to recovery from such Funds.

**B.    Transmar's $28 Million Transfers to Euromar LLC and Subsequent Transfers to AMERRA**

105.    On December 30, 2014, Euromar LLC borrowed substantial sums from AMERRA and executed promissory notes in favor of AMERRA with full payment due by January 31, 2015.

106.    One such note, executed by Euromar LLC, was in the amount of $25 million (the "$25 Million Euromar Loan") with payment guaranteed by Euromar GmbH.

107.    Euromar LLC and AMERRA agreed to several extensions of the repayment of the $25 Million Euromar Loan beyond January 31, 2015 by executing at least two replacement notes in the same amount, which extended the due date of the $25 Million Euromar Loan until September 30, 2015.

108.    Euromar LLC failed to repay the $25 Million Euromar Loan by September 30, 2015 and Obler subsequently referred to this "bridge loan" as being in default.

109.   In March and April 2016, AMERRA demanded full repayment of the principal balance of the $25 Million Euromar Loan.

110.   Transmar, not Euromar LLC, funded the repayment of the principal of the $25 Million Euromar Loan due to AMERRA.

111.   On April 8 and April 11, 2016, more than 15 months after the original principal due date, Transmar repaid AMERRA the principal of the $25 Million Euromar Loan by transferring a combined $25 million in funds to Euromar LLC which, upon information and belief, based on bank account statements, wire transfer records, wire instruction information and related correspondence, Euromar LLC in turn transferred to AMERRA on the same days for the same amounts.

112.   Partially as a result of this payment, even though Transmar's borrowing base had just increased, it was still unable to meet its cash needs.

113.   From January 2015 through April 2016, Transmar also funded the payment of over $3 million in interest due to AMERRA in connection with the $25 Million Euromar Loan.

114.   At the time of the principal and interest payments on the $25 Million Eurmoar Loan, Transmar intended, or knew with substantial certainty, that it would not be reimbursed by Euromar LLC and that Transmar's creditors would be deprived of these assets.

115.   The principal and interest payments made by Transmar to Euromar LLC that were in turn transferred to AMERRA on account of the $25 Million Euromar Loan (collectively, the "$28 Million Transfers") are set forth below:

| **Initial Transfer (Transmar to Euromar LLC)** | | **Subsequent Transfer to AMERRA (Euromar LLC to AMERRA)** | |
|---|---|---|---|
| **Date** | **Amount** | **Date** | **Amount** |
| 1/30/2015 | $287,500.00 | 1/30/2015 | $287,500.00 |
| 3/31/2015 | $500,000.00 | 3/31/2015 | $500,000.00 |
| 4/22/2015 | $183,333.33 | 4/22/2015 | $183,333.33 |

| 6/2/2015 | $258,333.33 | 6/2/2015 | $258,333.33 |
|---|---|---|---|
| 7/1/2015 | $250,000.00 | 7/1/2015 | $250,000.00 |
| 9/1/2015 | $241,666.67 | 9/1/2015 | $241,666.67 |
| 11/2/2015 | $250,000.00 | 11/2/2015 | $250,000.00 |
| 12/1/2015 | $258,333.33 | 12/1/2015 | $258,333.33 |
| 1/4/2016 | $291,666.67 | 1/4/2016 | $291,666.67 |
| 2/2/2016 | $233,333.33 | 2/2/2016 | $233,333.33 |
| 3/4/2016 | $241,666.67 | 3/4/2016 | $241,666.67 |
| 4/1/2016 | $258,333.33 | 4/1/2016 | $258,333.33 |
| 4/8/2016 4/8/2016 4/8/2016 | $12,420,000.00 $4,085,000.00 $1,495,000.00 | 4/8/2016 | $18,000,000.00 |
| 4/11/2016 4/11/2016 | $4,915,000.00 $2,085,000.00 | 4/11/2016 | $7,000,000.00 |
| 4/12/2016 | $65,333.33 | 4/12/2016 | $65,333.33 |
| **Total Paid:** | **$28,319,499.99** | | **$28,319,499.99** |

116.    Transmar transferred all of the $28 Million Transfers from its New York bank account to a New York bank account held by Euromar LLC.

117.    Upon information and belief, based on Euromar LLC bank account statements, wire transfer records, wire instruction information, and Euromar LLC's other wires to AMERRA, Euromar LLC then transferred all of the $28 Million Transfers from its New York bank account to AMERRA's New York bank account.

118.    The badges of fraud with regard to the $28 Million Transfers were, among others: (i) Transmar did not receive consideration for the $28 Million Transfers, (ii) Transmar was insolvent at the time of the $28 Million Transfers, (iii) Transmar made the $28 Million Transfers on behalf of its affiliate Euromar LLC, and (iv) members of the Johnson family, the indirect owners of both Transmar and Euromar LLC, and Obler, who managed AMERRA but was a de facto Transmar board member, orchestrated the transaction.

119.    As acknowledged by Transmar, the principal transfers totaling $25 million contributed significantly to Transmar's deepening financial distress in 2016.

120.    The $28 Million Transfers were made during the period of time when Transmar was admittedly engaged in transactions intended to defraud its primary creditors - - its lenders.

121.    Each of the following AMERRA Funds were referred to in the aforementioned original and replacement notes relating to the $25 Million Euromar Loan: AMERRA Latin, AMERRA Advantage, AMERRA MS and AMERRA Opportunity (collectively, the "Funds Relevant to the $28 Million Transfers").

122.    The $28 Million Transfers are avoidable as intentional and/or constructive transfers and the Trustee is entitled to recovery from Euromar LLC, AMERRA or, to the extent AMERRA asserts and proves that it received the $28 Million Transfers as a conduit for any and all of the Funds Relevant to the $28 Million Transfers, to recovery from such Funds.

## C.    Transmar's Additional Transfers to Euromar LLC and Subsequent Transfers to AMERRA

123.    On December 18, 2012, Euromar LLC borrowed $10 million from AMERRA and executed a "Subordinate Note" (the "Euromar LLC Subordinated Note") in favor of AMERRA with full payment due by March 31, 2017 (the "Euromar LLC Subordinated Loan").

124.    In conjunction with the Euromar LLC Subordinated Loan, Euromar LLC and AMERRA also entered into a letter agreement, also dated December 18, 2012 (the "Euromar LLC Subordinated Loan Agreement" and, together with the Euromar LLC Subordinated Note, the "Euromar LLC Subordinated Loan Documents").

125.    Transmar, not Euromar LLC, funded the interest and profit participation payments due to AMERRA on account of Euromar LLC's obligations under the Euromar LLC Subordinated Loan Documents.

126.    At the time of these interest and profit participation payments payments, Transmar intended, or knew with substantial certainty, that it would not be reimbursed by Euromar LLC and that Transmar's creditors would be deprived of these assets.

127.    The 2015 and 2016 interest and profit participation payments made by Transmar to Euromar LLC, which, upon information and belief, based on bank account statements, wire transfer records, wire instruction information and related correspondence, were in turn transferred to AMERRA in payment of the Euromar LLC Subordinated Loan (collectively, the "Additional Transfers") are set forth below:

| Initial Transfer (Transmar to Euromar LLC) | | Subsequent Transfer to AMERRA (Euromar LLC to AMERRA) | |
|---|---|---|---|
| **Date** | **Amount** | **Date** | **Amount** |
| 3/31/2015 | $265,720.00 | 3/31/2015 | $265,720.00 |
| 10/1/2015 | $271,624.89 | 10/1/2015 | $271,624.89 |
| 11/3/2015 | $103,029.15 | 11/3/2015 | $103,029.15 |
| 12/31/2015 | $271,624.89 | 12/31/2015 | $271,624.89 |
| 2/2/2016 | $106,333.30 | 2/2/2016 | $106,333.30 |
| 4/1/2016 | $282,087.36 | 4/1/2016 | $282,087.36 |
| 5/2/2016 | $76,281.99 | 5/2/2016 | $76,281.99 |
| 6/30/2016 | $282,087.36 | 6/30/2016 | $282,087.36 |
| 8/4/2016 | $80,697.00 | 8/4/2016 | $80,697.00 |
| 9/29/2016 | $285,187.22 | 9/29/2016 | $285,187.22 |
| **Total Paid:** | **$2,024,673.16** | | **$2,024,673.16** |

128.    Transmar transferred all of the Additional Transfers from its New York bank account to a New York bank account held by Euromar LLC.

129.    Upon information and belief, based on Euromar LLC bank account statements, wire transfer records, wire instruction information, and Euromar LLC's other wires to AMERRA, Euromar LLC then transferred the Additional Transfers from its New York bank account to AMERRA's New York bank account.

130.    The badges of fraud with regard to the Additional Transfers were, among others: (i) Transmar did not receive consideration for the Additional Transfers, (ii) Transmar was insolvent at the time of the Additional Transfers, (iii) Transmar made the Additional Transfers on behalf of its affiliate Euromar LLC, and (iv) members of the Johnson family, the indirect owners of both Transmar and Euromar LLC, and Obler, who managed AMERRA but was a de facto Transmar board member, or her subordinates, orchestrated the transaction.

131.    In addition, the Additional Transfers were made during the period of time when Transmar was engaged in transactions intended to defraud its primary creditors - - its lenders.

132.    Each of the following AMERRA Funds were referred to in the Euromar LLC Subordinated Note: AMERRA Fund II and AMERRA Opportunity (collectively, the "Funds Relevant to the Additional Transfers").

133.    The Additional Transfers are avoidable as intentional and/or constructive transfers and the Trustee is entitled to recovery from Euromar LLC, AMERRA or, to the extent AMERRA asserts and proves that it received the Additional Transfers as a conduit for any and all of the Funds Relevant to the Additional Transfers, to recovery from such Funds.

## THE INSIDER PREFERENCE PAYMENTS

**A.    The January 2016 Transfers to AMERRA**

134.    On December 25, 2015, Transmar executives discussed the need to create a transaction that would allow Transmar to reduce its borrowing base prior to year end with the intention to unwind the transaction once that had been accomplished.

135.    On December 29, 2015, Peter Jr. suggested to AMERRA's Obler that to increase the borrowing base, Euromar GmbH could "sell" AMERRA goods that were "not readily financeable" to then be "sold" on to Transmar.  He stated "[s]ince Amerra is not really owning

the goods for more than a few minutes to sell it onto Transmar, I don't think its [sic] critical to have the normal title document stuff done at such a detailed level."

136.    AMERRA suggested instead that Transmar repay money advanced by AMERRA by making a draw under its new 2016 borrowing base, with a request to Transmar's lenders that the proceeds of the draw be paid directly to AMERRA.

137.    Peter Jr. responded "I thought that Transmar would just return the goods to Amerra and Amerra to give back the goods to Euromar, so Euromar can pay back Amerra.  Isn't this easier?"

138.    However, Obler prevailed stating: "we still need to know the uses of the cash and how [AMERRA would] get repaid.  This is another unsecured loan…"

139.    Thus, the plan went forward with AMERRA providing Transmar with "5-day credit terms against a sale to [Transmar]."  In other words, the loan transaction would be papered as a sale of goods by AMERRA to Transmar on credit with payment due in five days so as to accomplish the necessary temporary reduction in Transmar's borrowing base.

140.    To implement this plan, Euromar GmbH and AMERRA entered into four sales contracts, dated December 30, 2015, whereby Euromar GmbH "sold" cocoa products to AMERRA with each contract specifying that AMERRA would "pay" Transmar the purchase price of the goods.

141.    One day later, on December, 31, 2015, AMERRA loaned $20,754,457.17 to Transmar by paying Transmar for the goods that AMERRA "bought" from Euromar GmbH (the "December 2015 Loan").

142.    As planned, following its receipt of the money from AMERRA, on December 31, 2015, Transmar used the sales proceeds from the loan to pay down its borrowing base.

143.    Shortly after the new year, Transmar submitted Notices of Borrowing for its lenders to extend credit from Transmar's 2016 borrowing base.  The requested monies allowed Transmar to repay AMERRA for the December 2015 Loan and, as set forth below, an additional amount of slightly over $1 million demanded by AMERRA as a transaction fee for the December 2015 Loan.

144.    On January 6, 2016, Transmar transferred $12,903,164.00 to AMERRA and on January 8, 2016, Transmar paid AMERRA the remaining $8,852,676.27 to repay the December 2015 Loan and provide AMERRA with the fee it demanded (collectively, the "January 2016 Transfers").

145.    Transmar transferred all of the January 2016 Transfers from its New York bank account to a New York bank account held by AMERRA.

146.    AMERRA and each of the following AMERRA Funds executed the above-referenced purchase and sales contracts: AMERRA Advantage, AMERRA Offshore II, AMERRA Opportunity, AMERRA MS, AMERRA Fund III and AMERRA KRS (collectively, the "Funds Relevant to the January 2016 Transfers").

147.    The January 2016 Transfers are avoidable as insider preference payments and the Trustee is entitled to recovery from AMERRA or, to the extent AMERRA asserts and proves that it received the transfers as a conduit for any and all of Funds Relevant to the January 2016 Transfers, to recovery from such Funds.

**B.    The Fee Payment to AMERRA**

148.    On December 30, 2015, Obler demanded that Transmar pay AMERRA a fee of $1 million, that she referred to as an equity return to AMERRA, for its participation in the December 2015 Loan.

149.     While Peter Jr. almost always tried to be in lockstep with Obler regarding transactions involving Euromar, Transmar and AMERRA, even he had to point out the absurdity of the proposed fee.

150.     On December 31, 2015, Peter Jr. asked Obler "Are you seriously suggesting we pay you 1M USD for borrowing $20M for 5 days?"

151.     Nonetheless, Transmar went forward with the transaction and made the fee payment of $1,001,383.10 (the "Fee Payment") to AMERRA as part of the January 2016 Transfers.

152.     Transmar transferred the Fee Payment from its New York bank account to a New York bank account held by AMERRA.

153.     The Fee Payment is either part of the insider preferences received by AMERRA on account of the December 2015 Loan, or, alternatively, is an intentional and/or constructive fraudulent conveyance.

154.     The badges of fraud with regard to the Fee Payment were, among others: (i) Transmar did not receive consideration for the Fee Payment, (ii) Transmar was insolvent at the time of the Fee Payment, and (iii) members of the Johnson family, the indirect owners of both Transmar and Euromar GmbH, and Obler, who managed AMERRA but was a de facto Transmar board member, orchestrated the transaction.

155.     In addition, the Fee Payment was made during the period of time when Transmar was admittedly engaged in transactions intended to defraud its primary creditors - - its lenders.

156.     The Trustee is entitled to recovery from AMERRA or, to the extent AMERRA asserts and proves that it received the Fee Payment as a conduit for the Funds Relevant to the January 2016 Transfers, to recovery from such Funds.

## C.   The Subordinated Debt Transfers to AMERRA

157.   On August 29, 2013, Transmar borrowed $10 million by executing an interest bearing subordinated note in favor of AMERRA (the "Subordinated Note").

158.   Pursuant to the Subordinated Note and corresponding loan agreements between the parties, AMERRA also had a right to profit participation payments as further consideration for making the loan to Transmar.

159.   As set forth in the chart below, between April and September 2016, Transmar made a total of four loan and profit-related payments to AMERRA totaling $2,235,297.72 (the "Subordinated Debt Transfers") on account of the antecedent debt—Transmar's obligations under the Subordinated Note and the corresponding loan agreements.

| Transmar Subordinated Debt Transfers to AMERRA | |
| --- | --- |
| **Date** | **Amount** |
| 4/1/2016 | $248,507.10 |
| 6/30/2016 | $248,507.10 |
| 8/9/2016 | $1,500,000.00 |
| 9/30/2016 | $238,283.52 |
| **Total:** | **$2,235,297.72** |

160.   Transmar transferred all of the Subordinated Debt Transfers from its New York bank account to a New York bank account held by AMERRA.

161.   The following AMERRA Funds are listed as lenders in the Subordinated Note: AMERRA Advantage, AMERRA Opportunity and AMERRA Latin (collectively, the "Funds Relevant to the Subordinated Debt Transfers").

162.   The Subordinated Debt Transfers are avoidable as insider preference payments and the Trustee is entitled to recovery from AMERRA or, to the extent AMERRA asserts and proves that it received the subordinated debt transfers as a conduit for any and all of the Funds Relevant to the Subordinated Debt Transfers, to recovery from such Funds.

## COUNT ONE
## INTENTIONAL FRAUDULENT TRANSFERS – 11 U.S.C. §§ 548(a)(1)(A), 550(a) AND 551

### (Avoiding and Recovering the $8.4 Million Transfer and the Fee Payment)

163.    To the extent applicable, the Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

164.    The $8.4 Million Transfer and Fee Payment were made on or within two years before the Filing Date.

165.    The $8.4 Million Transfer and the Fee Payment constituted transfers of interests of Transmar in property within the meaning of section 101(54) of the Bankruptcy Code.

166.    The $8.4 Million Transfer and the Fee Payment were made by Transmar with the actual intent to hinder, delay, or defraud some or all of Transmar's then existing and/or future creditors.

167.    The $8.4 Million Transfer and the Fee Payment constitute fraudulent transfers avoidable by the Trustee pursuant to section 548(a)(1)(A) of the Bankruptcy Code and recoverable pursuant to section 550(a) of the Bankruptcy Code.

168.    As a result of the foregoing, pursuant to sections 548(a)(1)(A), 550(a) and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against AMERRA, or the Funds Relevant to the $8.4 Million Transfer and/or the Funds Relevant to the January 2016 Transfers: (a) avoiding and preserving the $8.4 Million Transfer and the Fee Payment; (b) directing that the $8.4 Million Transfer and the Fee Payment be set aside; and (c) recovering the $8.4 Million Transfer and the Fee Payment, or the values thereof, from AMERRA, or the Funds Relevant to the $8.4 Million Transfer and/or Funds Relevant to the January 2016 Transfers, for the benefit of the Estate.

**COUNT TWO**
**CONSTRUCTIVE FRAUDULENT TRANSFERS – 11 U.S.C. §§ 548(a)(1)(B), 550(a) AND**
**551**

**(Avoiding and Recovering the $8.4 Million Transfer and Fee Payment)**

169.    To the extent applicable, the Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

170.    The $8.4 Million Transfer and the Fee Payment were made on or within two years before the Filing Date.

171.    The $8.4 Million Transfer and the Fee Payment constituted transfers of interests of Transmar in property within the meaning of section 101(54) of the Bankruptcy Code.

172.    Transmar received less than reasonably equivalent value in exchange each of the $8.4 Million Transfer and the Fee Payment.

173.    At the time of each of the $8.4 Million Transfer and the Fee Payment, Transmar was insolvent, or became insolvent as a result of the $8.4 Million Transfer and the Fee Payment.

174.    At the time of each of the $8.4 Million Transfer and the Fee Payment, Transmar was engaged in a business or a transaction, or was about to engage in a business or transaction, for which any property remaining with Transmar was an unreasonably small capital.

175.    At the time Transmar made the $8.4 Million Transfer and the Fee Payment, Transmar had incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay them as the debts matured.

176.    The $8.4 Million Transfer and the Fee Payment constitute fraudulent transfers avoidable by the Trustee pursuant to section 548(a)(1)(B) of the Bankruptcy Code and recoverable pursuant to section 550(a) of the Bankruptcy Code.

177.    As a result of the foregoing, pursuant to sections 548(a)(1)(B), 550(a) and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against AMERRA or the Funds

Relevant to the $8.4 Million Transfer and/or the Funds Relevant to the January 2016 Transfers: (a) avoiding and preserving the $8.4 Million Transfer and the Fee Payment; (b) directing that the $8.4 Million Transfer and the Fee Payment be set aside; and (c) recovering the $8.4 Million Transfer and the Fee Payment, or the values thereof, from AMERRA, or the $8.4 Million Transfer and/or the Funds Relevant to the January 2016 Transfers, for the benefit of the Estate.

**COUNT THREE**
**INTENTIONAL FRAUDULENT TRANSFERS– NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278 AND/OR 279, AND 11 U.S.C. §§ 544(b), 550(a) AND 551**

**(Avoiding and Recovering the $8.4 Million Transfer and the Fee Payment)**

178.   To the extent applicable, the Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

179.   At all times relevant to the $8.4 Million Transfer and the Fee Payment, and as of the Petition Date, there existed actual unsecured creditors of the Debtor who could have avoided any transfer of an interest of the Debtor in property that is avoidable under the DCL pursuant to Bankruptcy Code § 544(b).

180.   Each of the $8.4 Million Transfer and the Fee Payment constituted a conveyance by Transmar as defined under DCL section 270.

181.   The $8.4 Million Transfer and the Fee Payment were made by Transmar with the actual intent to hinder, delay, or defraud the creditors of Transmar.

182.   As a result of the foregoing, pursuant to DCL sections 276, 276-a, 278 and/or 279, sections 544(b), 550(a) and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against AMERRA or the Funds Relevant to the $8.4 Million Transfer and/or Funds Relevant to the January 2016 Transfers: (a) avoiding and preserving the $8.4 Million Transfer and the Fee Payment; (b) directing that the $8.4 Million Transfer and the Fee Payment be set aside; (c)

recovering the $8.4 Million Transfer and the Fee Payment, or the values thereof, from AMERRA, or the Funds Relevant to the $8.4 Million Transfer and/or Funds Relevant to the January 2016 Transfers; and (d) recovering attorneys' fees from AMERRA or the Funds Relevant to the $8.4 Million Transfer and/or Funds Relevant to the January 2016 Transfers, for the benefit of the Estate.

### COUNT FOUR
### CONSTRUCTIVE FRAUDULENT TRANSFERS – NEW YORK DEBTOR AND CREDITOR LAW §§ 273, 278 AND/OR 279, AND 11 U.S.C. §§ 544(b), 550(a) AND 551

**(Avoiding and Recovering the $8.4 Million Transfer and the Fee Payment)**

183.    To the extent applicable, the Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

184.    At all times relevant to the $8.4 Million Transfer and the Fee Payment, and as of the Petition Date, there existed actual unsecured creditors of the Debtor who could have avoided any transfer of an interest of the Debtor in property that is avoidable under the DCL pursuant to Bankruptcy Code § 544(b).

185.    Transmar was insolvent, or became insolvent, as a result of the $8.4 Million Transfer and the Fee Payment.

186.    Each of the $8.4 Million Transfer and the Fee Payment constitute a conveyance by Transmar as defined under DCL section 270.

187.    Transmar did not receive fair consideration for the $8.4 Million Transfer or the Fee Payment within the meaning of DCL section 272 because Transmar did not receive reasonably equivalent value for said Transfers (as defined herein).

188.    In addition to the lack of reasonably equivalent value received by Transmar, the $8.4 Million Transfer and the Fee Payment were not made in good faith because they preferred insiders of the Debtor to non-insider creditors of the Debtor.

189.    In addition, the $8.4 Million Transfer and the Fee Payment were not made for fair consideration because they were distributed to insiders of the Debtor and rendered the Debtor insolvent or were made at a time when the Debtor was insolvent.

190.    As a result of the foregoing, pursuant to DCL sections 273, 278 and/or 279, sections 544(b), 550(a) and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against AMERRA or the Funds Relevant to the $8.4 Million Transfer and/or Funds Relevant to the January 2016 Transfers: (a) avoiding and preserving the $8.4 Million Transfer and the Fee Payment; (b) directing that the $8.4 Million Transfer and the Fee Payment be set aside; and (c) recovering the $8.4 Million Transfer and the Fee Payment, or the values thereof, from AMERRA, or the Funds Relevant to the $8.4 Million Transfer and/or Funds Relevant to the January 2016 Transfers, for the benefit of the Estate.

## COUNT FIVE
## CONSTRUCTIVE FRAUDULENT TRANSFERS – NEW YORK DEBTOR AND CREDITOR LAW §§ 274, 278 AND/OR 279, AND 11 U.S.C. §§ 544(b), 550(a) AND 551

### (Avoiding and Recovering the $8.4 Million Transfer and the Fee Payment)

191.    To the extent applicable, the Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

192.    At all times relevant to the $8.4 Million Transfer and the Fee Payment, and as of the Petition Date, there existed actual unsecured creditors of the Debtor who could have avoided any transfer of an interest of the Debtor in property that is avoidable under the DCL pursuant to Bankruptcy Code § 544(b).

193.    Each of the $8.4 Million Transfer and the Fee Payment constituted a conveyance by Transmar as defined under DCL section 270.

194.    Transmar did not receive fair consideration for the $8.4 Million Transfer or the Fee Payment.

195.    At the time Transmar made each of the $8.4 Million Transfer and the Fee Payment, Transmar was engaged or was about to engage in a business or transaction for which the property remaining in its hands after each of the $8.4 Million Transfer and the Fee Payment was an unreasonably small capital.

196.    As a result of the foregoing, pursuant to DCL sections 274, 278 and/or 279, sections 544(b), 550(a) and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against AMERRA or the Funds Relevant to the $8.4 Million Transfer and/or Funds Relevant to the January 2016 Transfers: (a) avoiding and preserving the $8.4 Million Transfer and the Fee Payment; (b) directing that the $8.4 Million Transfer and the Fee Payment be set aside; and (c) recovering the $8.4 Million Transfer and the Fee Payment, or the values thereof, from AMERRA, or the Funds Relevant to the $8.4 Million Transfer and/or Funds Relevant to the January 2016 Transfers, for the benefit of the Estate.

## COUNT SIX
### CONSTRUCTIVE FRAUDULENT TRANSFERS – NEW YORK DEBTOR AND CREDITOR LAW §§ 275, 278 AND/OR 279, AND 11 U.S.C. §§ 544(b), 550(a) AND 551

**(Avoiding and Recovering the $8.4 Million Transfer and the Fee Payment)**

197.    To the extent applicable, the Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

198.    At all times relevant to the $8.4 Million Transfer and the Fee Payment, and as of the Petition Date, there existed actual unsecured creditors of the Debtor who could have avoided

any transfer of an interest of the Debtor in property that is avoidable under the DCL pursuant to Bankruptcy Code § 544(b).

199.   Each of the $8.4 Million Transfer and the Fee Payment constituted a conveyance by Transmar as defined under DCL section 270.

200.   Transmar did not receive fair consideration for the $8.4 Million Transfer or the Fee Payment.

201.   At the time Transmar made each of the $8.4 Million Transfer and the Fee Payment, Transmar had incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay them as the debts matured.

202.   As a result of the foregoing, pursuant to DCL sections 275, 278 and/or 279 and sections 544(b), 550(a) and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against AMERRA or the Funds Relevant to the $8.4 Million Transfer and/or Funds Relevant to the January 2016 Transfers: (a) avoiding and preserving the $8.4 Million Transfer and the Fee Payment; (b) directing that the $8.4 Million Transfer and the Fee Payment be set aside; and (c) recovering the $8.4 Million Transfer and the Fee Payment, or the values thereof, from AMERRA, or the Funds Relevant to the $8.4 Million Transfer and/or the Funds Relevant to the January 2016 Transfers, for the benefit of the Estate.

## COUNT SEVEN
## INTENTIONAL FRAUDULENT TRANSFERS- 11 U.S.C. §§ 548(a)(1)(A), 550(a) AND 551

**(Avoiding and Recovering the $28 Million Transfers and the Additional Transfers)**

203.   To the extent applicable, the Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

204.    The $28 Million Transfers and the Additional Transfers were made on or within two years before the Filing Date.

205.    The $28 Million Transfers and the Additional Transfers constituted transfers of interests of Transmar in property within the meaning of section 101(54) of the Bankruptcy Code.

206.    The $28 Million Transfers and the Additional Transfers were made by Transmar with the actual intent to hinder, delay, or defraud some or all of Transmar's then existing and/or future creditors.

207.    The $28 Million Transfers and the Additional Transfers constitute fraudulent transfers avoidable by the Trustee pursuant to section 548(a)(1)(A) of the Bankruptcy Code and recoverable under section 550(a) of the Bankruptcy Code.

208.    As a result of the foregoing, pursuant to sections 548(a)(1)(A), 550(a) and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against Euromar LLC: (a) avoiding and preserving the $28 Million Transfers and the Additional Transfers; (b) directing that the $28 Million Transfers and the Additional Transfers be set aside; and (c) recovering the $28 Million Transfers and the Additional Transfers, or the values thereof, from Euromar LLC for the benefit of the Estate.

### COUNT EIGHT
### CONSTRUCTIVE FRAUDULENT TRANSFERS –- 11 U.S.C. §§ 548(a)(1)(B), 550(a) AND 551

**(Avoiding and Recovering the $28 Million Transfers and the Additional Transfers)**

209.    To the extent applicable, the Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

210.    The $28 Million Transfers and the Additional Transfers were made on or within two years before the Filing Date.

211.    The $28 Million Transfers and the Additional Transfers constituted transfers of interests of Transmar in property within the meaning of section 101(54) of the Bankruptcy Code.

212.    Transmar received less than reasonably equivalent value in exchange for each of the $28 Million Transfers and the Additional Transfers.

213.    At the time of each of the $28 Million Transfers and the Additional Transfers, Transmar was insolvent, or became insolvent as a result of the $28 Million Transfers and the Additional Transfers.

214.    At the time of each of the $28 Million Transfers and the Additional Transfers, Transmar was engaged in a business or a transaction, or was about to engage in a business or transaction, for which any property remaining with Transmar was an unreasonably small capital.

215.    At the time Transmar made each of the $28 Million Transfers and the Additional Transfers, Transmar had incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay them as the debts matured.

216.    The $28 Million Transfers and the Additional Transfers constitute fraudulent transfers avoidable by the Trustee pursuant to section 548(a)(1)(B) of the Bankruptcy Code and recoverable under section 550(a) of the Bankruptcy Code.

217.    As a result of the foregoing, pursuant to sections 548(a)(1)(B), 550(a) and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against Euromar LLC: (a) avoiding and preserving the $28 Million Transfers and the Additional Transfers; (b) directing that the $28 Million Transfers and the Additional Transfers be set aside; and (c) recovering the $28 Million Transfers and the Additional Transfers, or the values thereof, from Euromar LLC for the benefit of the Estate.

## COUNT NINE
## INTENTIONAL FRAUDULENT TRANSFERS – NEW YORK DEBTOR AND

**CREDITOR LAW §§ 276, 276-a, 278 AND/OR 279, AND 11 U.S.C. §§ 544(b), 550(a) AND
551**

**(Avoiding and Recovering the $28 Million Transfers and the Additional Transfers)**

218.    To the extent applicable, the Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

219.    At all times relevant to the $28 Million Transfers and the Additional Transfers, and as of the Petition Date, there existed actual unsecured creditors of the Debtor who could have avoided any transfer of an interest of the Debtor in property that is avoidable under the DCL pursuant to Bankruptcy Code § 544(b).

220.    The $28 Million Transfers and the Additional Transfers constituted conveyances by Transmar as defined under DCL section 270.

221.    The $28 Million Transfers and the Additional Transfers were made by Transmar with the actual intent to hinder, delay, or defraud the creditors of Transmar.

222.    As a result of the foregoing, pursuant to DCL sections 276, 276-a, 278 and/or 279, sections 544(b), 550(a) and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against Euromar LLC: (a) avoiding and preserving the $28 Million Transfers and the Additional Transfers; (b) directing that the $28 Million Transfers and the Additional Transfers be set aside; (c) recovering the $28 Million Transfers and the Additional Transfers, or the values thereof, from Euromar LLC; and (d) recovering attorneys' fees from Euromar LLC for the benefit of the Estate.

**COUNT TEN
CONSTRUCTIVE FRAUDULENT TRANSFERS – NEW YORK DEBTOR AND
CREDITOR LAW §§ 273, 278 AND/OR 279, AND 11 U.S.C. §§ 544(b), 550(a) AND 551**

**(Avoiding and Recovering the $28 Million Transfers and the Additional Transfers)**

223.    To the extent applicable, the Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

224.    At all times relevant to the $28 Million Transfers and the Additional Transfers, and as of the Petition Date, there existed actual unsecured creditors of the Debtor who could have avoided any transfer of an interest of the Debtor in property that is avoidable under the DCL pursuant to Bankruptcy Code § 544(b).

225.    Transmar was insolvent, or became insolvent, as a result of the $28 Million Transfers and the Additional Transfers.

226.    The $28 Million Transfers and the Additional Transfers constituted conveyances by Transmar as defined under DCL section 270.

227.    Transmar did not receive fair consideration for the $28 Million Transfers and the Additional Transfers within the meaning of DCL section 272 because Transmar did not receive reasonably equivalent value for said Transfers.

228.    In addition to the lack of reasonably equivalent value received by Transmar, the $28 Million Transfers and the Additional Transfers were not made in good faith because they preferred insiders of the Debtor to non-insider creditors of the Debtor.

229.    In addition, the $28 Million Transfers and the Additional Transfers were not made for fair consideration because they were distributed to insiders of the Debtor and rendered the Debtor insolvent or were made at a time when the Debtor was insolvent.

230.    As a result of the foregoing, pursuant to DCL sections 273, 278 and/or 279, sections 544(b), 550(a) and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against Euromar LLC: (a) avoiding and preserving the $28 Million Transfers and the Additional Transfers; (b) directing that the $28 Million Transfers and the Additional Transfers be set aside;

and (c) recovering the $28 Million Transfers and the Additional Transfers, or the values thereof, from Euromar LLC for the benefit of the Estate.

### COUNT ELEVEN
### CONSTRUCTIVE FRAUDULENT TRANSFERS – NEW YORK DEBTOR AND CREDITOR LAW §§ 274, 278 AND/OR 279, AND 11 U.S.C. §§ 544(b), 550(a) AND 551

**(Avoiding and Recovering the $28 Million Transfers and the Additional Transfers)**

231.    To the extent applicable, the Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

232.    At all times relevant to the $28 Million Transfers and the Additional Transfers, and as of the Petition Date, there existed actual unsecured creditors of the Debtor who could have avoided any transfer of an interest of the Debtor in property that is avoidable under the DCL pursuant to Bankruptcy Code § 544(b).

233.    The $28 Million Transfers and the Additional Transfers constituted conveyances by Transmar as defined under DCL section 270.

234.    Transmar did not receive fair consideration for any of the $28 Million Transfers or the Additional Transfers.

235.    At the time Transmar made each of the $28 Million Transfers and the Additional Transfers, Transmar was engaged or was about to engage in a business or transaction for which the property remaining in its hands after each of the $28 Million Transfers and the Additional Transfers was an unreasonably small capital.

236.    As a result of the foregoing, pursuant to DCL sections 274, 278 and/or 279, sections 544(b), 550(a) and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against Euromar LLC: (a) avoiding and preserving the $28 Million Transfers and the Additional Transfers; (b) directing that $28 Million Transfers and the Additional Transfers be set aside; and

(c) recovering the $28 Million Transfers and the Additional Transfers, or the values thereof, from Euromar LLC for the benefit of the Estate.

<u>COUNT TWELVE</u>
<u>CONSTRUCTIVE FRAUDULENT TRANSFERS – NEW YORK DEBTOR AND CREDITOR LAW §§ 275, 278 AND/OR 279, AND 11 U.S.C. §§ 544(b), 550(a) AND 551</u>

**(Avoiding and Recovering the $28 Million Transfers and the Additional Transfers)**

237.    To the extent applicable, the Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

238.    At all times relevant to the $28 Million Transfers and the Additional Transfers, and as of the Petition Date, there existed actual unsecured creditors of the Debtor who could have avoided any transfer of an interest of the Debtor in property that is avoidable under the DCL pursuant to Bankruptcy Code § 544(b).

239.    The $28 Million Transfers and the Additional Transfers constituted conveyances by Transmar as defined under DCL section 270.

240.    Transmar did not receive fair consideration for any of the $28 Million Transfers or the Additional Transfers.

241.    At the time Transmar made each of the $28 Million Transfers and the Additional Transfers, Transmar had incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay them as the debts matured.

242.    As a result of the foregoing, pursuant to DCL sections 275, 278 and/or 279, sections 544(b), 550(a) and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against Euromar LLC: (a) avoiding and preserving the $28 Million Transfers and the Additional Transfers; (b) directing that $28 Million Transfers and the Additional Transfers be set aside; and

(c) recovering the $28 Million Transfers and the Additional Transfers, or the values thereof, from Euromar LLC for the benefit of the Estate.

## COUNT THIRTEEN
## RECOVERY OF SUBSEQUENT TRANSFERS –11 U.S.C. § 550(a)

243.    To the extent applicable, the Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

244.    Each of the $28 Million Transfers and the Additional Transfers is recoverable from AMERRA or the Funds Relevant to the $28 Million Transfers and/or the Funds Relevant to the Additional Transfers under section 550(a) of the Bankruptcy Code.

245.    AMERRA or the Funds Relevant to the $28 Million Transfers and/or the Funds Relevant to the Additional Transfers are immediate or mediate transferees of the $28 Million Transfers and the Additional Transfers from Euromar LLC.

246.    As a result of the foregoing, pursuant to section 550(a) of the Bankruptcy Code, the Trustee is entitled to a judgment against AMERRA or the Funds Relevant to the $28 Million Transfers and/or the Funds Relevant to the Additional Transfers: (a) recovering the $28 Million Transfers and the Additional Transfers, or the value thereof, from AMERRA or the Funds Relevant to the $28 Million Transfers and/or the Funds Relevant to the Additional Transfers and (b) recovering attorneys' fees from AMERRA or the Funds Relevant to the $28 Million Transfers and/or the Funds Relevant to the Additional Transfers for the benefit of the Estate.

## COUNT FOURTEEN
## AVOIDANCE AND RECOVERY OF PREFERENTIAL TRANSFERS UNDER 11 U.S.C. §§ 547(b), 550(a) and 551

### (Avoiding and Recovering the Subordinated Debt Transfers and the January 2016 Transfers)

247.    To the extent applicable, the Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

41

248.    At the time that the Debtor made each of the Subordinated Debt Transfers and the January 2016 Transfers, AMERRA, or the Funds Relevant to the Subordinated Debt Transfers and/or the Funds Relevant to the January 2016 Transfers, were "creditors" of the Debtor within the meaning of Bankruptcy Code § 101(10) and non-statutory insiders of the Debtor.

249.    The Subordinated Debt Transfers and the January 2016 Transfers constituted transfers of an interest of the Debtor in property within the meaning of Bankruptcy Code §§ 101(54) and 547(b).

250.    Each of the Subordinated Debt Transfers and the January 2016 Transfers was to, or for the benefit of, AMERRA or the Funds Relevant to the Subordinated Debt Transfers and/or the Funds Relevant to the January 2016 Transfers.

251.    The Debtor made, or caused to be made, the Subordinated Debt Transfers and the January 2016 Transfers for, or on account of, antecedent debts owed by the Debtor before such Subordinated Debt Transfers and January 2016 Transfers were made.

252.    Each of the Subordinated Debt Transfers and the January 2016 Transfers was made while the Debtor was insolvent.

253.    Each of the Subordinated Debt Transfers and the January 2016 Transfers enabled AMERRA, or the Funds Relevant to the Subordinated Debt Transfers and/or the Funds Relevant to the January 2016 Transfers, to receive more they would receive if: (a) the Debtor's Bankruptcy Case was administered under chapter 7 of the Bankruptcy Code; (b) the Subordinated Debt Transfers and the January 2016 Transfers had not been made; and (c) AMERRA, or the Funds Relevant to the Subordinated Debt Transfers and/or the Funds Relevant to the January 2016 Transfers, received transfers of such debt to the extent provided by the provisions of the Bankruptcy Code.

254.    AMERRA, or the Funds Relevant to the Subordinated Debt Transfers and/or the Funds Relevant to the January 2016 Transfers, were the transferees of the Subordinated Debt Transfers and the January 2016 Transfers that were made within one year of the Petition Date.

255.    The Subordinated Debt Transfers and the January 2016 Transfers, to the extent they are avoided pursuant to Bankruptcy Code § 547(b), may be recovered by Plaintiff pursuant to Bankruptcy Code § 550(a).

256.    As a result of the foregoing, pursuant to Bankruptcy Code §§ 547(b), 550(a) and 551, the Trustee is entitled to a judgment against AMERRA, or the Funds Relevant to the Subordinated Debt Transfers and/or the Funds Relevant to the January 2016 Transfers: (a) avoiding and preserving the Subordinated Debt Transfers and the January 2016 Transfers; (b) directing the Subordinated Debt Transfers and the January 2016 Transfers be set aside; and (c) recovering the Subordinated Debt Transfers and the January 2016 Transfers or the value thereof, for the benefit of the Estate.

## COUNT FIFTEEN
## DISALLOWANCE OF CLAIM PURSUANT TO 11 U.S.C. § 502(d)

257.    To the extent applicable, the Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

258.    As set forth in Counts One through Fourteen of the Complaint, AMERRA or the relevant AMERRA Funds, received transfers that are avoidable and recoverable by the Trustee for the benefit of the Estate (the "Transfers").

259.    Accordingly, to the extent that the Transfers are required to be paid to the Trustee, the Claim is subject to mandatory disallowance pursuant to Section 502(d) of the Bankruptcy Code, unless and until the Transfers are paid or turned over to the Trustee.

**RESERVATION OF RIGHTS**

260.     During the course of this proceeding, Plaintiff may learn (through discovery or otherwise) of additional transfers of the Debtor in property made directly or indirectly to the Defendants that may be avoidable and/or recoverable under Bankruptcy Code 544(b), 547(b), 548(a), 550(a), and 551 and DCL §§ 273, 274, 275, 276, 276-a, 278 and/or 279, including any transfers of an interest of the Debtor in property made to the Defendants during the two years preceding the Petition Date.  It is Plaintiff's intention to avoid and recover all such transfers made by the Debtor.  Plaintiff reserves the right to amend this original complaint to include: (i) further information regarding the Transfer(s); (ii) additional transfers; (iii) modifications of and/or revision to Defendants' names; (iv) additional defendants; and/or (v) additional causes of action (collectively, the "Amendments"), that may become known to Plaintiff at any time during this adversary proceeding, through formal discovery or otherwise, and for the Amendments to relate back to this original complaint.

**WHEREFORE,** the Trustee as plaintiff respectfully requests entry of judgment for the Trustee and against the Defendants, as follows:

(a)     On Count One, pursuant to sections 548(a)(1)(A), 550(a) and 551 of the Bankruptcy Code, a judgment against AMERRA, or the Funds Relevant to the $8.4 Million Transfer and/or the Funds Relevant to the January 2016 Transfers: (a) avoiding and preserving the $8.4 Million Transfer and the Fee Payment; (b) directing that the $8.4 Million Transfer and the Fee Payment be set aside; and (c) recovering the $8.4 Million Transfer and the Fee Payment, or the values thereof, from AMERRA, or the Funds Relevant to the $8.4 Million Transfer and/or Funds Relevant to the January 2016 Transfers, for the benefit of the Estate;

44

(b)      On Count Two, pursuant to sections 548(a)(1)(B), 550(a) and 551 of the
Bankruptcy Code, a judgment against AMERRA or the Funds Relevant to the $8.4 Million
Transfer and/or the Funds Relevant to the January 2016 Transfers: (a) avoiding and preserving
the $8.4 Million Transfer and the Fee Payment; (b) directing that the $8.4 Million Transfer and
the Fee Payment be set aside; and (c) recovering the $8.4 Million Transfer and the Fee Payment,
or the values thereof, from AMERRA, or the $8.4 Million Transfer and/or the Funds Relevant to
the January 2016 Transfers, for the benefit of the Estate;

(c)      On Count Three, pursuant to DCL sections 276, 276-a, 278 and/or 279, sections
544(b), 550(a) and 551 of the Bankruptcy Code, a judgment against AMERRA or the Funds
Relevant to the $8.4 Million Transfer and/or Funds Relevant to the January 2016 Transfers: (a)
avoiding and preserving the $8.4 Million Transfer and the Fee Payment; (b) directing that the
$8.4 Million Transfer and the Fee Payment be set aside; (c) recovering the $8.4 Million Transfer
and the Fee Payment, or the values thereof, from AMERRA, or the Funds Relevant to the $8.4
Million Transfer and/or Funds Relevant to the January 2016 Transfers, and (d) recovering
attorneys' fees from AMERRA or the Funds Relevant to the $8.4 Million Transfer and/or Funds
Relevant to the January 2016 Transfers, for the benefit of the Estate;

(d)      On Count Four, pursuant to DCL sections 273, 278 and/or 279, sections 544(b),
550(a) and 551 of the Bankruptcy Code, a judgment against AMERRA or the Funds Relevant to
the $8.4 Million Transfer and/or Funds Relevant to the January 2016 Transfers: (a) avoiding and
preserving the $8.4 Million Transfer and the Fee Payment; (b) directing that the $8.4 Million
Transfer and the Fee Payment be set aside; and (c) recovering the $8.4 Million Transfer and the
Fee Payment, or the values thereof, from AMERRA, or the Funds Relevant to the $8.4 Million
Transfer and/or Funds Relevant to the January 2016 Transfers, for the benefit of the Estate;

(e)        On Count Five, pursuant to DCL sections 274, 278 and/or 279, sections 544(b), 550(a) and 551 of the Bankruptcy Code, a judgment against AMERRA or the Funds Relevant to the $8.4 Million Transfer and/or Funds Relevant to the January 2016 Transfers: (a) avoiding and preserving the $8.4 Million Transfer and the Fee Payment; (b) directing that the $8.4 Million Transfer and the Fee Payment be set aside; and (c) recovering the $8.4 Million Transfer and the Fee Payment, or the values thereof, from AMERRA, or the Funds Relevant to the $8.4 Million Transfer and/or Funds Relevant to the January 2016 Transfers, for the benefit of the Estate;

(f)        On Count Six, pursuant to DCL sections 275, 278 and/or 279, sections 544(b), 550(a) and 551 of the Bankruptcy Code, a judgment against AMERRA or the Funds Relevant to the $8.4 Million Transfer and/or Funds Relevant to the January 2016 Transfers: (a) avoiding and preserving the $8.4 Million Transfer and the Fee Payment; (b) directing that the $8.4 Million Transfer and the Fee Payment be set aside; and (c) recovering the $8.4 Million Transfer and the Fee Payment, or the values thereof, from AMERRA, or the Funds Relevant to the $8.4 Million Transfer and/or Funds Relevant to the January 2016 Transfers, for the benefit of the Estate;

(g)        On Count Seven, pursuant to sections 548(a)(1)(A), 550(a) and 551 of the Bankruptcy Code, a judgment against Euromar LLC: (a) avoiding and preserving the $28 Million Transfers and the Additional Transfers; (b) directing that the $28 Million Transfers and the Additional Transfers be set aside; and (c) recovering the $28 Million Transfers and the Additional Transfers, or the values thereof, from Euromar LLC for the benefit of the Estate;

(h)        On Count Eight, pursuant to sections 548(a)(1)(B), 550(a) and 551 of the Bankruptcy Code, a judgment against Euromar LLC: (a) avoiding and preserving the $28 Million Transfers and the Additional Transfers; (b) directing that the $28 Million Transfers and the

Additional Transfers be set aside; and (c) recovering the $28 Million Transfers and the Additional Transfers, or the values thereof, from Euromar LLC for the benefit of the Estate;

(i)    On Count Nine, pursuant to DCL sections 276, 276-a, 278 and/or 279, sections 544(b), 550(a) and 551 of the Bankruptcy Code, a judgment against Euromar LLC: (a) avoiding and preserving the $28 Million Transfers and the Additional Transfers; (b) directing that the $28 Million Transfers and the Additional Transfers be set aside; and (c) recovering the $28 Million Transfers and the Additional Transfers, or the values thereof, from Euromar LLC; and (d) recovering attorneys' fees from Euromar LLC for the benefit of the Estate;

(j)    On Count Ten, pursuant to DCL sections 273, 278 and/or 279, sections 544(b), 550(a) and 551 of the Bankruptcy Code, a judgment against Euromar LLC: (a) avoiding and preserving the $28 Million Transfers and the Additional Transfers; (b) directing that the $28 Million Transfers and the Additional Transfers be set aside; and (c) recovering the $28 Million Transfers and the Additional Transfers, or the values thereof, from Euromar LLC for the benefit of the Estate;

(k)    On Count Eleven, pursuant to DCL sections 274, 278 and/or 279, sections 544(b), 550(a) and 551 of the Bankruptcy Code, a judgment against Euromar LLC: (a) avoiding and preserving the $28 Million Transfers and the Additional Transfers; (b) directing that the $28 Million Transfers and the Additional Transfers be set aside; and (c) recovering the $28 Million Transfers and the Additional Transfers, or the values thereof, from Euromar LLC for the benefit of the Estate;

(l)    On Count Twelve, pursuant to DCL sections 275, 278 and/or 279, sections 544(b), 550(a) and 551 of the Bankruptcy Code, a judgment against Euromar LLC: (a) avoiding and preserving the $28 Million Transfers and the Additional Transfers; (b) directing that the $28

Million Transfers and the Additional Transfers be set aside; and (c) recovering the $28 Million Transfers and the Additional Transfers, or the values thereof, from Euromar LLC for the benefit of the Estate;

(m)    On Count Thirteen, as a result of the avoidance of the $28 Million Transfers and the Additional Transfers pursuant to Counts Seven through Twelve, a judgment against AMERRA or the Funds Relevant to the $28 Million Transfers and/or the Funds Relevant to the Additional Transfers: (a) recovering the $28 Million Transfers and the Additional Transfers, or the value thereof, from AMERRA or the Funds Relevant to the $28 Million Transfers and/or the Funds Relevant to the Additional Transfers and (b) recovering attorneys' fees from AMERRA or the Funds Relevant to the $28 Million Transfers and/or the Funds Relevant to the Additional Transfers for the benefit of the Estate;

(n)    On Count Fourteen, pursuant to Bankruptcy Code §§ 547(b), 550 and 551, a judgment against AMERRA, or the Funds Relevant to the Subordinated Debt Transfers and/or the Funds Relevant to the January 2016 Transfers: (a) avoiding and preserving the Subordinated Debt Transfers and the January 2016 Transfers; (b) directing the Subordinated Debt Transfers and the January 2016 Transfers be set aside, and (c) recovering the Subordinated Debt Transfers and the January 2016 Transfers or the value thereof, for the benefit of the Estate;

(o)    On Count Fifteen, pursuant to Section 502(d) of the Bankruptcy Code, disallowing the Claim unless and until the Transfers are paid or turned over to the Trustee;

(p)    On all Counts, pursuant to federal common law and N.Y. CPLR 5001 and 5004, awarding Plaintiff pre-judgment interest at the maximum legal rate running from the date of the Transfers to the date of judgment herein;

(q)    On all Counts, pursuant to federal common law and N.Y. CPLR 5003 and 5004,

48

awarding post-judgment interest at the maximum legal rate running from the date of judgment herein until the date the judgment is paid in full, plus costs;

      (r)     Awarding to Plaintiff the costs and disbursements of this action; and

      (s)     Granting such other and further relief as this Court deems just and proper.


Dated: New York, New York     Respectfully submitted,
       December 21, 2018

                    WINDELS MARX LANE & MITTENDORF, LLP
                    *Attorneys for Alan Nisselson, Chapter 7 Trustee*


            By:    */s/ Howard L. Simon*
                  Howard L. Simon (hsimon@windelsmarx.com)
                  156 West 56th Street
                  New York, New York 10019
                  Tel. (212) 237-1000 / Fax (212) 262-1215